# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF GEORGIA
# GAINESVILLE DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | CRIMINAL ACTION NO. |
| | : | 2:02-CR-38-RWS-SSC |
| WILLIAM EMMETT LECROY, JR., | : | |
| | : | |
| Defendant. | : | |
| | : | |
| WILLIAM EMMETT LECROY, JR., | : | |
| | : | |
| Petitioner, | : | CIVIL ACTION NO. |
| | : | 2:08-CV-2277-RWS |
| v. | : | |
| | : | Prisoner Habeas Petition |
| UNITED STATES OF AMERICA, | : | 28 U.S.C. § 2255 |
| | : | |
| Respondent. | | |

## **ORDER**

This case comes before the Court on Defendant LeCroy's Motion to Vacate, Set Aside, or Correct Sentence under 28 U.S.C. § 2255 [493].  After a review of the record, the Court enters the following order.

AO 72A
(Rev.8/82)

## A. Relevant Factual and Procedural Background[1]

Mr. LeCroy is on death row for the murder of Joann Tiesler in October 2001, but events that occurred well before her death are relevant to this case.[2] We begin in 1989, when LeCroy was 19 years of age. After leaving the Army, LeCroy spent time at the home of his mother and stepfather, Donna and Sam Houston. Houston had two daughters, one of whom, Alecia, was 13 years old and lived with her father. LeCroy and Alecia began a sexual relationship that the parents discovered in January of 1990. Alecia's mother—Sam Houston's former wife—urged the authorities to prosecute LeCroy for statutory rape.

Around the same time, Cobb County police were investigating a series of burglaries in a residential neighborhood occurring in late 1990 and early 1991, and Cobb County Detective Kevin Flynn identified LeCroy as a suspect. On March 3, 1991, LeCroy was arrested following a traffic stop. In his car police found a holster and gun and several hand-written notes. One of the notes described a plan to "rob cars and kill people driving so the car can be used two or three days." Another listed steps to take in case of being chased, including "burglarize house," "flee and switch cars," "be ruthless and famous," and "rape rob and pillage [sic]." A third document had "H–L" written at the top and contained a list of

---

[1]As the Eleventh Circuit recently explained in Cooper v. Secretary, Department of Corrections, 646 F.3d 1328, 1331 (11th Cir. 2011), when a claim is made that counsel was ineffective for failing to investigate and present mitigation evidence at sentencing, the Court is to consider the "totality of the evidence before the judge and jury" at the initial sentencing in conjunction with the evidence presented at the evidentiary hearing to determine if the additional information "undermines [the Court's] confidence in [LeCroy's] sentence of death." Id. To carry out this goal, the Court will summarize the evidence presented at sentencing and the evidence presented at the evidentiary hearing.

[2]The Eleventh Circuit set out a factual summary of the crime in its direct appeal opinion. To avoid unnecessary duplication, that opinion is quoted here.

2

names; authorities contended this was a "hit list" of people LeCroy wanted to kill.

The investigation and evidence discovered in LeCroy's car resulted in multiple state charges, and authorities decided to simultaneously prosecute LeCroy for his relationship with Sam Houston's daughter and for burglary. In August of 1991, LeCroy was sent to prison in Georgia for aggravated assault, burglary, child molestation, and statutory rape. As he was serving his sentence for those crimes, he was charged and convicted under federal law of possession of a sawed-off shotgun, an item he had obtained during one of the burglaries. He served an additional five years in prison, this time in a federal facility.

LeCroy was released from federal custody in August 2001. Upon his release, he began serving a three-year term of supervised probation and moved into the home of his mother and stepfather, Mr. Houston, on Cherry Log Mountain in Gilmer County, Georgia.

As a condition of his supervised release, and because of his prior convictions for statutory rape and aggravated child molestation, LeCroy was ordered to undergo a psychosexual evaluation in September of 2001. LeCroy prematurely left the evaluation, and only agreed to return to submit to the testing after being warned by his probation officer that he risked being sent back to prison if he refused again. The evaluation was rescheduled for October 22, 2001. The government argues that despite agreeing to be retested, LeCroy had decided to flee.

In the weeks preceding Ms. Tiesler's death, LeCroy's stepfather was growing concerned about his stepson's behavior. Mr. Houston testified that LeCroy spent a great deal of time on the computer, rarely leaving his bedroom. Later investigation of the computer showed that it had been used to search for survival gear, and to scan and copy Mr. Houston's passport. On the back of the letter scheduling his original psychosexual evaluation, which was later

3

found by police, LeCroy wrote out a "need to acquire" list of items he intended to collect. These included binoculars, boots, gloves, guns, ammunition, and food and water.

On Friday, October 5, Donna and Sam Houston left LeCroy alone at the Cherry Log cabin, informing him that they would be gone until the night of October 8. This was the first time since his release from prison that Mr. LeCroy was left alone at the home. A series of robberies on Cherry Log Mountain occurred over the weekend of October 5-7, 2001, including the theft of medical supplies, a shotgun, and ammunition from homes in the neighborhood. Several weeks before Ms. Tiesler was killed, LeCroy purchased camouflage makeup and plastic cable ties. The government contends that the purchases and the robberies were part of LeCroy's plan to collect the items from his need to acquire list and flee the country.

It is undisputed that at some point on the evening of Sunday, October 7, LeCroy broke into the home of Joann Tiesler, who lived in the same neighborhood as LeCroy's stepfather. Entering through a bedroom window that overlooked a porch, LeCroy took steps to return the open blinds of the window to their original position so that it would look undisturbed from the outside. At the time of the break-in, LeCroy was armed with a loaded shotgun, a knife, and plastic cable ties.

Ms. Tiesler had spent the weekend in Rome, Georgia at the house of her fiancé. Around 5:40 pm on October 7, Tiesler was seen driving up the mountain toward her cabin. She entered her home and placed her purse on an island in the kitchen. Soon after that LeCroy attacked her, striking her in the back of the head with the shotgun and discharging it in the hallway outside her bedroom. He bound her hands behind her back with cable ties and strangled her with an electrical cord. Still alive, Ms. Tiesler was stripped of her underwear and forced to kneel at the foot of her bed, where she

4

was raped and then anally sodomized. Semen found in Tiesler's body was identified as that of LeCroy.

After raping her, LeCroy slashed Tiesler's throat with the knife. Doctors determined that this was likely the fatal wound, as the knife severed the external jugular vein, right internal jugular vein, and right carotid artery, penetrating down to Tiesler's cervical vertebrae. Finally, LeCroy stabbed Tiesler five times in the back and wiped his knife off on her shirt. She was left naked and bound on her bed, and was discovered the next day by a co-worker and a real estate agent.

After killing Ms. Tiesler, LeCroy took her keys and her car, a Ford Explorer, loaded it up with some supplies, and headed for Canada. Two days later, on Tuesday, October 9, 2001, LeCroy was captured at the border between Minnesota and Canada driving Ms. Tiesler's vehicle. Inside police found a knife stained with Tiesler's blood; a map with writing on the back;[3] a separate written note;[4] and plastic cable ties like those LeCroy used to tie up Ms. Tiesler. Police also discovered two unspent shotgun shells, boots, food, water, ammunition, gloves, and other items from LeCroy's need to acquire list.

LeCroy was indicted in the United States District Court for the Northern District of Georgia on May 15, 2002 for taking a motor vehicle by force, violence, and intimidation from Joann Tiesler resulting in her death, in violation of 18 U.S.C. § 2119(3). A superseding indictment added special death-eligibility allegations subsequently found by the grand jury on August 13, 2002.

---

[3]The writing on the map said: "Please please please forgive me Joanne [sic]. You were an angel and I killed you. Now I have to live with that and I can never go home. I am a vagabond and doomed to hell."

[4]The note said: "Please call the police and report this vehicle as stolen. Thanks, The Thief."

AO 72A
(Rev.8/82)

United States v. LeCroy, 441 F.3d 914, 918-20 (11th Cir. 2006).

Shortly following the initial indictment, Federal Defender Program, Inc. attorneys Paul Kish,[5] Stephanie Kearns,[6] and Brian Mendelsohn[7] were appointed to represent LeCroy. Dkt. No. [5]. Soon after, private attorney Daniel Summer[8] was also appointed via a CJA appointment. Dkt. No. [7].

---

[5]Paul Kish began practicing law in 1982. He first "clerked for a couple of federal judges," was briefly an associate at the former Powell Goldstein firm, and, in 1985, started with the Federal Defender Program where he remained until 2006. At the time of trial, Kish was the Deputy Director of the Federal Defender Program. He has "always done criminal defense work." Evidentiary Hearing Transcript ("EHT"), Dkt. No. [534] at 11:15-23, 14:12-13.

[6]Stephanie Kearns received her law degree from Emory University in 1975. Since then, Ms. Kearns has always specialized in federal court criminal defense work, and for the last twenty-five years she has served as the Executive Director of the Federal Defender Program–a post she held while representing LeCroy. Prior to the LeCroy case, Ms. Kearns had handled one other federal, death-penalty case. EHT, Dkt. No. [534] at 84:24-85:22.

[7] Brian Mendelsohn obtained his law degree from Columbia University in 1990 and immediately began to work at the Georgia Resource Center, a "community defender organization jointly funded by the state and federal governments to provide post-conviction representation to death row inmates in the State of Georgia." EHT, Dkt. No. [534] at 152:14-24. In 1995, Mendelsohn moved to the Federal Defender Program where he now works representing indigent clients charged with federal offenses and doing "capital post-conviction work." Id. at 152:10-12.

[8]Daniel is a local Gainesville attorney with substantial criminal law experience, including the trial of a death penalty case in state court. Kearns stated that Summers was appointed as "second learned counsel." EHT, Dkt. No. [534] at 86:1-2. All agree that Summers was primarily to serve as "local counsel" for the Gainesville trial and to work on the juror-wheel issue. As a Gainesville, Georgia attorney, Summers better understood

6

Counsel agreed that while all would work together on all issues prior to trial, during trial Kish and Summer would focus on the guilt/innocence portion of the case, and Kearns and Mendelsohn would primarily be responsible for sentencing. EHT, Dkt. No. [534] at 12:19-13:3, 13:21-24.

1. Jury Underrepresentation Challenge

On June 12, 2002, Defendant filed a Motion to Stay Proceedings (Petit Jury Challenge) in which he challenged the petit jury composition and selection process of the Northern District of Georgia, in the Gainesville Division, pursuant to the Jury Service and Selection Act of 1968, 28 U.S.C. § 1861 *et seq.* ("JSSA") and the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution. Dkt. No. [12]. On the same date, Defendant also filed a Motion to Stay Proceedings and/or Motion to Dismiss Indictment (Grand Jury Challenge), in which he challenged the grand jury composition and selection process on the same grounds stated in his petit jury challenge. Dkt. No. [13]. Defendant argued in both motions that the Northern District of Georgia's method of selecting persons for the master jury wheel from which the prospective grand and petit jurors are drawn, in particular the sole reliance on voter registration lists, results

---

the significance of juror's answers in *voir dire* (i.e., the significance of the church each juror attended, etc.) and any other local matters. Id. at 87:5-9.

7

in a substantial underrepresentation of African-Americans and persons of Hispanic origin in the jury wheel, and thus deprived Defendant of his due process rights, in violation of the Fifth and Fourteenth Amendments, and of his right to a fair cross-section of the community, in violation of the JSSA and the Sixth Amendments. He requested in both motions "that the Court set down a hearing on this Motion . . . and after receiving evidence thereon that the Court stay the proceedings in this case until such time as a plan is properly devised which fulfills the mandate a fair cross-section of the community be represented in the [petit jury and grand jury] pursuant to Title 18 28 U.S.C. § 1861 and the Sixth Amendment to the United States Constitution." He attached to both motions a copy of the 2002 "Amended Plan for the United States District Court for the Northern District of Georgia for the Random Selection of Grand and Petit Jurors" and the JS-12 reports for the 2001 master jury wheel for the four divisions of the Northern District.

The Court directed Defendant to perfect those motions, see Dkt. No. [19], and on August 23, 2002, Defendant filed a "Proffer in Support of Petit Jury Challenge and Motion to Stay Proceedings and Motion to Dismiss Indictment Based on Grand Jury Challenge." Dkt. No. [35]. In that filing, Defendant

AO 72A
(Rev.8/82)

argued that the proper comparison for establishing a *prima facie* case of underrepresentation is between the allegedly underrepresented-persons percentage included in the court's jury wheel for the Northern District and for the Gainesville Division (by sample) and the underrepresented-persons percentage in the total population (as opposed to population of eligible jurors) for the Northern District and the Gainesville Division. Id. at 8-11. He argued further that the "comparative disparity" method of comparison, rather than the "absolute disparity" method, is the proper method of comparing these percentages.[9] Id. at 12-14. Finally, he argued that he could establish that the underrepresentation of certain groups from the jury pool resulted from systemic exclusion. Id. at 14-15. Defendant filed a supplement to that proffer to which he attached the affidavits of Jeffrey O'Neal Martin and Stephanie Bohan, Ph.D.[10]

---

[9] These methods are discussed in greater detail *infra*.

[10] Mr. Martin is employed as a consultant on jury pool analysis. He holds a Bachelor's degree in Mathematics and Economics from Vanderbilt University and a Master's degree in Economics from the University of Chicago. Dr. Bohon is an assistant professor of Sociology at the University of Georgia, an affiliate with the Institute for Behavioral Research at the University of Georgia, and a research associate with the Southern Poverty Research Center at the University of Alabama. She holds a Bachelor's degree in Economics and Political Science from the College of Idaho, a Master's degree in Sociology from Bowling Green State University, and a Doctorate in Demography and Sociology from Penn State University. Martin Aff. at ¶ 1; Bohon Aff. at ¶ 1.

9

Dkt. No. [36].[11]

In his Affidavit, Mr. Martin found that there are problems with the Court's reliance on registered voters as the sole source of jurors, i.e., the "jury wheels, as constructed, exclude eligible non-voters." Martin Aff. at ¶ 6. Mr. Martin also opined that: "[t]o show that a jury selection plan is systematically excluding certain persons, one can compare the group from which jurors are selected with what the population as a whole looks like"; that, while many courts use absolute disparity (i.e. "the percentage of a group on a jury wheel less the percentage of that same group in the population") of 10% as a cut-off point for jury selection challenges, this method is misleading "for any distinct and cognizable group that is less than 10% of the population"; and that comparative disparity, i.e. "the rate at which a group is represented," is the more appropriate measure to use for a group comprising less than ten percent of a given population. Martin Aff. at ¶¶ 7-10. His Affidavit included a table showing the absolute and comparative disparities for Whites, African-

---

[11] In his proffer supplement, Defendant also argued "that the current jury selection system also violates the International Convention on the Elimination of All Forms of Racial Discrimination" and requested that "the Court dismiss the indictment in this case because it was returned by a grand jury that is constituted in violation of the international treaty obligations of the United States." Dkt. No. [36] at 1.

10

Americans, and Hispanics/Latinos in the Gainesville Division and for the combined divisions of the Northern District of Georgia. Martin Aff. at ¶ 11. Specifically, with respect to the comparison of the population of age 18 and over Hispanic/Latinos according to the 2000 Census with the population of Hispanic/Latinos in the sample of the qualified jury wheel, Mr. Martin found that there was a -6.08 percent absolute disparity in the Gainesville Division; an absolute disparity of -5.33 percent in the Northern District as a whole; a comparative disparity of -90.75 percent in the Gainesville Division; and a comparative disparity of -84.07 percent in the Northern District. Id. Mr. Martin further opined that "[b]ased on 1) the undercount in the Census, and 2) the problems of using inactive voters as part of the class, there is reason to believe that the absolute disparity of both African-Americans and Hispanic/Latinos is over 10% in either the Gainesville Division, or in the Northern District as a whole." Martin Aff. at ¶ 16. He concluded that "the jury selection Plan in the Northern District of Georgia: 1) systematically excludes virtually all members of the Hispanic/Latino class, 2) significantly under-represents African-Americans, and 3) consistently over-represents Whites." Id. In her Affidavit, Dr. Bohon provided several opinions consistent with Mr. Martin's concerning

11

AO 72A
(Rev.8/82)

the underrepresentation of African-Americans and Hispanic/Latinos in the Northern District's jury selection plan, preference for the comparative disparity method of analysis, and criticism of relying on voter registration records as the sole source of jurors in the Northern District. See Bohan Aff. at ¶¶ 5, 8-16.

In a Report and Recommendation signed October 27, 2003 [190], United States Magistrate Susan S. Cole recommended that Defendant's motions to stay proceedings and to dismiss the indictment [12, 13] be denied. Judge Cole found that Defendant had not shown a *prima facie* case of underrepresentation of African-Americans or Hispanics in the qualified jury wheel because, according to Defendant's witness, Mr. Martin, there was less than a 10 percent absolute disparity between the percentage of African-Americans or Hispanics in the qualified jury wheel (by sample) and the percentage of African-Americans or Hispanics age 18 and over in the general population according to the 2000 Census. Id. at 11-14. Therefore, Defendant had not met his burden under relevant Eleventh Circuit authority. Id. Judge Cole rejected Defendant's argument that comparison should be made with the total over-18 population of the distinctive group at large, but instead, found that the proper comparison is with the percentage of the relevant group's juror-eligible persons, noting that

12

there are several factors which affect a person's eligibility to serve on a jury, including, among other things, citizenship and an ability to speak English. Id. at 18-19 & n.11. However, according to Judge Cole, even if Defendant had "used the appropriate populations, i.e., jury-eligible Hispanics and African-Americans, his showing would be even more deficient," id. at 20, presumably because the disparities between those populations and the samples in the court's jury wheel would be even smaller. Judge Cole further found that even if the total population figures are the proper figures to use for the comparison, Defendant's experts had provided only "estimates and speculation" that an absolute disparity comparison yielded a greater than 10 percent disparity due to the alleged undercount of Hispanics in the Census. Id. at 19-20. Finally, Judge Cole found that reliance on the absolute disparity method of comparison, rather than the comparative disparity, is the more appropriate method of analysis. Id. at 20-22.

Defendant filed objections to that Report and Recommendation. Dkt. No. [216]. By Order signed January 13, 2004, the District Court adopted the Report and Recommendation as the Order of the Court. Dkt. No. [291].

AO 72A
(Rev.8/82)

2. Evidence Seized in 1991

On March 3, 1991, Officer Rodney Simmons of the Cobb County Police Department effectuated a traffic stop of Defendant in response to a "lookout" for Defendant and the vehicle he was driving, as Defendant was suspected of being involved in several burglaries. See Dkt. No. [158] at 2-4. During the stop, Officer Simmons retrieved a handgun from Defendant's vehicle, and the vehicle was impounded and searched as part of an inventory. Id. at 5-6. Among the items found in the vehicle were a sawed-off shotgun with obliterated serial number, ammunition, a bag, black and camouflage clothing, "commando paraphernalia," knives, tools and some papers with "handwritten notes on them which made reference to apparent plans to commit crimes such as armed robbery, burglary, rape, killing police officers, and killing a person identified as 'J' to take that person's car" and references to "C.C.P.O" and "C.C.P.D." Id. at 6. Cobb County Detective Kevin Flynn, who was investigating the burglaries, took the writings as evidence, placed them in his case file, and later questioned Defendant about them. Id. at 7.

Defendant was then charged in the United States District Court for the Northern District of Georgia with possession of a firearm, i.e. the shotgun,

14

which had the serial number obliterated and knowing receipt and possession of an unregistered firearm. See Dkt. No. [1], No. 1:93-CR-97-ODE. Defendant filed a motion to suppress in that case, seeking to suppress the shotgun. However, he did not seek to suppress the seizure of other evidence, including the writings seized on March 3, 1991.  See Dkt. Nos. [9, 18], No. 1:93-CR-087-ODE . The court denied Defendant's motion to suppress, finding that Officer Simmons lawfully stopped, detained, and arrested Defendant and lawfully searched his vehicle without a warrant and seized the shotgun. See Dkt. Nos. [18, 24], No. 1:93-CR-97-ODE.[12]

In the instant case, on September 30, 2002, Defendant filed a motion to suppress evidence seized and statements made following the March 3, 1991 traffic stop. Dkt. No. [57]; see also Dkt. No. [83]. Defendant argued that the evidence seized during the inventory search should be suppressed because: 1) the search was not conducted pursuant to the Cobb County Police Department's written inventory policy; 2) Detective Flynn conducted the inventory search as a subterfuge to discover incriminating evidence; and 3) with respect to the

---

[12] Copies of the Magistrate Judge's Report and Recommendation and the District Judge's adoption of that Report and Recommendation are attached to the Government's response to Defendant's motion to suppress filed in this case. See Dkt. No. [82].

15

writings, Flynn exceeded the permissible scope of the inventory search by inspecting the writings found inside the vehicle, and the seizure of the writings was unauthorized because they were not evidence of burglaries. Dkt. No. [83] at 7-13. The court conducted a hearing on the motion, see Dkt. Nos. [74, 80], and by Report and Recommendation dated September 3, 2003, Magistrate Judge Susan S. Cole recommended that Defendant's motion be denied. Dkt. No. [158]. Judge Cole found that "the inventory of Defendant's car was conducted pursuant to standardized procedures designed to produce an inventory and not for the sole purpose of investigation." Id. at 12. She found further that "Detective Flynn was authorized to examine Defendant's papers, including unfolding one of the notes, in order to determine whether the papers were items of value to be included on the inventory," and that "Detective Flynn immediately recognized the evidentiary value of the writings during the inventory search, and he seized the writings as evidence." Id. at 15.

Defendant filed objections to that Report and Recommendation, Dkt. No. [163], and on December 2, 2003, the undersigned adopted the recommendation as the Order of the Court and denied Defendant's motion to suppress. Dkt. No. [248].

16

AO 72A
(Rev.8/82)

3. Mental Evaluation of LeCroy

On March 27, 2003, defense counsel hired Dr. Michael C. Hilton, M.D.

to conduct a forensic psychiatry evaluation on LeCroy. Hilton Reports, EHT

Gov't Exs. 50-52. The three-part report first revealed that LeCroy was

competent and could not present an affirmative defense of not guilty by reason

of insanity. Hilton Report 1, EHT Gov't Ex. 50 at 2; Hilton Report 2, EHT

Gov't Ex. 51 at 2. The third portion of the report was a seventeen-page

document which summarized LeCroy's diagnoses, any information which Dr.

Hilton used to make those diagnoses, as well as any additional professional

observations. Hilton Report 3, EHT Gov't Ex. 52.

Relevant here, Dr. Hilton's report first described LeCroy's family history

and his extended family's propensity for "psychiatric problems." Id. at 2.

Growing up, LeCroy's father–Bill, Sr.–was a controlling, verbally abusive man

whom "no one was ever close to," and his mother was, in LeCroy's opinion, a

"loving, gentle, timid woman" to whom LeCroy was always close. Id. at 3. His

parents had a very poor marriage marked by frequent arguing. Id. A year after

his parents divorced, his mother married Sam Houston, his father's former

17

AO 72A
(Rev.8/82)

police partner–a fact which LeCroy viewed as an act of betrayal by Houston against his father. Id.

LeCroy grew up feeling very alienated and alone. Id. He received frequent criticism and ridicule from his father, and his mother demanded that he do well in school. As a result, LeCroy never felt that he could talk to his parents about his problems. Id.

At the age of eight, LeCroy had his first sexual encounter with his female babysitter–a woman called "Tinkerbell." At first, LeCroy and his brother played a "kissing game" with her where they would run up to Tinkerbell, kiss her, and then run away. However one night, after he and his brother were put to bed, Tinkerbell came into LeCroy's room and told him that if he was going to kiss a girl, he needed to "know how to do it right." Id. at 5. She then started to french kiss him, taking off his clothes and her shirt, and then performed oral sex on him and had him to fondle her breasts. A week later, again after putting the children to bed, Tinkerbell molested LeCroy. She undressed both of them and sat down, pulling his genitals next to hers in what may or may not have been intercourse. Id.

18

The day after the second occurrence, LeCroy started up the stairs to visit Tinkerbell as she lived in the apartment above his family. However, before he could get to her door, he saw Tinkerbell coming down the stairs arm-in-arm with her boyfriend. She gave LeCroy a big "malevolent" smile; he felt betrayed. His family moved a week later and he never saw Tinkerbell again. LeCroy never told anyone in his family that the abuse occurred. Id.

When he was twelve, LeCroy's cousin Russ showed him how to masturbate and subsequently asked LeCroy to participate in Russ' masturbatory acts by "whipping Russ with a folded belt across his penis while he was masturbating." Id. at 5. On a separate occasion, Russ asked LeCroy to tie him down and spank Russ' penis while Russ masturbated. This time, though, his grandmother and aunt caught them, punished them, and told them never to do it again. Id.

At seventeen, LeCroy joined the Army. He soon went AWOL and began breaking into homes to provide for himself. Id. at 7. At some point, he was eventually arrested for cocaine possession and for going AWOL. The Army gave him the option to remain in the service or take a general discharge; he selected the general discharge. Id.

19

At nineteen, LeCroy had his only serious girlfriend whom he dated for ten months. Id. at 6. Their relationship ended after his girlfriend obtained an abortion. LeCroy felt guilty over the abortion, and the relationship was unable to survive. Id.

Within that same year, LeCroy had two sexual encounters with his fourteen-year-old step sister, Alecia. She initiated the encounters, but following her mother finding a note she had written about the incident, the authorities were called, and LeCroy was arrested. Id.

At the same time, LeCroy was also prosecuted for a string of burglaries which he had been conducting. Id. at 7. He initially started stealing when his father suggested that LeCroy rob his father's poker game. Soon after, he began stealing from homes to support himself. Id. He was convicted on these charges and spent ten years in state and federal prisons. Id.

After summarizing LeCroy's life, Dr. Hilton then described what LeCroy told him about the offense and Dr. Hilton's conclusions. This report is so crucial to the Court's decision that the relevant portions will be reprinted in full here:

> **HISTORY OF THE PRESENT OFFENSE**: Mr. LeCroy was
> released from Federal prison in late August 2001. He moved in

20

AO 72A
(Rev.8/82)

with his mother and stepfather in [B]lue Ridge, Georgia. He was working with his father in Marietta and traveling back and forth by motorcycle from his mother's home in Blue Ridge to work in Marietta. Every day, he would drive by Joanne Tiesler's (victim's) home, and occasionally he would see her in the yard. They would usually both have a friendly wave for one another. In early October 2001, Mr. LeCroy was traveling to a spot in the woods, where he had a hidden stash of survival gear out of concerns that the government would look for a way to put him back in prison, and he did not want to return to prison. His thoughts were that when the government came after him, he would get his survival gear and move out into the woods. On this date in early October 2001, Mr. LeCroy was traveling to his hidden spot, and as he drove by Ms. Tiesler's house, she was in the yard. He waved, but she did not wave. He did not think too much about it; he went on to his hiding spot. He had a couple of shirts to put in his survival pack. As he was walking to his spot, he heard a car traveling on gravel. He turned around and saw Ms. Tiesler driving toward him in her SUV. As she approached him, she stopped her vehicle, looked out her half-open driver's side window and said, "Huh!" She then turned her vehicle around and left. Mr. LeCroy put his shirts in with his other survival gear and went home. The whole time, however, he continued to think about Ms. Tiesler, what had happened and why it had happened. He wondered what her intentions were. He did not think she would call the police, but he could no[t] figure out what she was thinking. The possibility of a sexual motive crossed his mind, and then he began wondering if Ms. Tiesler might actually be his babysitter (Tinkerbell) from over twenty years ago. In his mind, Tinkerbell had always been present with him, and now he wondered if Ms. Tiesler might actually be Tinkerbell. These thoughts led him to thinking about all the various problems he had in his life, including his relationship problems with women, his difficulties in being teased about being homosexual and the various difficulties he had had in general in his life. His mother and stepfather were gone for the weekend, and he had 'no one to talk to.' He said his thought about Ms. Tiesler and Tinkerbell continued

21

to consume him for a few days. He began thinking about how his future had been destroyed. He started turning to some of his religious teachings, particularly some of the teachings of Thomas Ledford, who was head of the Wicca (witchcraft) movement at Butner Federal Penitentiary. He also started thinking about his experience with Asutru, which he described as a magical religious system. By Friday (October 5, 2001), Mr. LeCroy had come to believe that Tinkerbell had placed a spell on him. Thomas Ledford had always said that sexual magic was the most powerful of all magic. Mr. LeCroy realized that he needed powerful magic to counteract this powerful sexual magic. He began to think that Tinkerbell needed to undo what she had done. He stayed up all Friday night and into Saturday morning, ruminating about his life, Tinkerbell, Ms. Tiesler[,] and the spell craft magic. On Saturday, he did an Internet search, looking for his therapist's telephone number. (While in Federal prison in Oklahoma, he had received therapy from Dr. Carlson.) He decided he wanted to speak with her, but the website that would allow him to track Dr. Carlson down required a credit card, and he did not have one. He realized he would have to deal with these issues on his own. He began to believe that Ms. Tiesler was indeed Tinkerbell. He also said as he began to think about Tinkerbell, he started having sexual urges. He went to several pornography sites. He started to develop a plan that he needed to reverse the roles on Tinkerbell and do to her what she had done to him. He thought about her all day Saturday and stayed up until 2:30 AM on Sunday. At that point, he decided that he "had to do it." He went to bed and got up the next day (October 7, 2001) at 10:00AM.

Mr. LeCroy got up and put on his black Army battle dress uniform. He put his stepfather's [] police badge on his uniform. He found his stepfather's high tech police boots on the front porch and put those on. He started heading out to Ms. Tiesler's cabin, but then realized he needed something to gain access to her cabin. He went back to the house and got a pry bar. He started out again and then realized he needed other supplies. He went back home and got his

AO 72A
(Rev.8/82)

fanny pack and started putting all sorts of stuff in it. He also realized he needed combat protection. He got plastic ties, duct tape, Gatorade[,] and Power bars. He looked around for a weapon, but all he could find were steak knives, and they did not seem adequate. His leatherman also did not seem adequate. He left out again for her cabin, one of five cabins in a row. He got to her cabin and broke in through the use of a tall ladder he found under her crawl space. Climbing up the back and getting onto her porch, he used a pry bar to get the screen off and then open the window. As he was getting into her cabin, he saw two cats inside and realized that he was in the right place. He said, "Cats and witches go together." Once in her cabin, which was empty, he again decided that he needed a more adequate weapon. He left her cabin and went to the cabin next door, which was also empty. He broke in, but found nothing of use. He left that cabin and went to the next cabin. He broke in and found some soup and a Coke. He had lunch and then left. He went to the next cabin. While on the porch, he found a sheathed knife with a lock blade. He took it and put it in his fanny pack. He decided it would be a good back-up weapon, but he also needed a gun. He broke into the last cabin, where he found an antique shotgun over the mantle. He looked around and found some associated 16-gauge shotgun shells and took them. He realized that one of the cabins he had been in earlier had a hacksaw in it. He took the shotgun and the shells and went back to the cabin to get the hacksaw. He sawed off the barrel of the shotgun. **At that point, he decided he was ready.**

Mr. LeCroy went back to Ms. Tiesler's house and went inside to wait for her. He then heard a car drive up. He became nervous. He looked out the window and saw that it was some of Ms. Tiesler's neighbors arriving at the cabin next door. He continued to wait and was quite nervous. He used her restroom. He urinated and defecated in the toilet. As he was coming out of the bathroom, he heard another vehicle coming. He went into her bedroom and could hear her approaching the cabin. As she came in, he saw her and struck her in the back of the head with the gun. The shotgun

AO 72A
(Rev.8/82)

accidentally discharged, shooting into the wall. She fell on the floor. He told her not to look at him. He also, however, had the collar of his combat uniform pulled up over the bottom part of his face and the back of the collar pulled up around the back of his head over the top of his head, so that only his eyes were exposed. He said the conversation was minimal. He told her several times, "You know what I want." She questioned him about the possibility of wanting money, and he told her he did not want her money. He used the plastic ties that he brought with him to tie her hand together. He then tied her legs together. As he started undoing her belt, she asked him, 'Is this what this is?' He did not say anything. She cooperated with him as he took her pants down. She stated only, 'Not on the floor.' Mr. LeCroy picked her up and put her on the side of the bed. He said his penis was too soft to penetrate her. He asked for some Vaseline. She told him where it was. He put some Vaseline on his penis and on her vagina. He was then able to penetrate her and immediately developed an erection. During the act, they were both silent. After he climaxed, he told her it was her turn to "undo it." She questioned him about what he meant. He told her she knew. They argued a little bit. He told her, "I'm getting pissed off." She was trying to appease him, but was not complying with his demands. He did not know what she had done the first time (when he was a child). He put a new shotgun shell in his shotgun and threatened her, yet she still did not comply. He then found a cord from a carbon monoxide monitor and looped it around her neck. He told her to "do it or else," but she did not know what to do. He started choking her to the point that she could not breathe. She started gasping. She grabbed at his pants legs. He heard her start to urinate and defecate on herself. He then let go of the cord and said, "That's it." He told her, "You can do it or I'll do it." At that time, she was only making mumbling sounds. He pulled his knife out of its sheath, grabbed her head by her hair from behind, pulled her head back and cut her throat as hard as he could. She went limp immediately, but he could still hear breathing sounds. He became frustrated that she would not die. He started to think, "I can't kill this woman." He walked out of the bedroom and

24

AO 72A
(Rev.8/82)

looked out the window to see if anyone was around. He was planning to go back into the bedroom and shoot her in the back of the head with both barrels of the shotgun, but when he went into the bedroom, she was not making any sounds. She was dead.

Mr. LeCroy had not thought past his encounter with her. He had not made plans for what was next. At that point, there was a stench coming from her; he felt nauseated. He went into her computer room to look for books on witchcraft. He found a few Karate belts, but no witchcraft books. He went to the TV and looked for videotapes that might be helpful, but all he found were exercise videos. He started feeling panicky and frustrated. He grabbed her car keys and went to look through her vehicle, but still found nothing other than suitcases and clothes. At that point, he realized he had to find someone else with witchcraft powers of either an equal or higher rank. He decided he needed some of her personal belongings. He took her car with her clothes and drove to his mother's house. He changed his clothes and got the money he had been saving. He got an overnight bag and decided to go to North Carolina to find his friend (Thomas Ledford). He started to rethink his plan. He realized that Mr. Ledford was still in prison. He started to realize that he was all alone and that he was in trouble.

While driving Ms. Tiesler's car, Mr. LeCroy found a Christian CD and an Enya CD. He realized that a Christian CD was incongruent with his thoughts that she was a witch. He started having doubts about "who Ms. Tiesler really was." He realized he could not go back. He started driving North on I-75. At Highway 40, he had thoughts of possibly going back East to locate another friend he had been in prison with who was in North Carolina. He also thought about going West to Oklahoma to find Dr. Carlson. At Highway 40, he did neither and continued North on Highway 75 toward Canada. He eventually turned off and went through Wisconsin and then Minnesota. He had plans of abandoning the vehicle and living in the wilderness until he died. He thought about possibly taking a canoe across the lake into Canada, but eventually

AO 72A
(Rev.8/82)

he drove back into a local town and then North toward the border. He had plans of getting rid of her belongings and her vehicle again, but as he was unloading everything, an elderly woman drove up and saw him. She confronted him about dumping trash. He picked everything up, put it back in the truck and left. He decided he would drive the vehicle into Canada. He was then arrested at the Canadian border.

**MENTAL STATUS EXAMINATION**: Mr. LeCroy is dressed in an orange prison outfit. He is adequately groomed, but has facial hair. His gait is normal. There is no bizarreness in his presentation. He makes good eye contact and is alert and calm throughout the interview. Initially he is friendly, and rapport is good. There is no fidgeting or restlessness. He is polite and pleasant. As the interview progresses and particularly **when discussing the offense, he is much more serious, less animated, and his tone is flat. There is no thought disorder.** . . . He has had thoughts of suicide on a few occasions. He has thought about hanging himself, but does not see that as a very viable option in his cell. He feels like "nothing really matters anymore." **He has had some thoughts of homicidal ideations toward a few of the other inmates.** When asked about specifics, he said **they have done nothing significant – "It's always trivial things."** He reports no history of hallucinations or delusions. He denies feelings of suspiciousness or paranoia. He is alert. He complains of problems focusing and concentrating. His short-term memory is not as good as it has been in the past. **His intelligence is assessed as above average**. His self-esteem appears to be reduced. He acknowledges feelings of guilt over his behavior.

. . .

**DIAGNOSIS AT THE TIME OF THE OFFENSE:**

| Axis I: | Clinical Disorders | (1) Previous History of Major Depression |
| Axis II: | Personality Disorders | (1) Schizotypal Personality |

26

Disorder
(2) Antisocial Personality
Disorder
(3) Borderline Personality
Disorder

**DISCUSSION AND OPINION**: Mr. LeCroy is an individual who grew up in a dysfunctional environment. His father, who was a very large and powerful man, was very controlling and abusive. Mr. LeCroy's mother, who was more nurturing, was passive. Mr. LeCroy's parents divorced when he was 16 years old. His mother subsequently remarried Mr. LeCroy's father's former police partner, which further added to the turmoil of a dysfunctional family environment. As an 8-year-old boy, Mr. LeCroy was sexually abused by a 19-year-old family babysitter. At the age of 12, Mr. LeCroy was exposed to pornography and unusual masturbatory behaviors by a cousin. Mr. LeCroy has subsequently developed aberrant sexual interests, which have affected his heterosexual relationships. At the age of 19, he had a sexual encounter with a stepsister who was a few weeks away from her fourteenth birthday. Mr. LeCroy's first age appropriate sexual encounters were with prostitutes in Hawaii at the age of 18. Mr. LeCroy was given unrestricted access to weapons at the age of 16 by his father. Mr. LeCroy's first experience with burglary was at the age of 18 when he was homeless in Honolulu, having been AWOL for several weeks; he stole food. Upon returning to Georgia after his discharge from the Army, he was in a family environment, where he was encouraged by his father to participate in a robbery of his father's poker game. Following this robbery, Mr. LeCroy started into a career of burglary. He developed his techniques along the lines of a military operative. Ultimately, he was caught and arrested and went off to serve time in a State prison.

While in the State prison, Federal authorities pursued additional charges out of concerns that he was a dangerous individual.

27

AO 72A
(Rev.8/82)

Among Mr. LeCroy's belongings at the time of his arrest for burglary were papers that indicated intentions of killing individuals. These documents suggest a fantasy world of a wannabe military operative/survivalist. Mr. LeCroy subsequently spent a total of ten years incarcerated. While incarcerated, Mr. LeCroy received counseling to deal with his psychological dysfunction. He was noted to have borderline features to his personality. He was diagnosed as suffering from an Antisocial Personality Disorder. In the course of this counseling, it was noted that he had attempted suicide on several occasions in the past. He was noted to suffer from Major Depression with some moderate to severe levels of dysfunction as a result of that depression. He was referred for psychiatric intervention and was treated with antidepressants. During his counseling, Mr. LeCroy discussed his problems with anger management, resentment, feelings of revenge, numerous traumatic experiences in his past that involved his father's abusiveness, his parents' divorce, his problems with sexual abuse at the hands of his babysitter (Tinkerbell) and feelings of hopelessness about his future. Records indicate that he worked hard in therapy and did homework assignments to try to better understand himself and improve his control over his behaviors.

Upon Mr. LeCroy's release from prison, he had an unusual and unexplainable encounter with Ms. Tiesler (the victim) after she followed him down a dirt road, looked at him, said 'huh' and then drove off. That experience inflamed some of his unresolved issues relative to his sexual abuse experience by his babysitter (Tinkerbell) when he was 8 years old. His schizotypal tendencies of magical thinking and his previous experiences in witchcraft led him to believe that Ms. Tiesler was indeed his formed babysitter (Tinkerbell), that witchcraft was involved and that a spell needed to be broken. Mr. LeCroy had no one with whom to discuss these thoughts. These ideas gradually coalesced through rumination to an obsessional level of ideation. A plan of reversing the roles and undoing what had been done developed. These thoughts that Mr. LeCroy developed, while not classically in keeping with psychosis,

28

were distortions of reality based on mental illness (Borderline Personality Disorder and Schizotypal Personality Disorder). Mr. LeCroy subsequently fell into his military operative/survivalist mode. He broke into the victim's home, as well as four other homes, in pursuit of his plan. Ultimately, he raped the victim and then following the rape and when there was no undoing of the spell, he became angry, frustrated and then acting as a military style operative he killed the victim then seen as the aggressor in a violent, military-style fashion. After Ms. Tiesler's death, Mr. LeCroy began looking for other possible options to have the "spell" broken. He subsequently took Ms. Tiesler's car and some of her belongings, and then headed off in a poorly planned fashion, looking for a more powerful "spell breaker." Then after a period of time on the road in his victim's vehicle, he began to realize that, indeed Ms. Tiesler was not his former babysitter. He developed remorse and wrote a letter to Ms. Tiesler, apologizing and acknowledging that he was "doomed to hell."

Id. at 9-17 (emphasis added).

On October 17, 2003, LeCroy gave notice pursuant to Federal Rule of Criminal Procedure 12.2(b) of his intent to introduce an expert regarding "a mental disease or defect or any mental condition of the defendant bearing on the issue of punishment." Dkt. No. [183]. On November 10, 2003, Magistrate Judge Susan S. Cole granted the Government's motion for a psychiatric examination of Defendant. Dkt. No. [210]. Defendant appealed this order, and the undersigned met with defense counsel *ex parte* regarding his objections. Dkt. Nos. [245, 250]. As a result of those conversations, the Court ordered the

29

Government to appoint a fire-walled attorney or attorneys who would solely address the mental-examination issues and would not disclose any mental-health evidence to the Government's prosecution team. Dkt. No. [269]. The Court also directed defense counsel and fire-walled counsel to "confer regarding the need for the Government to obtain a mental examination of Defendant." Id. If the Government felt it needed an evaluation, the Court stated it would hold a hearing to discuss the issue. Id. The newly appointed fire-wall counsel decided that they needed a hearing, and the Court scheduled it for December 22, 2003.

Following the hearing, the Court found that the Government was entitled to a mental-health examination. Dkt. No. [306]. The Defendant was then ordered to produce his mental-health expert list to the fire-walled U.S. attorneys and to submit to a psychological evaluation. Id. at 2-3. The Defendant did provide his expert list, but argued that a full evaluation was not necessary because the defense only intended calling Dr. David Lisak as a "teaching expert"–meaning Dr. Lisak would "look at the history that [defense counsel] could provide through documentation of Mr. LeCroy and then give an opinion as to whether or not it would be possible for Mr. LeCroy to be exhibiting the

30

symptoms of childhood sexual abuse by a female." EHT, Dkt. No. [534] at 94:15-19.

Following the Government's objection, the Court ruled that because the Defendant intended to "present evidence that he experienced childhood trauma, thereby inviting the jury to make conclusions about how Defendant's childhood trauma may have impacted him and could impact him in the future," the Government was entitled to an evaluation by its expert–Dr. Julie Medlin. Dkt. No. [330] at 2. However, that evaluation never occurred because LeCroy invoked his 5th Amendment right against self-incrimination under advice of counsel and refused to submit to an evaluation. Dkt. No. [346].

However, even in the face of Defendant's invocation, the Court reserved ruling on whether Dr. Lisak could testify as a teaching witness and instead ruled that, in the interim, Dr. Medlin could review the mental-health evidence that was otherwise available through discovery and prepare a written opinion which would be filed under seal with the Court. At the close of the guilt-innocence phase, the report would be released to defense counsel and the fire-walled U.S. Attorneys, and at that point defense counsel could elect whether they intended to introduce mental-health evidence at sentencing. If so, the report would then

AO 72A
(Rev.8/82)

be released to the Government's prosecution team. Dkt. No. [346]; see also LeCroy, 441 F.3d at 927.

### 4. Motion to Recuse the United States Attorneys Office

Shortly after the Court ruled on the Defendant's invocation, the Defendant moved to recuse the United States Attorneys Office for the Northern District of Georgia for violating the Court's fire-wall order. Dkt. No. [349]. Pursuant to the Court's order, the Defendant had provided fire-wall counsel with the name of "his expert, his qualifications, a summary of his testimony, and additional background materials that were provided to this expert." Id. at 2. After that disclosure, the fire-wall attorneys provided the name of the Government's expert to the Government's prosecution team, and that team was involved in vetting their expert. The defense argued that because of the narrow field in which the Government's expert worked, the prosecution team knew to prepare for a sexual-abuse defense and gained an unfair advantage. Id. However, the Court denied the motion based on its findings during a telephonic conference that the Government should be able to vet its own expert. Dkt. No. [455] at 19-20.

32

5. Sentencing

LeCroy was tried in February 2004 and was found guilty of carjacking. Dkt. No. [398]. The Defense's theory during the guilt/innocence phase was a jurisdictional one–that the carjacking federal "hook" did not exist. EHT, Dkt. No. [534] at 165. Following the verdict, the parties then proceeded with the penalty phase.

### a. Government's Case-in-Chief

#### i. Victim's Impact Evidence

The Government presented victim impact evidence from four witnesses: Janie Wells–the victim's mother; Mary Miller–the victim's college friend; Cayce Tiesler,–the victim's brother; and, Judy Long–a friend and patient of the victim. Trial Transcript ("TT"), Dkt. No. [433] at 1721, 1746, 1762. These witnesses generally testified about what Ms. Tiesler was like, her position in the community, and how each of them was affected by his or her loss. Id. at 1721-1769.

#### ii. 1991 Crime Evidence

### a. Lt. Kevin Flynn

The Government next presented evidence from LeCroy's 1991

AO 72A
(Rev.8/82)

convictions. First, Lt. Kevin Flynn testified about the documents which he found when searching LeCroy's car, which included: 1) a list of names which the Government argued was a "hit list"; 2) a document which listed tasks to complete, including "get clothes, burglarize house, take stuff to boot village to cash in, take car to Paulding, take Jaka out to lunch, say goodbyes, kill Dallas policeman, go to abandoned house to sleep, after sleeping get food for week"; 3) another list which stated "steal a car, do an armed robbery, ditch car, go home, hit Ricky Smith, hit Romeo, hit another armed robbery, start game plan in wallet"; and, 4) to other documents which make references to people and places, specifically "popping cops." Id. at 1800-04.

### b. Kathy Bullard

Ms. Kathy Bullard, a victim of LeCroy's 1991 burglary, testified next. Id. at 1811. Bullard testified that she came downstairs and found LeCroy in her living room. Id. at 1812. She screamed, begging for her life, and tried to run away, but he pointed a gun at her and told her to stop screaming. Id. at 1812-13. He then told her he was an undercover police officer but refused to produce identification. Id. 1813-14. After he went to the basement to "tell his partner the

34

AO 72A
(Rev.8/82)

house [was] clean," Bullard ran out of the home and went to her neighbor's house. Id. at 1815. The event lasted between 20-25 minutes. Id.

### c. Betty Murphy

Afterward, Betty Murphy–the mother of LeCroy's step-sister Alecia–testified. Id. at 1820. Murphy learned that LeCroy had molested Alecia through a note Alecia had left in her bedroom. Id. at 1822. After she confronted Alecia about the conduct, Alecia admitted it had occurred. Id. at 1823. Murphy then reported the molestation to the police, and LeCroy was let out on bond. Id. at 1823-24. Murphy subsequently learned from the police that LeCroy later admitted to burglarizing her home while he was out on bond for the molestation charges. Id.

### d. Rebecca Leggett

The Government then had Rebecca Leggett provide a possible explanation of the initials and a location which were found on the "hit list." Id. at 1850-53. However, Leggett also testified that she had always found LeCroy to be a polite young man. Id. at 1856.

### e. Bill, Sr.

William LeCroy, Sr.–LeCroy's father–was also called. Bill, Sr. first

35

AO 72A
(Rev.8/82)

testified about the "hit list." He stated that LeCroy told him the list was "just a

piece of paper that [LeCroy] wrote some names down on about people who had

been messing with [him] and screwing with [him his] whole life." Bill, Sr. then

explained the significance of the various initials and other abbreviations on the

list. On cross, Bill, Sr. further elaborated that LeCroy did not say that he

intended to harm anyone on the list. However, on redirect his father stated that

he never asked LeCroy whether he intended to harm anyone on the list–Bill, Sr.

just dropped the issue. He also stated that he was concerned enough about his

ex-wife Denisha's name on the "hit list" that he called her at 1:30 a.m. the night

he learned of Ms. Tiesler's death. Basically, he thought his son had gone

"berserk" or had "lost his mind" because he thought harming another would be

out of character for LeCroy. TT, Dkt. No. [434] at 1934-47.

ii. LeCroy's Post-Arrest Conduct

### a. Lonnie Faircloth

The Government next called Lonnie Faircloth, a correctional officer at

the Federal Bureau of Prisons ("BOP") in Butner, North Carolina. He testified

that one night while he was handing out supplies, LeCroy told him he needed to

be moved into his own cell because his cellmate was a "nigger" and LeCroy had

36

AO 72A
(Rev.8/82)

tattoos which indicated that he did not like African-Americans. After being told he would not be moved, LeCroy immediately hit his cellmate in the face and a scuffle broke out between the men. LeCroy was then placed in his own cell.

On cross, Faircloth testified that prison tattoos could be offensive to other inmates, and that if a scuffle broke out during the night, it could have taken the BOP "a while" to get to LeCroy's aid. As well, the medical report revealed that LeCroy's cellmate's injuries were not serious, and Faircloth's initial report did not state that the attack was racially motivated. However, on redirect, Faircloth confirmed that it does not violate BOP policy to use a racial slur; thus, it was not included. And, LeCroy did not have visible tattoos. Id. at 1857-70.

### b. Officer Aaron Welch

Aaron Welch, a Lumpkin County Detention Officer, then testified about LeCroy's time in the Lumpkin County Detention Center. LeCroy was held there in the Maximum Security Block between March and July of 2003. On April 25, 2003, LeCroy picked up another inmate and helped him crawl into the drop ceiling in an area of the rec room which was not easily visible from the control tower. However, LeCroy was never charged for the conduct, and the detention center had experienced escapes before due to its poor design. In fact, the

37

AO 72A
(Rev.8/82)

catwalk in the ceiling had been used as a "virtual highway" between the male and female housing. Welch also testified that he was not aware of any violent interactions between LeCroy and other inmates. Id. at 1870-90.

### c. Officer Christopher Holman

Following Welch, Officer Christopher Holman of the Lumpkin County Sheriff's Office–who managed the day-to-day operations of the Lumpkin County Detention Center–testified regarding two other incidents that LeCroy was involved in at the jail. The first involved finding two female inmates under a bed in LeCroy's cell. Apparently, the male inmates climbed into the ceiling and went and got the female inmates from their cells. The second incident occurred on June 30, 2003. By this time, LeCroy had been moved to an isolation cell. Next to the isolation cell was a long room known as the mechanical chase. Welch entered the chase after women in their cells had reported seeing a man walking around in the chase, and when he entered, he found that LeCroy had removed the shower assembly from his shower and had created a hole in the shower wall which was large enough for him to sneak through. The officer immediately had LeCroy moved, and when they did, they found a note that LeCroy had written on the wall. The note stated, "So well,

38

have a great day explaining to the Marshals about me. Thanks for the food, . . . smokes, and women, LeCroy. P.S. Had a great time here, but sorry I won't miss you." On cross, the officer stated that LeCroy was never charged with escape or attempted escape due to those incidents. Id. at 1890-1919.

### d. Ten Swanson

Last, the Government called Ted Swanson, a maintenance custodian for the Lake County Jail in Two Harbors, Michigan. As a part of his duties as a maintenance custodian, Swanson was assigned to clean LeCroy's cell and to look for contraband after LeCroy left that prison's custody. LeCroy had been kept segregated from the general prison population in a cell to himself. Upon examining LeCroy's cell, Swanson found metal shower curtain hooks which had been removed from the ceiling. The hooks had been left by prison personnel on a ceiling-mounted shower rod which was no longer in use. Id. at 1948-64. The Government then rested. Id. at 2000.

### b. Defendant's Mitigation Evidence

#### i. Evidence Regarding Threat to Others in Prison

##### a. Shanna Smith

The Defense first called Shanna Smith who was confined with LeCroy at

AO 72A
(Rev.8/82)

the Lumpkin County Detention Center. Smith testified male and female inmates freely traveled through the Detention Center's ceiling to hang out and have sex; the prison was not very secure. In her opinion, LeCroy did not want to escape the Detention Center because it was so easy that he would have just done it. Rather, he was interested in staying at the Detention Center because he was interested in her cellmate, Heather Carter. He brought Carter gifts and was in love with her.

Shanna then went on the explain the differences between the Lumpkin County Detention Center and federal prison; namely, that federal prisons are much more secure. She also confirmed that in regards to her underlying drug conviction, she provided substantial assistance and was given a downward departure for that testimony. Id. at 2000-23.

### b. James Moose

The Defense then called another inmate who was incarcerated with LeCroy at the Detention Center, James Moose. Moose was one of the men who had actually escaped the Detention Center. Moose testified that LeCroy "treated everybody fine" and was rather quiet. LeCroy never talked about escape with Moose–whether about Moose's escape or any intended escape by LeCroy. And,

40

Moose stated that the Detention Center was easily escapable even after Moose returned and the security vulnerabilities had been exposed. Id. at 2024-2040.

### c. Dr. Randall Atlas

Next, the Defense called Dr. Randall Atlas, a specialist in the design of criminal-justice facilities. He testified that there are not any state-wide jail construction standards in Georgia. Therefore, counties can build anything they deem fit. Regarding the Lumpkin County Detention Center, Dr. Atlas opined that the drop ceiling was too low in blind spots that the control room could not easily see, and the concrete walls were not taken to the roof as the plans required. Moreover, the prison did not fill the concrete block with grout, and the inmates were able to remove soap dishes, shower fixtures, or ceiling lights, break through the cement blocks, and gain access to an unauthorized zone. The inmates were also able to look through windows and see inmates in other housing sections. Therefore, the constructed building posed a security risk as inmates could easily travel from one part of the facility to another–a security risk which would not occur in a BOP-run facility. However, on cross, Dr. Atlas did concede that the hole in LeCroy's cell was not caused by poor design on its own–it was caused by LeCroy. Id. at 2043-86.

AO 72A
(Rev.8/82)

### d. Jason Medlock

Jason Medlock then testified for the Defense. Medlock was in state prison with LeCroy from 1992-1994 and 1995-1997. He testified about the terrible conditions at Hancock Prison, and the safety concern that both of them felt which caused both to voluntarily agree to solitary confinement–"the hole." He also testified that despite the violent environment that they lived in, LeCroy never said a cross word to anyone or fought with anyone. In sum, Medlock testified that they felt like prey.

Following Hancock Prison, both men were moved to Central Prison, which was a much safer environment. They were both able to focus on studying religion, meditation, and yoga. Id. at 2086-2107.

### e. Herbert Keller

Next, the Defense called Herbert Keller, another friend of LeCroy's from Hancock Prison. Keller testified that as a new prison inmate, LeCroy was branded a "new jack," which meant the other inmates would try and target him. Keller helped to protect LeCroy from this phenomena. Keller also testified about the terrible riots and abuse by prison personnel, and that he never found LeCroy to be violent; rather, he found him quite meek. Id. at 2110-24.

42

AO 72A
(Rev.8/82)

### f. John Swatz

John Swatz followed Keller. He, too, was incarcerated with LeCroy at Central and participated in yoga and tai chi with him. Swatz felt that LeCroy used tai chi to try and achieve inner peace, and he would not consider LeCroy to be a danger to the prison environment. On cross, he confirmed that knowing that LeCroy had admitted to killing the victim in no way affected his opinion that LeCroy would not be violent in prison. Id. 2124-33.

### g. Lemuel Bleu

The Defense also called Lemuel Bleu. Bleu was in federal prison with LeCroy in 1999, and LeCroy helped him with algebra so that Bleu could pass his G.E.D. exam. They also were in Toastmasters, a once-a-month club that taught public speaking, and they took anger management classes together. Bleu opined that if LeCroy received a life sentence, he would have "a lot" to give the prison community in the way of tutoring and helping others to develop social skills. Id. at 2133-42.

### h. William Galloway

William Galloway then testified about the AA meetings which he attended with LeCroy in federal prison in 1999. LeCroy drafted a handout

43

AO 72A
(Rev.8/82)

which is still used by the AA group today. He also stated that LeCroy attended

church during their time together. Like the other inmates, Galloway also

testified that LeCroy would not be a threat to the general prison population if

given a life sentence and stated that his view was not affected by this crime. Id.

at 2142-52.

### i. Clyde Denbo

Clyde Denbo, another inmate from federal prison in 1999, confirmed the

other inmates' testimony regarding LeCroy's AA, Toastmaster's, and church

attendance. He also testified that based on the LeCroy he knew in 1999, he

would not worry about being imprisoned with him. However, on cross, he said

that after hearing what LeCroy did to the victim, his opinion of LeCroy was

lowered. Id. at 2153-58.

### j. Kurt Lattimer

The Defense next called Kurt Lattimer, an inmate at LSCI Butner, who

attended Buddhist meetings with the Defendant. Lattimer first testified that

Butner is a low security prison, and LeCroy would only have been transferred

there if he had exhibited good behavior. He then recounted that while at Butner,

LeCroy acted as a "caretaker" for another inmate who was in a wheelchair.

AO 72A
(Rev.8/82)

However, on cross, he stated that his opinion of LeCroy was lessened after reading about this crime. TT, Dkt. No. [435] at 2180-84.

### k. Donald Romine

After the inmates, Donald Romine–a retired federal BOP official–testified as an expert on the security of federal prisons. Romine opined that someone who was convicted of LeCroy's crimes and was given a life sentence would be housed at a United States Penitentiary–a maximum security prison with walls, gun towers, and razor wire. The walls at those prisons are monitored with detection devices and, if triggered, would alert command that someone had come in contact with the fence. As well, inmates are frequently counted and are locked behind multiple doors. During the day, depending upon their privileges, some inmates will go to work on the property, but inmates can only move from one place in the prison to another during specified times. All visitors must be a placed on a limited visitor's list and must pass a background check. Unlike other facilities, the federal system houses the men and women seperately, the ceilings are poured concrete, staff members are well-trained, and all fixtures are attached with security screws that require specialized tools to remove.

AO 72A
(Rev.8/82)

Inmates who are identified as escape risks receive special treatment in the BOP. They are included in a program called Posted Pictures, which alerts staff members about inmates who require extra attention and supervision. As well, at some institutions, inmates can be placed on two-hour watches so that they are counted every two hours.

Romine also opined that if an inmate has exhibited good prison behavior in the past, it would be "very unusual" for the inmate to turn into a problematic inmate in the future. He stated that prior prison behavior is typically more predictive of future prison behavior than that person's behavior on the street. And, he stated that striking another inmate in the face can often be used by a prisoner to get what they want–and would not necessarily indicate future dangerousness. However, on cross he stated that if an inmate had broken out of his cell before, the BOP would consider that act in its classification of that prisoner's risk.

Romine also opined about the shower curtain rings which were found in LeCroy's cell. He stated that while the rings would be considered contraband, he did not believe they were weapons because they were not altered in any way to make them sharp, etc. However, he stated on cross that one of the found

46

items could have been used to unlock locally used handcuffs, but that he did not know for certain.

Romine also stated on cross that some inmates have been able to escape maximum security prisons due to their ingenuity–including inmates who walked out the front door by rigging a device which would open the doors–or through riots. As well, inmates have been able to murder other inmates and BOP staffers while being accompanied by prison personnel. Romine also stated that prison employees do not carry weapons, and while male and female inmates are not housed together, female correctional officers work in male penitentiaries. He stated that if LeCroy were required to appear in court, the U.S. Marshals' Service would have to house him in either a BOP or local jail, and that he could not opine about the security that would be available if a local jail had to be used.

If LeCroy were sentenced to death, Romine stated that LeCroy would be housed in Terre Haute, Indiana on death row where he would be kept in an individual cell. In contrast, less than half of all inmates who have life sentences are serving in high-security institutions. Id. at 2189-2244.

47

AO 72A
(Rev.8/82)

## ii. Court's Ruling on Mental Health Evidence

Prior to introducing sexual-abuse mitigation evidence, the Defense sought clarification on the Court's prior ruling. Namely, counsel attempted to determine whether the Defense could ask Defendant's former psychiatrists about the results of any psychiatric tests which were taken and what the results of those tests meant. Id. at 2166-80. The Court ruled that those witnesses were

> permitted to testify to fact matters that occurred in the meetings with Mr. LeCroy. They may testify to any personal history he gave them. They may testify to the events that occurred at that time including such alleged suicide attempts or whatever may have occurred.
>
> If the Defense chooses to have them testify as to psychological testing, results, diagnoses, opinions, then the government will be permitted to rebut that testimony through the use of [Dr. Medlin].

Id. at 2248. The Court ruled that if Defendant wanted to ask these mental-health witnesses about their opinions–even prior ones–he should have given 12.2(B) notice to the government that this witness would provide expert testimony regarding a mental disease or defect, beyond any fact evidence. Id. at 2249. However, the Court noted that it was not precluding the Defendant from going into those matters despite failing to notice the Government because it felt that

48

AO 72A
(Rev.8/82)

Dr. Medlin's expert report sufficiently addressed those issues. Unless

Defendant opened the door, though, her report would remain under seal. Id.

### iii. Mental Health Evidence

### a. Dr. Gary Ganahl

The Defense then called Dr. Gary Ganahl, a psychological counselor who

was assigned to LeCroy in 1992 while LeCroy was in the state prison system.

LeCroy first came to Dr. Ganahl after he attempted suicide by overdosing on

indocin, an analgesic and anti-inflammatory medication. LeCroy told prison

authorities that he attempted suicide because his girlfriend had an abortion, and

he was feeling very depressed and isolated. By way of history, LeCroy reported

that he was physically abused by his father as a child, and his mother confirmed

that this abuse occurred. He also reported that he was molested by a babysitter

at age eight. On cross, Dr. Ganahl stated that a mental health counselor was

later told by LeCroy that he had superficially cut his wrist to get out of work

camp. On redirect, Dr. Ganahl stated that inmates "might lie" to get out from

under the additional restrictions that are placed on inmates undergoing

psychiatric care. Id. at 2250-62.

AO 72A
(Rev.8/82)

### b. Kenneth Morris

The Defense next called Kenneth Morris, the Defense's computer expert. Morris reviewed the Defendant's family computer hard drive which revealed that someone searched for "Marti Carlson" in "Oklahoma City, Oklahoma" using that computer. However, Morris could not opine as to that search's purpose. Id. at 2262-66.

### c. Anita Novey

Anita Novey, a drug treatment specialist for the BOP in El Reno, Oklahoma, next testified. She saw LeCroy in a "cowork group" drug abuse program ("D.A.P.")–a year-long, voluntary, four-phase program which addressed chemical dependency, antisocial behavior, and other life skills.When he entered the program, LeCroy self-reported that he needed assistance with anger management, substance abuse, low self-esteem, interpersonal communication skills, and antisocial behavior–or the inability to conform with society's laws. Novey stated that LeCroy was an "excellent participant, almost a model participant" of the program.

However, LeCroy developed feelings for Novey–a common occurrence in therapy–and she transferred him to a different DAP group. Even after LeCroy

50

AO 72A
(Rev.8/82)

expressed his feelings for her, though, she was never afraid of him.

On cross, Novey testified that LeCroy expressed remorse in his relationship with his stepsister, and she gathered that he had emotionally manipulated her into the sexual relationship. She also explained the letter in which LeCroy told her about his romantic feelings. LeCroy's letter came in a manilla envelope which said "do not open until you're relaxing in a bubble bath or alone." The letter itself expressed LeCroy's feelings of love and "then it went on to get pretty blatantly sexual about fantasies," including various attachments which described the fantasies in detail. Even after he was transferred to a different group, LeCroy contacted Novey again through a more-appropriate, but still sanctioned, greeting card that could be construed as a thank-you card. As well, Novey stated that most inmates do not write their professions of love because they would not want the statement to be traceable back to them. Id. at 2267-96.

### d. Dr. Marti Carlson

The Defense next called Dr. Marti Carlson, LeCroy's clinical psychologist who coordinated the DAP program at El Reno. As the coordinator,

AO 72A
(Rev.8/82)

Carlsen met individually with inmates involved in the DAP program and specifically had individual counseling sessions with the Defendant.

Prior to Dr. Carlson's counseling, LeCroy reported symptoms consistent with "major depression such as insomnia, suicidal ideations, decrease in appetite, decrease in energy, loss of interest [in] activities he used to enjoy, feeling depressed[,] and feeling hopeless." Id. at 2320:5-8. He also reported a history of suicide attempts, including his overdose at Butner, and a history of reckless behavior in which he would swim out in water until he could not swim any further, unconcerned about making it back to shore.

Prior to his first session with Dr. Carlson, LeCroy prepared a letter to define what he wanted to discuss in therapy. This nine-page letter first stated that while his family spoke of "love and family above all else," LeCroy actually experienced violence, hypocrisy, financial insecurity, and alienation. LeCroy went on to explain what made him lose his self-esteem and led him toward violence–being molested by his babysitter at age eight.

In middle school, LeCroy joined the Junior ROTC because he felt the uniforms allowed him to fit in, and he enjoyed belonging to something. But, in high school, LeCroy became suicidal because his parents got a divorce and his

52

life was full of turmoil. Bill, Sr. was arrested during this time–but never tried–on making terroristic threats against his mother; his father was very connected in the local law enforcement and legal community and was able to skirt any consequences for those actions. To escape his home life, LeCroy joined the Army.

In the military, LeCroy developed an alcohol and drug problem. He subsequently went AWOL and, after discharge, returned to Atlanta. When he returned, LeCroy had a hard time dealing with his parents' remarriages and wanted to break them both up. As retribution for his mother and step-father's marriage, LeCroy seduced his stepsister and stated that he "rationalized" the decision to do so. After he was arrested for the molestation, LeCroy stated that he began doing even more drugs, alcohol, and committing crimes because he "thought [he] had done the unspeakable and [he] can never expect to have any life" after his actions. He then went on to explain that at the time of the letter he had issues dealing with his ex-fiancé's abortion, and that he had nothing to live for.

As a result of that letter and Dr. Carlson's interview with LeCroy, he was prescribed medication and began individual therapy to address his issues. In

AO 72A
(Rev.8/82)

therapy, they discussed LeCroy's feelings for Ms. Novey and worked on LeCroy's anger issues–he would bottle up his anger until he exploded. LeCroy expressed in therapy that "the event which bothered him most in life was having had sex with a minor." In one session, LeCroy expressed a concern that without a therapist in his life he would return to his old lifestyle. In another, LeCroy confessed that because of his experience with his babysitter, he required drugs to be intimate with a woman because he relived the childhood abuse each time he was intimate. As a result, he sought revenge against the babysitter. LeCroy spent much of his therapy working through his vengeful thoughts and, after much therapy, decided that he no longer wished to pursue revenge.

Eventually, LeCroy also developed feelings for Dr. Carlson. He thought that he might be transferring his feelings for the babysitter onto Dr. Carlson because he saw some similarities between the two. But, by the end of the program, LeCroy saw marked improvement in his anger management and self-esteem. Dr. Carlson encouraged LeCroy to continue individual counseling at the new facility where he was being transferred.

On cross-examination, the Government first confirmed for the jury that Dr. Carlson did not offer any diagnoses about the Defendant and was only

reciting what the Defendant told her in therapy; she could not verify the veracity of those claims. The Government then asked about LeCroy's fears which related to hurting others. Specifically, LeCroy told Dr. Carlson that he was concerned that he would hurt those who have hurt him after he was released from prison. He also expressed concern that if he got angry with Dr. Carlson he might hurt her. The Government also introduced a homework assignment which LeCroy completed on revenge. In it, LeCroy defined the "Law According to LeCroy" and listed various sins against him and the appropriate punishment he would deliver. However, the Defense pointed out on redirect that this was written toward the beginning of therapy.

The Government then questioned Dr. Carlson about LeCroy's feelings for her. Like Novey, he also wrote Dr. Carlson a sexually charged letter which described his sexual fantasies with her. Dr. Carlson testified that while it is not abnormal to have feelings for a therapist, acting on those feelings steps over boundaries–an action which many patients do not take. It is especially abnormal for a patient to convey their love to a second therapist after being told the first time that the conduct was not appropriate. Id. at 2302-93.

AO 72A
(Rev.8/82)

### e. Susan Miller

The Defense next called Susan Miller, an investigator for the Federal Defender Program, who testified about various records she had obtained about LeCroy. First, she testified that LeCroy had declined psychology services at Butner (after his time with Dr. Carlson) but did join anger management groups. Regarding the man he punched in prison, LeCroy accepted responsibility for the event and stated that he felt that he was taking his anger about being moved into a different housing unit out on his roommate. He also expressed that he harbored anger at his father for physically abusing him as a child. Right before his release, LeCroy began to express his fears about what would happen when he was released and he withdrew from therapy.

On cross, the Government pointed out inconsistencies in LeCroy's reports of suicide. At USP in Atlanta, LeCroy reported that he tried to kill himself by playing Russian Roulette in 1985, accidentally shooting himself in 1988, and trying to overdose in Georgia State Prison in 1992. However, thirteen days later at Butner, LeCroy reported his suicide attempts consisted of the gunshot wound in 1988, a 1989 car wreck, and an overdose in 1991. Id. at 2394-2409.

AO 72A
(Rev.8/82)

iv. Defendant's Family and Friends

### a. Teresa Horton

The Defense first called Teresa Horton. Her husband had been an inmate with LeCroy at Butner, and while there, her husband asked if LeCroy could put Ms. Horton's daughter on LeCroy's visiting list because LeCroy was a "good guy that was helping him" and never had any visitors. Butner allowed it, and the four of them–Mr. Horton, Ms. Horton, their daughter, and LeCroy–visited together weekly for about 24 weeks. Occasionally, Ms. Horton would also bring her grandchildren and she was never concerned for their safety with LeCroy. As well, when her eldest son came to visit, LeCroy would make a point of talking to him about staying out of trouble.

While in prison, LeCroy specifically helped Mr. Horton with his anger issues. Ms. Horton found LeCroy to be very friendly and well-mannered and noticed that LeCroy had a special way of helping Mr. Horton calm down when he became angered. After prison, LeCroy reimbursed Ms. Horton for all of the snacks that she had purchased him at Butner. Overall, Ms. Horton testified that LeCroy had a positive influence on her family and his life was worth saving.

AO 72A
(Rev.8/82)

After Mr. Horton was released from prison while LeCroy was still at Butner, the Hortons intended to continue to visit LeCroy and write him letters. However, LeCroy sent them a letter severing all ties because he did not want to be a burden on them. TT, Dkt. No. [436] at 2420-41.

### b. Amanda Florido

The Defense next called Ms. Horton's daughter, Amanda Florido. She testified that LeCroy was a nice guy who treated her kids like they were a part of his family. He helped her deal with feelings about her weight and told her that what was on the inside was all that mattered. He also wrote to her during her cancer scare, and she testified that his life was worth saving. Id. at 2441-50.

### c. Tanya LeCroy

Tanya LeCroy, the Defendant's step-mother, testified next. She testified that she first met LeCroy while he was incarcerated in the state system and, once he was in the federal system, the family visited a couple of times at each location. She also spoke with LeCroy as frequently as his phone privileges allowed and would occasionally write him letters. Once he was released, Tanya was in contact with him five to six times a week because LeCroy worked for his

AO 72A
(Rev.8/82)

dad and they had originally planned to have him live with them. After his release, LeCroy also spent time mentoring his brother Jamie.

Following the commission of the current crime, Tanya spoke with LeCroy on the phone two or three times after she sent him a letter. Her family also visited LeCroy every other week and many times her sons would go with them. Tanya testified that she was not afraid of bringing her kids around LeCroy.

On cross, Tanya testified that she never heard LeCroy say that he was afraid of his father or that his father had mistreated him. They did everything they could to help the Defendant after he was released from prison. She also testified that her husband was never abusive toward her and as far as she knew, there is no truth to the allegation that Bill, Sr. was abusive. However, on redirect, she stated that she probably would not have expected LeCroy to confide in her about historical problems he had with his father. Id. at 2150-65.

### d. Tracy Buckner

The Defense next called Tracy Buckner, a family friend. Buckner grew up with LeCroy but only really began to interact with him when he returned from the Army. She had a crush on him, and they would "make out" when

AO 72A
(Rev.8/82)

Buckner's brother–LeCroy's friend–was not around. But LeCroy ended the relationship because he said he was not good enough for her; he showed her respect.

After LeCroy was arrested on burglary and rape, Buckner stayed in contact with LeCroy and would visit and write to him. During these visits, LeCroy expressed regret about pulling a weapon on a woman during a burglary. They also rekindled their relationship during this time and talked of a future together. But once LeCroy was convicted on the federal crimes, their relationship fizzled again because he would be in prison even longer. Id. at 2465-76.

### e. Jaka Brooks

Jaka Brooks,[13] the Defendant's ex-fiancé, testified next. She stated that she dated LeCroy for a year and a half and that LeCroy was the nicest guy she had ever dated–a gentle lover. During their relationship, Brooks became pregnant and they decided to abort the baby. After that incident, the relationship changed but LeCroy never threatened her and she never feared him.

---

[13]Brooks is also referred to as the Defendant's girlfriend by various witnesses.

AO 72A
(Rev.8/82)

While they were dating, Brooks saw LeCroy daily but never saw him do drugs, and he only drank occasionally. However, at the end of 1990, he changed. He no longer went to work and began burglarizing houses. LeCroy admitted to her that he was committing the crimes but did not want her to get involved.

Brooks only saw LeCroy get upset one time toward the end of their relationship when they were breaking up. He pushed her during an argument, she kicked him back, and she told him to get out and she never wanted to see him again. He called and apologized and told her that he did not want to hurt her, but they only spoke once after that. After LeCroy was arrested, Brooks was also investigated as they shared a car. Brooks went to visit him in jail and he told her that he was sorry for what he had put her through and hoped that she would not hate him. Id. at 2477-90.

### f. Donna Houston

Afterward, the Defense called Donna Houston, the Defendant's mother. Houston was not capable of testifying herself about LeCroy's childhood and her marriage so she told her story to Jan Vogelsang, a clinical social worker, who

61

AO 72A
(Rev.8/82)

then testified for her. But, before leaving the stand, she did ask the jury for mercy. Id. at 2491-2500.

### g. Jan Vogelsang

Vogelsang completed a biopsychosocial assessment[14] on the LeCroy family which involved talking to friends and family members, visiting the community where they grew up, reviewing records, and reviewing research to provide a theoretical basis for the findings. Her assignment was to determine if there were any patterns of behavior or significant events in the family which would create a greater risk that a person within that family would be incarcerated.

Vogelsang first stated that Bill, Sr.'s family was "a family that was without limits and without boundaries; and this was more in the area of gambling, the areas of money and the areas of the ready availability of [loaded] weapons." They also were prone to immature behavior and some of that family demonstrated suicidal behavior. Children were poorly supervised, and much of their discipline was out of anger, not correction. Lack of loyalty was punished,

---

[14]A biopsychosocial assessment is a "method of collecting extensive information on an individual and/or his family. Typically [the report covers] at least three or four generations" of a family. Id. at 2509:6-8.

62

and while the family looked tight-knit from the outside, their relationships were very fractured.

Bill, Sr.'s family also lived in a very sexualized environment. Id. at 2501-31.

> This was an environment in the extended family, and I mentioned early that these family members got together, the kids stayed at the grandmother's a lot, she kept the children a lot, where, again, adult supervision was absent. And so beyond the years when children normally explore sexually, when children normally are curious, these cousins continued to have sex with each other, to engage in sexual behaviors that sometimes were almost right in front of their parents with nothing being said, incidences where they would explore and fondle each other and experiment in the back seat of the car with their parents driving the car in the front seat and nothing being said about it; and within another environment where the message [from LeCroy's dad and the other uncles] to the male children was that this was the only thing women were good for was sex and that if it weren't for sex, women would have a bounty on their heads.

Id. at 2532:1-15.

LeCroy's immediate family was marked by humiliation and physical and emotional abuse. His home life was very chaotic because, due to gambling and multiple separations, the family was constantly moving–22 times within 17 years of marriage.

63

AO 72A
(Rev.8/82)

Bill, Sr. controlled his family and had once written a suicide note in which he confessed to mentally abusing his family. He denied the family privacy and required all doors–including the bathroom–to be open at all times. He interrogated Ms. Houston and would use a physical technique where he would squeeze the back of her neck until he reached a nerve in order to force her into compliance. And, even when Bill, Sr. was caught committing a crime–such as embezzling or assaulting Ms. Houston–he was never prosecuted to completion. LeCroy and his brother Chad witnessed their father commit crimes and avoid punishment.

In contrast, Ms. Houston grew up in a very strict religious home with her grandmother after her mother abandoned her. As a result, she struggled with divorce for a long time and was taught to be submissive. Ms. Houston had originally been interested in Sam Houston–her now husband–but the church would not approve their relationship so she began to date Bill, Sr.. At 16, she became pregnant with LeCroy, dropped out of school, and got married. She tried to provide appropriate ethical and moral standards for the children.

Bill, Sr. had a learning disability and speech impediment as a child. He was physically abused by his family and was known to be a bully in the

AO 72A
(Rev.8/82)

neighborhood, taking a bat to mailboxes. After his father died, Bill, Sr.'s family was destitute, and he was forced to go to work to help provide for the family. Because of that financial dependence, his mother never held her children accountable for their actions.

The LeCroys had a terrible divorce. Bill, Sr. threatened to rape and kill Ms. Houston and to kill her coworkers. He once put his handgun to her forehead and told her that he could blow her brains out but would not do it because the children were in the other room. After that episode, Bill, Sr. gave his gun to LeCroy to keep him from killing Ms. Houston. On another occasion, Chad came home and found his father at his home, got a gun, and told his father if he did not leave he would shoot him.

Bill, Sr. appeared to be very involved in LeCroy's life from the outside, but on the inside was physically and emotionally abusing him. His father humiliated him when he did not excel at sports and, after being bullied, taught LeCroy to punch by punching him. His father often beat him with his police belt for doing anything that he did not approve.

To escape this life, LeCroy joined the Army. Shortly after entering, though, LeCroy broke his ankle which meant he could not be a paratrooper as

AO 72A
(Rev.8/82)

he intended. He soon began doing drugs and drinking, went AWOL, and was honorably discharged.

When LeCroy returned, he went on a trip with his mother, step-father, brother, and step-sisters. LeCroy stayed in one room with all of his siblings, and it was during this time that his brother Chad and step-sister Priscilla started a sexual relationship–they were both fifteen. Subsequently, LeCroy started a sexual relationship with his other step-sister, Alecia.

After describing the family history, Vogelsang then described the factors that she found would make it more likely for someone in LeCroy's family to commit serious crimes. Vogelsang found: 1) a family with a pattern of mental, emotional, and behavioral problems; 2) LeCroy's mother was abandoned as a baby and was left to grow up in destitution; 3) Father raised with no consequences for aggressive and illegal behavior; 4) Born to teenage parents with no skills or resources of their own; 5) Early childhood strengths ignored and rejected; 6) Physical and emotional abuse by his father; 6) Multiple moves; 7) Childhood adolescence filled with negative messages about women and sex; 8) Relationship between sex and anger modeled by father; 9) Molestation twice by a babysitter; 10) The constant threat of harm by the father in the home with

66

threats to kill; 11) Exposure to weapons in the home with threats to kill; 12) Marital rape of a submissive and fearful mother; 13) Lack of limits and boundaries in the home; 14) Father never pays consequences for illegal and aggressive behaviors; 15) Choices and responsibilities were not modeled or taught; 16) Disciplining for lack of loyalty rather than right or wrong; 17) Forced to relay threats of violence to the mother by powerful authoritarian father; 18) Isolated from opportunities to form relationships outside the family; and, 19) Lack of intervention for trauma suffered during childhood and adolescence.

On cross, Vogelsang confirmed that her report only dealt with how LeCroy's childhood affected him in 1991, not at the time of the murder. She also confirmed that all of LeCroy's moves were within Cobb County, and he always did well in school.

Regarding the abuse by Tinkerbell, Vogelsang confirmed that even though she spoke with LeCroy's mother, father, and brother, none of them knew that LeCroy had ever been molested. And, none of them ever remembered a babysitter named Tinkerbell at all.

AO 72A
(Rev.8/82)

The Government also questioned why Vogelsang did not mention LeCroy's "attempted suicide" when he shot himself in the leg. This event occurred when LeCroy accidently loaded the wrong type of ammunition in a gun and it misfired. Vogelsang stated that she did not know if he was attempting to kill himself because he only later described it as a suicide attempt; at the time he described it as an accident.

Vogelsang also confirmed that Bill, Sr. has never admitted to any physical abuse of the family, and he states that the threats only started once Ms. Houston left him. The only arrest for spousal abuse and his "suicide note" occurred while they were going through a divorce and they were under great stress. She also confirmed that beyond the sexual abuse, Bill, Sr. never physically abused Ms. Houston–only the boys. However, the boys were never medically treated for their injuries and social services was never called. And Vogelsang stated she has no evidence that his father physically abuses his young children that are currently at home. She also stated that his father's second and third wives have never reported abuse but his second wife did report threats. She also stated that it was Bill, Sr.–not his mother–that went looking for him in Hawaii when he went AWOL. Bill, Sr. also visited him frequently while

68

he was in prison the first time and "half a dozen times" between Ms. Tiesler's murder and the trial. His mother had not visited him following Ms. Tiesler's death.

The Government also focused on the fact that in 2001, both his mother and father opened their homes up to LeCroy and wanted to support his reentry to society, while most convicts do not have a supportive family upon release. As well, her report did not focus on what difference LeCroy's therapy in prison had on the risk factors that she found. And, risk factors are not certainty; they are just probability for criminal conduct.

On redirect, Vogelsang stated that while his mother has not gone to see LeCroy since Ms. Tiesler's death, she has spoken to him on the phone. Ms. Houston–being that she was Ms. Tiesler's neighbor–harbored guilt for Ms. Tiesler's death that Bill, Sr. did not have. As well, Chad told Vogelsang that the physical abuse stopped when the boys grew up and were physically the same size as their father. Regarding his father's consequences, Ms. Houston stated that Bill, Sr. told her that due to his family and law enforcement connections he had judicial immunity and no one would ever believe her. Id. at 2532-2610.

69

### h. Mark Ditmanson

Last, the Defense called Mark Ditmanson, the pastor of the Lutheran Church in Grand Marais, Minnesota, who pastored LeCroy in jail after he was picked up for the murder of Ms. Tiesler. LeCroy asked him if he could be forgiven by God. LeCroy was very remorseful and very sincere. Id. at 2618-22.

The Defense then rested. Notable to this order, the Defense did not call Dr. Hilton or Dr. Lisak before resting.

### c. Closing Argument

Relevant to this petition, Ms. Kearns gave the closing argument on mitigation. Regarding sexual abuse, Ms. Kearns stated *in toto*:

> And, again, I think if you look at his history, what you see and what–the family history, what Jan Vogelsang and what Dr. Carlson, I think, more importantly shows to you is that you have someone who has a basic moral fiber. His entire childhood through that divorce he was a good kid. He was doing well in school. He sought out ROTC, it's in the writings, he seeks out ROTC because it gives him something that he is missing, those boundaries that Jan Vogelsang described there were a lack of. He seeks it out on his own. He knows that ROTC is healthy for him, it has discipline, it builds his self-esteem, the self-esteem that is in the pits. And you know he has virtually no self-esteem.
>
> And what does he attribute that to? The baby-sitter, to the sexual abuse he suffered as a child. And the government may–Mr. Burby made a big deal yesterday of one of the witnesses about he never described the child molestation to anybody. He didn't tell anybody.

AO 72A
(Rev.8/82)

His family didn't know about it.

Come on, this is 2004. You know, we all watch TV. If we haven't read books about it, why do we have all these priests that are now being accused of sexual abuse for things they did 20 years ago? Because children don't talk about it. For whatever reasons, whatever happens. That doesn't mean it didn't happen.

Why would he be talking about sexual abuse by a teenager while he's in therapy with Dr. Carlson? He's not in therapy to get out of jail. He's not in therapy to cut his sentence short. He has no benefit to gain from the therapy or the D.A.P. program that he was involved in El Reno except self-improvement or to relieve himself, learn how to deal with his anger and get beyond his anger so that his life will be better emotionally. There's no motive to lie about the baby-sitter. And he's talking about the baby-sitter in '92 and he's talking about the baby-sitter in '99. But it's a significant event because it robbed him of his self-esteem. That's the impact it had on him. We know that from what he's written.

TT, Dkt. No. [437] at 2715-16.

### d. Jury Instructions

Relevant to this petition, before the penalty phase began, the Defense argued that the Court's initial draft on its future dangerousness instruction was incorrect because it allowed the jury to consider LeCroy's risk to the general public–not just the prison community. TT, Dkt. No. [433] at 1670. The Court stated it needed to think about the issue and declined to decide without reviewing the relevant authority. Id. at 1672. At the end of the penalty phase,

71

AO 72A
(Rev.8/82)

the Court provided counsel with revised jury instructions, and while the

Defendant objected to many of the instructions, he did not object to the future

dangerous instruction. TT, Dkt. No. [436] at 2638-59. That instruction read:

> IN CONNECTION WITH THE AGGRAVATING FACTOR OF
> FUTURE DANGEROUSNESS, THE GOVERNMENT HAS
> ALLEGED THAT THE DEFENDANT POSES A RISK OF
> ESCAPE. DANGER POSED TO THE GENERAL PUBLIC BY
> MR. LECROY MAY BE CONSIDERED BY YOU ONLY IF
> EACH OF YOU FINDS BEYOND A REASONABLE DOUBT
> THAT MR. LECROY DOES POSE A RISK OF ESCAPE.
>
> THE LAW REQUIRES THAT FOR YOU TO CONSIDER MR.
> LECROY'S ALLEGED FUTURE DANGEROUSNESS, THE
> PROSECUTION MUST PROVE BEYOND A REASONABLE
> DOUBT TO EACH AND EVERY ONE OF YOU THAT MR.
> LECROY WILL COMMIT CRIMINAL ACTS OF VIOLENCE
> IN THE FUTURE, WHICH WOULD BE A CONTINUING AND
> SERIOUS THREAT TO THE LIVES AND SAFETY OF OTHER
> INMATES OR PRISON OFFICIALS, OR, IF ALL OF YOU
> FIND BEYOND A REASONABLE DOUBT THAT MR.
> LECROY IS AN ESCAPE RISK, THAT HE WOULD BE A
> SERIOUS THREAT TO THE SAFETY AND LIVES OF
> PERSONS IN THE GENERAL PUBLIC.

Id. at 2739.

AO 72A
(Rev.8/82)

5. Verdict

After deliberating, the jury found that all of the eligibility,[15] statutory,[16] and non-statutory[17] aggravating factors existed. As to the mitigating factors, all of the jurors found: 1) that his conduct was appropriate during his ten years in prison; 2) that LeCroy was subjected to emotional and physical abuse as a child; 3) that he grew up in an unstable and violent environment that included divorce, family violence, and repeated moves and school changes; 4) that LeCroy had been exposed to a harsh and difficult prison life; 5) that LeCroy was a kind and loving grandson, son, brother, and friend; 6) that he had shown himself to be a person of kindness, friendship, and generosity; 7) that LeCroy was deeply tormented after his fiancé got an abortion; 8) that during prison LeCroy helped other inmates and took part in counseling; 9) that he would likely do well in a

---

[15]The jurors found that the Defendant intended to kill Ms. Tiesler and intentionally inflicted serious bodily harm that resulted in her death. Id. at 2766.

[16]The jury found that: 1) LeCroy committed the offense in an especially heinous, cruel, and deprived manner in that it involved torture and serious physical abuse; and, 2) that LeCroy committed the crime after substantial planning and premeditation. Id. at 2767.

[17]The jury found that: 1) LeCroy would be a future danger to the lives and safety of other persons as evidenced by specific threats of violence, risk of escape, and low rehabilitative potential, and his dangerousness tends to support imposition of the death penalty; and, 2) LeCroy caused injury, harm, and loss to the victim's family. Id. at 2767.

AO 72A
(Rev.8/82)

prison environment; 10) that executing him would cause his family grief; and, 11) that LeCroy spent the first 18 years of his life in a violent and abusive household and the next ten years in an often harsh and brutal prison environment. Two jurors found that LeCroy expressed remorse and 6 found that he was sexually molested as a child. No jurors found either that the prison had sufficient security measures for housing offenders serving a life sentence without the possibility of parole or that LeCroy had tried to nurture his younger brothers. Id. at 2766-70.

The jury then found that the aggravating factors sufficiently outweighed any mitigating factors and imposed the death penalty. Id. at 2770.

6. Direct Appeal

The Defendant filed a direct appeal which was denied. See LeCroy, 441 F.3d at 931. Relevant to this petition, the Eleventh Circuit first refused to consider LeCroy's juror selection challenge because the Defendant failed to "proffer any evidence of the relevant [challenged] population–the percentage of the Hispanic population that is eligible for jury service." Id. at 918 n.1. Next, the Circuit found that the Federal Death Penalty Act ("FDPA") was constitutional. Id. at 920-23. It also found that the use of the 1991 evidence was

74

AO 72A
(Rev.8/82)

not in error, but declined to decide whether the Government's retention of the 1991 evidence violated his 4th Amendment rights because that argument was first presented in his reply brief. Id. at 925 n.8.

With regard to the Court's expert rulings, the Circuit found that because the Defendant did not call his teaching expert or proffer his testimony, any evidence that the Government's rebuttal would have been overkill was wholly speculative and thus, not reviewable. Id. at 927-28. The Court also found that because the Defendant did not object to the future dangerousness jury instruction, the Circuit would only apply plain error–which it found did not exist. Id. at 930-31.

7. Habeas Petition

Following denial of his direct appeal, Defendant then filed a 28 U.S.C. § 2255 habeas petition in this Court, enumerating the following grounds:

A. Whether LeCroy's right to the effective assistance of counsel was violated when his trial counsel failed to adequately investigate and/or present a mental health case at sentencing;

B. Whether LeCroy's right to the effective assistance of counsel was violated when his trial counsel failed to proffer his teaching expert's testimony which would have enabled the district court to rule on the scope of the Government's rebuttal evidence and whether the Government was entitled to evaluate LeCroy;

AO 72A
(Rev.8/82)

C. Whether LeCroy's 5th and 6th Amendment rights to due process and the effective assistance of counsel were violated when the Government breached a court-ordered firewall;

D. Whether LeCroy's right to the effective assistance of counsel was violated when his trial counsel failed to conduct and present an adequate and comprehensive mitigation investigation and presented character witnesses who were not properly prepped;

E. Whether LeCroy's right to the effective assistance of counsel was violated when his trial counsel failed to object to the Court's instruction regarding claimed future dangerousness because of the "risk" of escape;

F. Whether LeCroy's right to the effective assistance of counsel was violated when his trial counsel failed to present juror eligible statistics regarding the Hispanic population in the Gainesville Division;

G. Whether LeCroy's right to the effective assistance of counsel was violated when his appeal counsel failed to adequately present the 1991 document retention issue;

H. Whether LeCroy's right to the effective assistance of counsel was violated when his trial counsel failed to request an instruction requiring the jury to find beyond a reasonable doubt that LeCroy should be sentenced to death only if each juror found beyond a reasonable doubt that all aggravating factors, both statutory and non-statutory, outweighed the mitigating factors presented by the defense;

I. Whether the FDPA is unconstitutional facially or as applied because it does not require that the aggravating factors be alleged in the indictment;

76

J. Whether the FDPA is unconstitutional facially or as applied because it does not require the non-statutory aggravating factors be alleged in the indictment;

K. Whether LeCroy's protections against cruel and unusual punishment would be violated if he were executed pursuant to current BOP and Justice Protocols;

L. Whether LeCroy's right to the effective assistance of counsel was violated when his trial counsel failed to make an effective penalty-phase closing argument regarding mitigation evidence actually presented;

M. Whether LeCroy was denied due process when the Government failed to disclose exculpatory evidence to the Defense;

N. Whether LeCroy's rights to due process, a fair and impartial jury, the effective assistance of counsel, and to be free of cruel and unusual punishment were violated when the government retained a jury selection expert to assist the Government without disclosing that fact to the Defense;

O. Whether LeCroy's right to the effective assistance of counsel was violated when his appellate counsel did not properly allege or present viable issues on appeal.

See generally Pet., Dkt. No. [493]. Upon reviewing the petition and the

response and traverse thereto, the Court ordered an evidentiary hearing

regarding:

1) whether trial counsel were ineffective in the presentation of mental health evidence during the sentencing phase of the trial, 2) whether government attorneys violated the court's 'firewall' order regarding the disclosure of certain reports related to defendant's

77

AO 72A
(Rev.8/82)

mental health issues, and 3) whether trial counsel were ineffective in the jury challenge regarding underrepresentation of the Hispanic/Latino community.

Dkt. No. [512]. In a later order, the Court also stated that it would hear argument on whether, if the Defendant produced mitigation witnesses who could have testified about bizarre sexual activities that occurred involving the Defendant as a child, Petitioner would be entitled to relief. Dkt. No. [518]. After the Defendant's proffer on the bizarre sexual activity issue, the Court declined to hear further evidence as it found that this issue was sufficiently introduced during sentencing and any additional evidence would be cumulative. Dkt. No. [540].

### a. Evidentiary Hearing

#### i. Mitigation Evidence

#### A. Paul Kish

The Defense first called Paul Kish, one of LeCroy's trial attorneys. Kish primarily worked on the guilt/innocence phase of the trial and focused his work on the jurisdictional question–whether the Government could prove that the offense was a federal crime. EHT, Dkt. No. [534] at 13.

Kish believes that he suggested to hire Dr. Hilton to evaluate LeCroy–a standard practice in a capital case. After receiving that evaluation, Kish never met with Dr. Hilton. But, it was his hope that, at sentencing, the Defense would present sexual abuse and mental illness as a mitigating factor. In fact, there was initially a plan to try to introduce "far more evidence than was actually put into the record," but that plan "depended upon the rulings that would come from the trial court." Id. at 17-18, 29.

Kish testified on cross that he never doubted that LeCroy was competent to stand trial, and that Dr. Hilton found that LeCroy did not have an insanity affirmative defense. Id. at 29. He also explained why the defense did not want LeCroy to be evaluated by the Government:

> Again, this was mostly Brian [Mendelsohn] and Stephanie [Kearns]'s area of expertise; but the way I recall it is that Brian's strategy, and it was mostly Brian's, Brian's strategy was that he believed, and I concurred with this, that an evaluation by a government expert would have resulted in very harmful information. Real frankly, we didn't trust the government experts. And we felt that when the government would have such information, it would make it exceptionally difficult to raise the parts of Bill's background that we thought were worthy of presenting to the jury when they had to make their decision about during the sentencing phase of the case.
>
> Brian's . . .strategy, in essence, was that he had, I think he called him a teaching expert. He was going to use what I call these shards

79

AO 72A
(Rev.8/82)

> of information about the potential for sexual abuse in Bill LeCroy's background, have a teaching expert talk with the jury about what happens when a person has been the subject of childhood sexual abuse, and in that fashion avoid having to make Mr. LeCroy available for a government examination.
>
> Furthermore, it's my understanding that Brian believed and predicted accurately what likely would have been the Court's response to that strategy. And Brian thought because the law was quite new in this area, that the Court's fairly predictable response to our position would have been a good issue for appellate purposes.

Id. at 45-46.

Moreover, Kish explained why they did not call Dr. Hilton, the psychiatrist who actually evaluated LeCroy. Kish stated that the team was fully aware of what Dr. Hilton could testify to, including the childhood sexual abuse and the diagnoses, and–whether or not Kish would call it strategic–the team discussed all of the "potential ramifications of various aspects of that report being considered by the jury." Id. at 49-50.

Kish also stated that while he did not recall much of the decision not to call Dr. Lisak, he does know that he concurred with Mendelsohn and Kearns' decision. The defense team also knew that by having LeCroy invoke the 5th Amendment they could forfeit their ability to present mental health evidence at sentencing. Id. at 59-60.

AO 72A
(Rev.8/82)

## B. Stephanie Kearns

The Defense next called Stephanie Kearns who, along with Mendelson, was responsible for the trial's mitigation phase. Like Kish, Kearns stated that Dr. Hilton was a psychologist who her office frequently used, and that after receiving his report, she never met with him. Id. at 91-92. Counsel decided not to call Dr. Hilton because they did not find the diagnoses of "borderline personality disorder and antisocial personality disorder to be particularly helpful in a criminal case." Id. at 103-04. And they were concerned that if Dr. Hilton was cross-examined, he would be asked about how those diagnoses affect LeCroy's behavior–information which they thought would not have been helpful. Id. at 104. However, counsel did recognize that some aspects of the report–such as LeCroy's magical thinking–might have been "very helpful to explaining the case." Id.

Instead of using Dr. Hilton, counsel contacted Dr. Lisak, the "preeminent expert on the effect of sexual abuse on young boys by females." Id. at 93. It was their understanding, though, that if Dr. Lisak evaluated LeCroy, the Government would be entitled to evaluate him as well. Kearns was "very fearful" of a Government evaluation based upon her 30 years of experience

AO 72A
(Rev.8/82)

doing criminal defense work. Id. at 94, 108. Specifically, Kearns did not want him evaluated by a BOP psychiatrist because she had not had a good experience with them in the past. Id. at 110.

To avoid an evaluation, counsel wanted to use Dr. Lisak as a "teaching expert." Dr. Lisak would review all of LeCroy's history–without meeting him–and give an opinion if, based on the evidence presented, LeCroy was exhibiting childhood-abuse symptoms and how those symptoms might explain the crime itself. Id. at 94. The Defense did not want Lisak to evaluate LeCroy because counsel was concerned that he would make the same diagnoses as Hilton, that the Defense would then have to turn over those diagnoses to the Government, and Lisak would then be cross-examined about them. Id. at 113-14. Strategically, the team did not want the Government to know LeCroy suffered from those disorders. Id. at 114:2-6. But, Kearns never spoke with Hilton about what those diagnoses specifically meant and whether the diagnoses were the but-for cause of the crime. Id. at 144.

Additionally, had LeCroy been evaluated, Lisak would likely have been told the same detailed confession which LeCroy told Hilton–one which conflicted with the Defense's theory of the case. In both the guilt phase and the

AO 72A
(Rev.8/82)

sentencing phase, the defense argued that LeCroy was attempting to rob Tiesler's home and that she came home and surprised him; the killing was not planned or premeditated. However, in LeCroy's confession, he states that he laid in wait for her to come home and intended to kill her so that he could "break the spell." Counsel did not want the jury to know what LeCroy said or how he said it because that testimony would have proven the Government's aggravating factors. Id. at 114-18. But, Kearns confirmed that the facts themselves created problems for any aggravating factor defense. Id. at 142.

However, Lisak was never called and the Court was never asked to make a ruling on his ability to testify. Id. at 95, 121:6-12. After the jury began deliberating and before the sentencing phase began, defense counsel was "given the Dr. Medlin report which was the Government's response to [the Defense's] teaching expert . . .and at that point, [the Defense team] decided that the battle of the two experts was not worth the risk." Id. at 96. Counsel knew that if they did not have Lisak testify, then the Government would not be able to put up Dr. Medlin and her opinions. Id. at 122. They were concerned about Dr. Medlin's "complete apparent unwillingness to accept any impact of childhood sexual abuse on an adult man" and the fact that the expert opinions were "polar

83

opposites"–one said the trauma was very damaging and the other said it simply was not. Id. at 125. As well, if Dr. Medlin testified, the Government's rebuttal would have focused on whether the abuse had happened at all–even though the defense thought they could explain these inconsistencies. Id. at 124-25.

In making that decision, though, Kearns did not personally consult Dr. Lisak and ask him what he thought about Dr. Medlin's report. Id. at 96. But all four discussed the pros and cons of not calling Dr. Lisak and determined that the harm of calling Lisak outweighed any potential benefit. Id. at 124-25. As well, because the Court had not finally ruled on Lisak's testimony's admissibility, counsel was still concerned that calling Lisak would have still prompted a Governmental evaluation–even if Lisak had not evaluated him. Id. at 129. Ultimately, they decided that the best mitigation case they could make "would be without [Lisak and Medlin's] testimony." Id. at 125.

Instead, the Defense planned to introduce mental health evidence through historical treatment records. Kearns stated that, at the start of sentencing, she had hoped that she would be able to elicit opinion testimony from the mental-health fact witnesses but still avoid a Government expert. However, after the Government's objection, the Court ruled that any opinion testimony by any

84

health professional would open the door to Dr. Medlin's testimony. Id. at 148. Counsel was concerned if they attempted to obtain the prior diagnoses from the mental health professionals, they would have had general psychiatry testimony up against Dr. Medlin's rebuttal–who would specifically testify that childhood abuse by a woman on a young boy does not produce any effects. Id. at 151.

The Defense decided that they would just obtain the health professionals' objective findings and then Kearns would attempt to draw the same inferences that Lisak would have in her closing. Id. at 97. However, after reviewing her closing, Kearns opined that she "barely" argued that LeCroy was "damaged goods because of what he suffered in his childhood." Id. Her mental health argument was two paragraphs of her closing, and she stated that the childhood sexual abuse was significant in that it "robbed him of his self esteem." Id. at 146.

Kearns also testified regarding the failure to proffer Lisak's testimony. She stated that she did not recall counsel ever discussing that they should have proffered the testimony and, in hindsight, counsel was more concerned that they did not request an explicit ruling from the Court on the issue. Id. at 100.

AO 72A
(Rev.8/82)

## C. Brian Mendelsohn

Mendelsohn was essentially "lead counsel" for the sentencing phase, although all decisions were made by the Defense team jointly. Id. at 300. He stated that, like the others, he received Dr. Hilton's report but never talked to him about it. Id. at 158. Hilton's evaluation was intended to be a "test run" to "see what would happen" if they let LeCroy be evaluated; Hilton was never intended to be a witness at trial from the start. Id. at 265-266.

All four attorneys reviewed the report and found that "the facts in [Hilton's] report were not particularly helpful." Id. at 262:24-25, 268. Counsel were concerned that exposing the jury to LeCroy's detailed confession would contribute to the statutory aggravating factors and would eliminate their ability to rebut them. Id. at 259-61. As well, that confession would have been inconsistent with the Defense's theory that the murder only occurred because Tiesler surprised the Defendant. Id. And the diagnoses were not "particularly good" or "compelling" and would not provide an affirmative defense to the charges. Id. at 264, 293.

After reading the report, Mendelsohn had their investigator, Susan Miller, talk to Thomas Ledford about the Wicca religion which was mentioned in the

AO 72A
(Rev.8/82)

report. Id. at 158. Ledford confirmed the "magical" aspect of the religion. Id. at 158-59. Counsel discussed this issue of magic and witchcraft and ultimately decided the diagnosis was not particularly helpful. Id. at 299-300.

Early on in the case, the Defense had learned from various records and from talking to LeCroy that he had been abused as a child by his babysitter. Id. at 156-57. As a result, they contacted Dr. Lisak because Mendelsohn had recently used him in a capital habeas case and was familiar with his work. Id. at 157. Lisak reviewed LeCroy's records and stated that, in his opinion, he believed LeCroy's behavior was consistent with someone who had been abused as a child by an adult female. Id. at 176-77. However, like Kearns, Mendelsohn did not want Lisak to evaluate LeCroy because he was "very scared" of a Government evaluation. Id. at 159:18. They were concerned that the details of the crime would be revealed and that the Government's expert's conclusions "could conceivably be worse." Id. at 269:10-11. All of LeCroy's lawyers advised him to invoke the 5th Amendment because they were concerned that even if the Court ordered only a restricted evaluation, the Court might not be able to control it. Id. at 163. As well, as long as the Government was not able to

87

evaluate LeCroy, the details of the Hilton report would remain confidential. Id. at 269.

After receiving Medlin's report, Mendelsohn stated that counsel did review it with Dr. Lisak before making the decision about how to proceed. Id. at 166, 296-99. Dr. Lisak thought the report was "nonsense" and was a "hatchet job by somebody who really didn't know what she was talking about." Id. at 166-67. For instance, Lisak thought she was giving inappropriate significance to individual questions on a personality inventory, and that she did not cite "real" studies. Id. at 167.

However, they still decided that not calling Dr. Lisak was the "best course." Id. at 274. They were concerned about Medlin's opinion that people in jail fake mental health issues for sympathy and to receive benefits, and that she would tie that opinion to LeCroy's self-reporting inconsistencies. Id. at 275-77. Counsel thought that while they could easily explain why LeCroy made the inconsistent statements, they did not want to have to address that issue in the sentencing phase. Id. at 277.

> And [Mendelsohn's] bottom line ultimately on it was while [he] didn't think very much of Dr. Medlin's report, [they] weren't dealing with experts, [they] were dealing with lay people; and in the end it may just be a battle of the experts. No matter how

AO 72A
(Rev.8/82)

> incredible [Medlin] may be on an objective expert level, you know, she could come off polished enough to a lay jury that [they] would end up having her be believable.

Id. at 277:25-278:6.

But this decision was not made on a fear that allowing Lisak and Medlin to testify would prove the statutory aggravating factors as, in his opinion, he did not think they had "much of a shot" to defeat them. Id. at 173, 281-92. And even after they realized that the Court would not even allow the mental health diagnoses, they did not reassess their avoid-an-evaluation plan. Id. at 171.

Mendelsohn stated that he had hoped that the Defense would be able to make a case for mental health mitigation at closing. As he stated:

> A: The way I saw it is this whole incident was tied to the sexual abuse and that Mr. LeCroy saw Ms. Tiesler, had some connection with the babysitter, snapped, had some sort of psychotic break and lost it and committed the offense. And so that's how I was hoping to be able to tie it up down the road.
> Q: Well, was that inferential argument ever made by either you or Ms. Kearns?
> A: No, it never was.

Id. at 169. He had expected Kearns to make that argument but "somehow it didn't happen." Id. at 170.

89

AO 72A
(Rev.8/82)

**D. Dr. Hilton**

Dr. Hilton testified that in his expert opinion, LeCroy's personality disorder played a "direct role" in the crime, and that without his mental illness, LeCroy would not have committed the crime. Id. at 204-05. He also had "no doubt" that LeCroy was sexually abused as a child. Id. at 205. Dr. Hilton further stated that if the Defense team had called him about his report, he would have told them that LeCroy's illness was the cause of his crime. Id. at 206-07.

Hilton also expressed doubts about the quality of Dr. Medlin's report. He felt that "Dr. Medlin seems to have gone a little far at times in trying to find reasons not to accept what's in the medical records" and the "overwhelming evidence of a very dysfunctional" childhood. Id. at 208. He also questioned Medlin's decision to take single questions out of the personality tests and give them weight. Id. at 209.

Hilton felt that LeCroy's reporting inconsistencies did not affect the veracity of his abuse claims. First, Hilton pointed out that while LeCroy "will probably never" say he was sexually assaulted–which was how the question was worded on his intake form–he would have responded positively if the question had been have you ever had an "inappropriate relationship as a child

90

with an adult." Id. at 210. Moreover, Hilton finds that "checklists are unreliable when it comes to this sort of personal information." Id. at 211. And when some of the tests were taken, LeCroy was near parole and, consistent with his manipulative personality disorders, was likely trying to make himself look as healthy as possible so he could be released. Id. at 214-15.

On cross, Dr. Hilton was asked to confirm the results of LeCroy's MCMI-III psychological testing report ("Millon") which was taken in August 1999. The Millon revealed that: 1) "this abrasive and intimidating prisoner is likely to be defiant and untrustworthy"; 2) "this inmate possesses a deficient conscience and may not only seek conflict and confrontations, but may also evidence a recklessly violent disposition"; 3) LeCroy "exhibits malicious and hostile tendencies which may lead this prisoner to humiliate and sexually dominate weaker inmates"; 4) and as to suicide, "most individuals with this profile are unlikely to turn their hostility inward and engage in suicidal behaviors." Id. at 220-22. Hilton also stated, though, that psychologists would not solely rely upon one exam to diagnose a patient. Id. at 253.

Hilton also confirmed that LeCroy's motive for killing Ms. Tiesler still remains unresolved–Tinkerbell is still out there, and LeCroy is not cured. Id. at

AO 72A
(Rev.8/82)

223. As well, Hilton opined that LeCroy would be a danger to commit murder if he ever escaped custody. He also stated that because LeCroy has homicidal ideations against other prisoners, it is possible that he would be a danger in prison, and LeCroy might also be a danger to a female guard who he mistook for Tinkerbell. Id. at 226. However, Hilton noted that people with LeCroy's disorders tend to do well in prison's structured environment. Id. at 254.

Regarding the aggravating factors, Hilton stated that had he testified at trial, the defense would not have been able to argue their jurisdictional defense that it was a "burglary gone bad." As well, his testimony would have been inconsistent with challenging the aggravating factors. Id. at 238-43. The Government also demonstrated what cross-examination would have looked like if Hilton had testified by making Hilton confirm every pre-meditated and gruesome detail of LeCroy's confession. Id.

### E. Dr. Marti Carlson

Dr. Carlson testified that she first learned of LeCroy's child abuse in individual therapy. Id. at 308. As a result of their conversations, Carlson diagnosed LeCroy with major depression and referred him to a psychiatrist who prescribed him antidepressants. Id. at 310-11. Dr. Carlson also stated that while

92

she never diagnosed LeCroy with borderline personality disorder, she did see the traits in him. Id. at 321.

While at El Reno, LeCroy worked through his vengeful thoughts and feelings of abandonment. Id. at 312-319. Dr. Carlson never felt that LeCroy was ever being untruthful about his background. Id. at 319. As well, she was never afraid of LeCroy and felt that he did well in a structured environment. Id. at 326.

When asked to review LeCroy's intake form, Dr. Carlson stated that it "would not surprise her" that someone who had been sexually abused would not check that box on his form. Id. at 325. It is not unusual for an inmate to deny sexual abuse. Id. at 326.

Dr. Carlson testified that Defense counsel came to El Reno, reviewed LeCroy's records, and asked her general questions about LeCroy's treatment. However, they never asked if LeCroy's symptoms were consistent with someone who has been abused as a child, and they never asked her to explain how his depression would increase his propensity to commit future crimes. Id. at 320.

AO 72A
(Rev.8/82)

On cross, Dr. Carlson confirmed that she went through every note during the sentencing and explained what was said in a factual manner–she just did not explain her opinions. Id. at 332.

### F. Dr. David Lisak

Dr. Lisak is a clinical psychologist and Associate Professor of Psychology at the University of Massachusetts in Boston who specializes in child sexual abuse.[18] EHT, Dkt. No. [537] at 556-57. He was contacted by Mendelsohn, and he originally understood that he would be evaluating LeCroy, a "critical part" of his process. Id. at 559-60. However, counsel then stated that they would not have him evaluate LeCroy; rather, he would be called to provide "general educational testimony" about the impact of childhood abuse. Id. at 562-63.

### i. Dr. Lisak's "teaching expert" testimony

Dr. Lisak was first asked to provide the testimony he would have given had the Defense called him as a "teaching expert." In 2003, Lisak was provided LeCroy's Georgia State Department of Corrections File, his pre-sentence report

---

[18] Dr. Lisak has "evaluated and interviewed hundreds of men who were abused as children" and has "testified in sort of live testimony more than 20 times and then given written testimony more than 50 times." Id. at 557:17-19, 558:19-21.

94

from his 1995 federal conviction, his BOP counseling records, and Dr. Hilton's report. Id. at 611-13. Dr. Lisak stated that he read Dr. Hilton's report back in 2003-04 but would have been unable to verify any of Dr. Hilton's diagnoses because he did not evaluate him in 2003-04. Id. at 613-14.

Lisak testified that childhood abuse victims tend to struggle with intense emotions, such as helplessness, powerlessness, rage, and fear. Id. at 564. They also commonly experience a range of depressive episodes and anxiety disorders. Id. at 564-65. And these victims tend to struggle in academic and work environments. Id. at 565.

In the case of men, there is commonly confusion about their identity as men and their sexual identity. Id. at 564. Men who are abused are typically humiliated and shamed by the abuse and are less likely to report it. Id. at 567. Because they never report the conduct, these men typically have a warped understanding of what happened to them and what that abuse means. Id. Many panic that because they were abused they must be homosexual, whether they were abused by a man or a woman. Id. at 567-68.

Neurobiologically, child abuse victims' brains become hyper-vigilant due to their constant exposure to violence, and this constant exposure to adrenaline

95

damages the hippocampus, which controls memory. Id. at 566-67. In a situation like LeCroy, where the victim was exposed to multiple types of abuse, the victim has a "substantially elevated risk" of developing a psychological reaction. Id. at 568. For instance, in one study Dr. Lisak found that male victims of childhood sexual abuse alone are 30% more likely to commit violence later in life, but male victims of childhood sexual and physical abuse were 48-49% more likely to commit future violence. Id. at 569.

### ii. Dr. Lisak's evaluation testimony

In preparation for the evidentiary hearing, Dr. Lisak evaluated LeCroy over two days at the federal correctional facility in Tierre Haute. Id. at 572-73. He took a very detailed sexual history, asking LeCroy about "everything that has really ever happened to [him] of a sexual nature as far back as [he] can remember." Id. at 573. It is "quite typical for men not to perceive a sexual abuse experience as being sexual abuse," so Dr. Lisak asks about sexual experiences generally as opposed to "sexual abuse" incidents. Id. at 574.

LeCroy first told Dr. Lisak about the two nights he spent with Tinkerbell and detailed the same facts which Dr. Hilton relayed about the incidents. Id. at 575-79; see supra. In the days following the abuse, LeCroy attempted to french

AO 72A
(Rev.8/82)

kiss another girl from his neighborhood in the way that Tinkerbell had kissed him, but the girl screamed and told her mother. The girl's mother then called LeCroy's father, and LeCroy's father beat him over it. Id. at 580. Dr. Lisak explained that this behavior is precocious or regressive sexual aggression, which occurs when an abused child acts out sexual conduct that he learns from his abuser. Id. at 580.

LeCroy also struggled with self-identity, specifically whether he was homosexual. His father and uncles referred to homosexuals as "men who take it in the butt" and that phrase triggered for LeCroy the memory of Tinkerbell putting her finger in his anus. Id. at 581. LeCroy assumed that because he had been involved in what might have been a homosexual act, he must be homosexual. These thoughts coupled with the homosexual disparagement by his family caused LeCroy to be panicked. Id. at 581-82.

Dr. Lisak also explained that men are very reluctant to disclose sexual abuse, so he was not troubled that LeCroy would not have reported the abuse to his parents. Id. at 582-84. Even without those disclosures, Dr. Lisak opined that he believed LeCroy was abused as a child. Id. at 584-85. He based this opinion on LeCroy's description of the event, his acting out, and his confusion with

AO 72A
(Rev.8/82)

homosexuality, *inter alia*. Id. Dr. Lisak also stated that in order for LeCroy to have fabricated his responses, he would have had to read "a lot" of "pretty esoteric literature." Id. at 585-86. He opined that he was not troubled that LeCroy would write to his parents that he loved them, even if he had been physically and mentally abused by them. Id. at 586. It is very common for abused children to recall their childhood in a completely distorted manner as the "most crucial need of childhood is secure attachment." Id. at 586.

On cross, Dr. Lisak stated that he reviewed Dr. Hilton's conclusion that LeCroy had an antisocial personality disorder in 2004 and would have considered that disorder's tendency to lie as a factor when evaluating LeCroy's sexual-abuse claim. Id. at 615-16. He also looked at records in which the Defendant claimed he committed suicide in conjunction with the psychologists' conclusion that he cut himself for manipulative purposes. Id. at 622-25. He stated that it was possible the Defendant cut himself to get special treatment, but that cutting was generally also viewed as a symptom of borderline personalities. Id. at 625.

The Government also asked Dr. Lisak to explain why LeCroy reported significantly more mental health issues on his Millon in 1999 when he was

98

AO 72A
(Rev.8/82)

working with Dr. Carlson than in 2000 when he was looking to be released. Id. at 627-28. Dr. Lisak stated that LeCroy might report more mental health issues if he wanted to see Dr. Carlson or he might have simply been more honest in 1999. Id. at 628. He also stated it was possible that LeCroy made up the sexual-abuse issue because he wanted to see Dr. Carlson and Ms. Novey. Id. at 631.

### iii. Dr. Lisak's opinion of Dr. Medlin's report

Dr. Lisak first stated that, as Dr. Medlin acknowledges, her opinion was seriously limited because she did not meet with LeCroy. Id. at 589. As well, he felt that Dr. Medlin made very "tenuous readings" of the record. Id.

Dr. Lisak challenged the studies Dr. Medlin relied upon, including the *National District Attorney's Association Bulletin* which–as far as Dr. Lisak knows–is not peer-reviewed. Id. at 590. He stated that her assertion that "a significant number of sex offenders fabricate a childhood history of sexual abuse" overstates the issue. While some percentage of individuals will make up abuse, the research reveals that as opposed to fabricating abuse, child abuse victims typically do not disclose it at all. Id. at 590-91. He also challenged her use of the Kolko study which stated that those with a supportive parent figure, high intellectual functioning, and higher socioeconomic status are able to cope

AO 72A
(Rev.8/82)

better from an early adverse parenting experience. Lisak stated that he would find that LeCroy's mother was timid–not supportive–and his socioeconomic status was in constant flux. Id. at 600-02. Thus, he would not find them as resiliency factors. Id. at 602.

He also was not concerned that LeCroy did not report sexual abuse on his intake forms. First, as stated before, the questions ask about sexual assault, not sexual abuse. And, sexual abuse disclosures by men tend to be intermittent; they disclose when they are upset. Id. at 592-93, 603-06. He also was not concerned that LeCroy asked his psychologist to tell the parole board that he did not have a "serious mental health problem" and that he had a supportive family, as he could have stated that to get paroled.

As well, Dr. Lisak expressed concern with using specific answers to the Millon as diagnostic tools. Id. at 598. The Millon is useful because it creates personality profiles based on recognizing patterns within responses. Id. However, there is no correlation between individual answer responses and behaviors; the test is not intended to be used that way and no reputable psychologist would use it that way. Id. at 598-99.

AO 72A
(Rev.8/82)

Finally, Dr. Lisak challenged Medlin's assertion that childhood sexual abuse victimization is "neither a necessary nor a sufficient cause of adult sexual offending." Id. at 605. He stated that Medlin's conclusion is true, that sexual abuse itself does not cause the victim to be an abuser later, but it does create a higher risk that the victim may be violent. Id. at 605-06.

### G. Dr. Julie Medlin

Dr. Julie Medlin is a licensed psychologist and the Director of the Medlin Treatment Center, a private outpatient counseling center which specializes in the evaluation of sexual abuse and sexual deviancy. Id. at 665. In 2004, Dr. Medlin had originally expected to do a full evaluation of LeCroy which would have included an in-person interview. Id. at 673. However, after LeCroy invoked the 5th Amendment, she prepared her report solely on written records. Id. However, she was not privy to Dr. Hilton's report which fully detailed the sexual assault at the time she prepared her report. Id. at 723-24.

From those records, Medlin found that LeCroy had an above-average IQ and was inconsistent in reporting child abuse. Id. at 676. LeCroy originally reported the sexual abuse to Bryan Dempster in 1992 and did not report the abuse again until 1999 with Ms. Novey and Dr. Carlson. Then, in 2000, LeCroy

101

AO 72A
(Rev.8/82)

denied the sexual abuse. Id. at 677. Dr. Medlin expressed concern that LeCroy most notably reported childhood sexual abuse to female mental health professionals that he liked. Based upon the Hindman study,[19] which found that, of those who report childhood abuse, approximately half of sex offenders falsely report that they themselves were victims of child abuse as a means to justify their offending, Dr. Medlin found that LeCroy's inconsistencies may well have occurred because LeCroy wanted to relate to his therapists. Id. at 677-78. In fact, because false reporting is so common, the State of Georgia requires all sex offender treatment providers to polygraph probationers every six months while they are in treatment. Id. at 682.

However, Dr. Medlin conceded that some children do not immediately report sexual abuse, and some do not tell their parents. As well, some children give conflicting reports. Id. at 706. Whether a child portrays sexually reactive behavior is a factor she would consider when evaluating the credibility of a

---

[19]In the Hindman study, Hindman asked a group of adult sex-offenders whether they had been abused as a child. Sixty-five percent reported that they had. In conjunction with immunity, the same sex offenders were again asked whether they were sexually abused while being polygraphed, and only 30% of those originally questioned were found to be telling the truth on the childhood abuse question. The study was then replicated with 61% reporting childhood abuse and the polygraph revealing 30% were actually abused. Id. at 679-81.

102

child-abuse report. Id. at 706. As well, she stated that she never talked to any of LeCroy's mental health professionals–she only reviewed their notes. Id. at 709-10.

Dr. Medlin also pointed to LeCroy's inconsistencies in suicide and depression reports. After LeCroy overdosed on indocin, he originally reported to Dempster that he had wanted to commit suicide, but later stated that he was only trying to numb the pain so that he could cut himself to get out of work camp. Id. at 683-84. As well, LeCroy initially reported at El Reno that he had never been diagnosed with depression, but after he met with Dr. Carlson, he reported that he had previously suffered from depression and tried to kill himself in 1991. Id. at 686. He also faked a seizure to avoid being sent to his correctional unit. Id. at 687.

Dr. Medlin stated that these inconsistencies are relevant to LeCroy's sexual abuse claim as it shows he has a history of lying about his symptoms. Id. at 686. Ultimately, in Dr. Medlin's opinion, LeCroy "says whatever he thinks at the time is going to benefit him the most in terms of being moved out of work camp or being paroled or getting a therapist to like him or feeling sorry for him or things of that nature. So, it appears he is not a reliable reporter." Id. at 687.

103

She also noted that in 1998 LeCroy sought therapy, and for whatever reason was not given therapy. But in 1999, after he may have exaggerated his symptoms, he was then offered therapy. Id. at 689. On cross, however, Dr. Medlin acknowledged that LeCroy may have lied about his suicide so that he would be paroled. Id. at 711. She also stated that LeCroy likely told Dempster about his sexual abuse because he was trying to make Dempster feel sorry for him as they were talking about LeCroy's own sexual offending. Id. at 712.

But, Dr. Medlin did acknowledge that people view sexual "abuse" and a sexual "assault" differently. Further, Medlin did not know the context in which LeCroy filled out his intake forms. Id. at 720-21. She also recognized that many people are reluctant to reveal sexual abuse to someone they just met, and they would be more likely to reveal it to their established, mental-health professional. Id. at 721.

Dr. Medlin also challenged Dr. Lisak's opinion that males who are sexually abused by women fear that they are homosexual. In her experience, males abused by women do not even perceive the conduct as sexual abuse and instead many view it as a positive experience–"that they were being initiated into the sexual world by this older woman." Id. at 690.

AO 72A
(Rev.8/82)

She also stated that even if LeCroy was abused, he did not appear to be traumatized because of it. Dr. Medlin pointed out that LeCroy thought it made him "special," he masturbated about the experience, and had some "positive feelings" about it. Id. at 690. However, she did state that child abuse is never "good," and that because she did not evaluate LeCroy, her opinion on the matter was limited. Id. at 700.

She also pointed out that LeCroy did not appear to take responsibility for his actions as a sex offender. When he told Dr. Carlson he wanted to apologize to his step-sister for his behavior, he actually wrote a letter where he forgave himself. Meaning, he viewed himself as the victim which is very common among sex offenders. Id. at 691-92.

Last, Dr. Medlin explained her use of the Millon and Kolko study. She stated that Dr. Lisak was correct, that individual questions from the Millon should never be used to form a diagnosis, but because she was not able to evaluate LeCroy, she viewed the individual responses as relevant as just another "piece of information in the case." Id. at 693. She also viewed LeCroy's IQ and family background as factors which would mitigate against his future

AO 72A
(Rev.8/82)

propensity for violence. <u>Id.</u> at 694. However, Dr. Medlin did not know the population the IQ test was normed against. <u>Id.</u> at 703.

ii. Jury Selection Expert/Firewall Breach

**A. Paul Kish**

Kish was the first to learn that the Government had used a jury-selection expert to "find out what would be the impact on a potential juror if part of the Defense case was to raise the issue of childhood sexual abuse." He learned this information three years after the trial at a jury experts seminar in which Sally Quillian Yates, the current U.S. Attorney who was First Assistant U.S. Attorney at the time of LeCroy's trial, made a presentation wherein she disclosed that her office had used such an expert in a capital carjacking case–LeCroy's case.

There was "no doubt in his mind" that Yates employed the jury expert for childhood sexual abuse–not just exposure to a dysfunctional family. Kish was concerned about this information as the Court had instituted a firewall which was supposed to prevent any sentencing mitigation information from being revealed to the trial team. Thus, per his understanding, the trial team should not have known that sexual abuse would be an issue before trial–when the jury

expert was used. Id. at 25-28. Kish also stated that this conversation with Sally Yates was the only basis of his suspicion. Id. at 39.

The Government explained its sexual-abuse knowledge by having Kish authenticate two documents from pre-firewall discovery–which the government gave the defense–in which LeCroy told his prison counselors that he was abused as a child. Because this exchange occurred before the firewall, the trial attorneys would have had access to the documents. However, Kish pointed out that only two of the 1722 documents produced discussed this childhood sexual abuse. Id. at 32-36.

### B. Stephanie Kearns

Kearns testified that they did not have any evidence that the Government's firewall attorney disclosed anything other than Dr. Medlin's name, and that if they had any evidence, they would have raised it with the Court when the issue arose. Id. at 132-33. As well, in Kearns opinion, any breach of the firewall was mooted when they decided not to call Dr. Lisak. Id. at 133.

AO 72A
(Rev.8/82)

### C. Brian Mendelsohn

Mendelsohn stated that he did not know why counsel did not raise the firewall issue on appeal. He thinks they "just left it out" and it was not because they did not call Dr. Lisak. Id. at 165.

### D. Raymond J. Burby, IV

Raymond Burby was second chair for the Government during LeCroy's trial. EHT, Dkt. No. [536] at 439. The Government employed a jury consultant, R&D Strategic Solutions, LLC, to complete focus groups who would help the Government to determine how best to present its case and to help it anticipate the jury's reactions to any possible defenses. Id. at 440-41, 448. In preparation for those groups, Burby wrote a summary of what they thought was a "strong possibility" of the Defendant's case. Id. at 441-42. That document was last saved or modified on December 11, 2003 at 3:53pm on a Government computer, five days before the firewall procedure was created. Id. at 443. In that summary, Burby wrote:

> Bill, Jr.'s greatest secret of all, however, was the fact that a
> babysitter had molested him. He carried the shame of that abuse
> around with him for most of his life, never telling his parents or
> brother. It was not until he went to federal prison and began to
> receive counseling that he even talked about it – or ever talked
> about it.

AO 72A
(Rev.8/82)

. . .

> There's another factor that mitigates against imposition of a death penalty here. At the time Bill, Jr., raped and murdered Ms. Tiesler, his capacity to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of the law may have been significantly impaired. A psychiatrist who has reviewed Bill, Jr.'s, case believes that the sexual abuse he suffered as a child at the hands of a babysitter, the abuse of his mother that he witnessed as an adolescent, and his rape in prison as an adult could all have contributed to cause him to "snap" and literally lose control of himself . . ."

Id. at 445:13-18, 447:19-48:4. He stated that the Government had gleaned that possible defense from the BOP records, and as of December 11th, the Government only knew that LeCroy had raised a mental health defense–not the substantive basis of that defense. Id. at 446.

### E. Joseph Plummer

Joseph Plummer is an Assistant United States Attorney who was the Government's firewall counsel along with Yonette Buchanan. Id. at 511-12. Plummer stated that the only mental health information he possibly disclosed to the Government's trial counsel was the name of the Government's expert–Dr. Medlin. Id. at 513-16, 519-21. Ultimately, the trial attorneys wanted this information to check Medlin's references and see whether she had been qualified as an expert before. Id. at 522-23.

109

AO 72A
(Rev.8/82)

### F. Judge Russell Vineyard

Judge Russell Vineyard, now a magistrate judge, was the Government's lead trial attorney who questioned LeCroy's family before the federal grand jury in 2002. Id. at 526. During that questioning, Judge Vineyard asked LeCroy's brother, mother, and father if LeCroy was sexually abused as a child because he had read "something about a babysitter" in LeCroy's prison records and wanted to check the veracity of that allegation. Id. at 527, 529-34. All stated that they were not aware of any abuse. Id.

Judge Vineyard also testified that he did not receive any information from the firewall counsel which violated the firewall order. Id. at 535-36. However, someone on the trial counsel team did review Dr. Medlin's curriculum vitae and "probably" could have determined her area of expertise. Id. at 537.

### iii. Jury Underrepresentation Issue

### A. Paul Kish

Kish was primarily responsible for preparing Defendant's challenges to the grand juror and petit juror selection procedures on the ground that the jury pool did not represent a fair cross-section of the community because African-

AO 72A
(Rev.8/82)

Americans and Hispanics were underrepresented. EHT, Dkt. No. [534] at 18, 72-73. Kish worked with Jeffrey Martin[20] to prepare statistical data in support of Defendant's motions. Id. at 18, 73-74. In presenting figures regarding the Hispanic population in the Gainesville Division and the Northern District to support those challenges, Kish presented numbers from the Census. Id. at 18, 73. Kish made the decision to ask Martin to use the Census general population figures instead of citizenship figures; it did not "occur to" him to adjust the Census figures in terms of citizenship, and he does not know why he made that decision. Id. at 18-19, 74, 77.[21] He also provided the opinions of Dr. Bohan, who performed a statistical analysis in support of Defendant's motions; Kish did not provide her with citizenship figures either. Id. at 75-77.

On cross-examination, Kish denied that he knew that if he used citizenship numbers as opposed to general population numbers, the comparative disparity and absolute disparity would be lower. Id. at 77. When asked whether he remembered arguing in his brief "that underrepresentation should be

_____

[20] Jeffrey Martin is the brother of Jack Martin, Esq., who currently represents Defendant. Dkt. No. [534] at 18.

[21] Kish testified that this was his first JSSA/Sixth Amendment challenge in which he had presented evidence. Dkt. No. [534] at 74.

111

AO 72A
(Rev.8/82)

measured against the general population, not the jury eligible population," Kish

testified that he did not remember making that argument.[22] Id. at 78.

### B. Lucy Moses[23]

Lucy Moses is the jury administrator for the United States District Court

for the Northern District of Georgia. Id. at 462. She has been in that position for

13 years. Id. She oversees the jury process for the District, including

"rebuilding [the] jury master wheel, mailing out the questionnaires, qualifying

the questionnaires once they come back, mailing out the summonses, handling

any excuses to be postponed or excused, providing jury orientation to the jurors

when they have to report, and paying the jurors." Id. at 462-63. She is guided in

the performance of her duties by the Jury Plan, included at Appendix A to the

court's Local Rules. Id. at 463, 492. Under that Plan, the Clerk of Court, to

whom Moses reports, has the authority for administering the jury selection

process, under the supervision of the Chief Judge. Id. at 463. The court must

---

[22] That argument can be found at Dkt. No. [35] at 8-11.

[23] Although Moses testified after Martin, whose testimony is discussed *infra*, her testimony concerning the Northern District's jury selection system provides information helpful to understanding Martin's testimony about that system and is therefore addressed before his.

112

also follow the provisions of the Jury Selection and Service Act, 28 U.S.C. §§ 1861 *et seq*. Id. at 492.

The Jury Plan, which was first established in 1982, is drafted by the court and approved by the Eleventh Circuit. Id. at 463, 493. The Plan governs the four divisions in the District—Atlanta, Gainesville, Newnan, and Rome. Id. at 464. Jury Plans were issued in 1997, 1999, 2002 and 2008. Id. at 464; see also Gov't Exs. 14, 26, 38.

The Jury Plan requires that the master jury wheel, from which all prospective grand jurors and petit jurors are selected, be rebuilt every four years, after every general election; thus, the jury wheel was rebuilt after the general elections in 1996 and 2000. Id. at 464, 501-02. In order to rebuild the master wheel, the Clerk requests a list of registered voters from the Georgia Secretary of State's Office of Voter Registration approximately a month prior to the voter registration deadline, see, e.g., EHT Gov't Exs. 2, 15; the Plan provides that the voter registration list is the only source for creating the master jury wheel. Id. at 466, 493. Moses explained that the court does not use other sources, such as driver's license lists, because "the voter registration source most accurately reflects what we need as far as for jurors," and that if other

113

AO 72A
(Rev.8/82)

sources are used, the lists would include persons under 18, felons, and non-citizens. Id. at 466.

On cross-examination, Moses conceded that the voter registration list includes people who are not qualified to serve as jurors, and that the jury qualification questionnaire, discussed *infra*, could be used to disqualify people if other sources were used to rebuild the jury wheel such as driver's license lists.  Id. at 496-500. Moses also acknowledged that 18 U.S.C. § 1863 provides that voter registration lists should be used for the jury wheel, but that other sources should be used to "supplement that list if the goals of the plan, which is a representative jury and nondiscrimination, are not being achieved," and that there are courts around the country that supplement the voter registration list with other sources. Id. at 494-95.

After the Clerk requests the voter registration information, the Secretary of State provides the names and addresses of all the voters in the state[24] to all of the federal Districts, generally on a compact disc. Id. at 468, 505; see also EHT Gov't Exs. 3, 16. The third-party vendor responsible for rebuilding the wheel then certifies that it has received the voter registration information. Id. at 468-

---

[24]All three Districts, i.e., Northern, Middle and Southern, rebuild their jury wheels at the same time. Dkt. No. [536] at 466-67.

114

69; see also EHT Gov't Ex. 17. The Clerk also provides the third-party vendor

with a copy of the Jury Plan, the court's authorization for the vendor to build

the master jury wheel, a quotient in order to determine the starting number for

selecting names from the voter registration list, and additional instructions for

building the wheel. Id. at 469-70; see also EHT Gov't Exs. 4, 5, 18.

The quotient is determined by first determining how many jurors will

likely be needed for a four-year period in each division and then dividing that

number into the total number of registered voters for each division. Id. at 471-

72. For example, if the number of jurors needed for the Atlanta Division is

60,000 (the minimum number of jurors required by the Plan, id. at 472), and

there are 600,000 registered voters in the Atlanta Division, the quotient is 10.

Once the quotient is determined, a public "random draw" is performed to pick a

starting number between one and the quotient. Id. at 473-76; see also EHT

Gov't Exs. 6, 7, 19, 20. Once the quotient and starting number are determined

for each division, that information is provided to the vendor to rebuild the

wheel. Id. at 476, 491-92; see also EHT Gov't Ex. 8.

The Clerk has no discretion to choose or exclude jurors during this

process and cannot alter the composition of the master wheel based on the race

115

AO 72A
(Rev.8/82)

or ethnicity of the jurors, and Moses is aware of no procedures that the jury office conducts that could be considered discriminatory on the basis of race or ethnicity. Id. at 476-77, 492.

In order to be qualified to be a juror, a person must be a citizen; must not be an elected official or one who is appointed by an elected official; must be over the age of 18; must not be a felon whose civil rights have not been restored; must not be in the armed services, a law enforcement officer, or firefighter; and must be able to read, speak, and understand English. These qualifications are set out in the Jury Plan. Id. at 477. Once the vendor builds the master jury wheel, the Clerk mails, by First Class mail, questionnaires to prospective jurors at the addresses provided by the Secretary of State's Office, in order to determine whether they are qualified to serve as jurors. Id. at 477-78, 508; see also EHT Gov't Ex. 22. In addition to asking questions about the person's qualifications to serve as a juror, the questionnaire asks for, among other things, information about the person's race, i.e., asian, native hawaiian/pacific islander, native american indian, black, white, or other, and also asks whether or not the person is Hispanic. Id. at 484-85; see also EHT Gov't Ex. 22.

116

Prior to mailing the questionnaires, the vendor compares the voter registration database to the National Change of Address database "to ensure that we have the most accurate addresses for our jurors."[25] Id. at 478-79.  If the person has moved and provided a forwarding address to the United States Postal Service, the questionnaire will be forwarded to that new address. Id. at 479. Moses' office also receives information from family members or executors that people on the wheel are deceased and information that a person has moved out of the Northern District of Georgia. Id. at 479-80. In 1996 and 2001, when Moses received questionnaires returned as undeliverable, she attempted to find a "better address" for a person by using "White Pages" and sent him or her a new questionnaire. Id. at 480, 508. If a questionnaire is not returned, her office mails a second notice and another questionnaire.[26] Id. at 480-81; see also EHT Gov't Ex. 24. Historically, 25 percent of those who receive questionnaires do not return them, and then after Moses' office sends out the notice and second questionnaire, approximately 50 percent of those persons return the

---

[25] Moses conceded that driver's license and personal identification card lists would have more updated addresses than voter registration lists. Dkt. No. [536] at 506.

[26] Questionnaires inform prospective jurors that it is a federal requirement to return them. Dkt. No. [536] at 507.

117

questionnaire. Id. at 481-82. The Clerk does not take further action on the questionnaires that are not returned after sending out the notice. Id. at 509. The Clerk has no way of determining the race or ethnicity of the persons whose questionnaires are returned as undeliverable or who do not return the questionnaire. Id. at 482.

The questionnaires are then used to determine which jurors are qualified pursuant to the Jury Plan. Id. Once the Clerk has has identified those jurors, their names are put into a wheel. Id. The Clerk then makes a report to the Chief Judge, who accepts the recommendation for the master wheel.[27] Id. at 484; see also EHT Gov't Exs. 9, 25.

The Clerk also completes a "Report on Operation of the Jury Selection Plan," referred to as a "JS-12" report, for each division concerning the results of the qualification questionnaires. Id.; see also EHT Gov't Exs. 10-13, 27-30. The JS-12 reports include an analysis of the questionnaire responses about race, identification as Hispanic, etc., in order to make sure that a group is not over- or underrepresented on the jury wheel so that the qualified jury wheel "fairly

---

[27] Once a master wheel is created, the Clerk also requests permission of the Chief Judge to shred the questionnaires, and therefore, the 1997 questionnaires have been shredded. Dkt. No. [536] at 488-89; see also EHTGov't Ex. 41.

118

represents the community." Id. at 485, 503-04. In order to accomplish this objective, the Administrative Office recommends that the court pick a sample of jurors to reflect demographic information such as race, ethnicity, etc., and the sampling number is included on the JS-12. Id. at 504. Moses "had no reason to believe that the sampling size would not provide an accurate picture of whether or not the system was accurately representing the community[.]" Id.

In order to determine whether or not a group is over- or underrepresented, the Clerk compares a sample of the populations reflected in the jury questionnaires to the populations reflected in Census population data, obtained from the Administrative Office of the U.S. Courts, see EHT Gov't Exs. 31, 32, and determines whether any racial or ethnic group is over- or underrepresented in the qualified jury wheel by more than 10 percent when compared to the Census figures.  Id. at 485-86; see also EHT Gov't Exs. 10-13, 27-30.

Petit jurors are chosen from the qualified jury wheel for a particular division, and grand jurors are selected from the entire district based on a proportional representation of qualified jurors in each district. Id. at 487, 509-510. At the "summoning stage," prospective jurors are sent another

AO 72A
(Rev.8/82)

questionnaire that asks qualifying questions and provides an opportunity for the

person to seek an excusal from jury service.[28] Id. at 501.

In this case, Defendant's grand jury was empaneled on September 11,

2001 and was drawn from the master wheel created in 1997 pursuant to the

1997 Jury Plan. Id. at 465, 489. Defendant's petit jury was empaneled on

February 17, 2004 and was drawn from the 2001 master jury wheel pursuant to

the 2002 Jury Plan. Id. at 465, 491.  The procedures used to create the 1997 and

2001 master wheels were the same as described *supra*. See id. at 465-66.

## C. Jeffrey Martin[29]

Jeffrey Martin worked with Defendant's trial counsel, Summer and Kish,

to perform an analysis of the jury system in the Northern District of Georgia

---

[28] The Plan also provides for excusals, such as being a full-time caregiver or if the person is over 70; excusals occur after the person has been summoned for jury duty and excused by a District Court judge.  Id. at 494, 501. Excusals do not remove the person from the jury wheel, they simply excuse the person from service. Id. at 501.

[29] Among other things, Martin has worked as a consultant on jury pools and statistical issues in the federal and state courts. Dkt. No. [536] at 353-54. That work involves reviewing Census data and performing "statistical tests of how this system is doing in representing the community[.]" Id. He has "been qualified to testify as an expert in the areas of jury representativeness and how successful the system is in representing the community[.]" Id. at 354-55. He estimates that he has testified approximately 35 times and has served as a statistical expert in 47 counties in Georgia and in at least three federal courts, mostly addressing fair cross-section jury challenges. Id. at 354, 381. He has always testified on behalf of the defendants, but he has also been asked by judges in the state system to analyze their systems. Id. at 381, 428.

120

AO 72A
(Rev.8/82)

and in the Gainesville Division, in particular data relating to the qualified jury wheel for Defendant's grand and petit juries. Id. at 355, 383. Martin performed an "analysis of how well the system both in the Gainesville Division and in the Northern District of Georgia was doing in representing the community . . . on racial factors and gender factors and ethnicity[.]" Id. at 357. In order to provide that analysis, he looked at statistics set out in the JS-12 reports dated December 21, 2001 for all four divisions of the Northern District of Georgia and reviewed 2000 Census materials related to the Northern District, in order "to compare the actual representation on the jury wheels to the actual community." Id. at 355-58, 383-84; see also Gov't Ex. 27-30.

Martin also prepared an Affidavit in support of Defendant's jury representation challenge. Id. at 358-59, 407-08; see also EHT Def. Ex. 90.[30] Paragraph 11 of that Affidavit contains a chart with figures and analysis prepared by Martin comparing the Hispanic community to the "age eligible," i.e., 18 years and older, figures from the Census. Id. at 359; see also EHT Def. Ex. 90. Those figures were not refined with respect to citizenship, and Kish and

---

[30]Martin's Affidavit was attached to Defendant's supplemental proffer filed on August 28, 2002. See Dkt. No. [36].

121

AO 72A
(Rev.8/82)

Summer did not ask him to refine the figures based on citizenship.[31] Id. at 359, 358. In that analysis, Martin found absolute disparaties for the Hispanic/Latino population of 5.33 percent underrepresentation for the Northern District and 6.08 underrepresentation for the Gainesville Division and comparative disparities of 84.07 percent for the Northern District and 90.75 percent for the Gainesville Division. Id. at 408; EHT Def. Ex. 90 at ¶ 11. Those numbers are higher than the numbers discussed *infra* because they include general population statistics, not limited to citizens. Id.

Martin has now performed an analysis in which he has limited the total population figures to not only age, but also citizenship.[32] Id. at 359-60; see also EHT Def. Exh. 17. His analysis, titled "Statistical Analysis of the Qualified Jury Wheel for the Gainesville Division in the Northern District of Georgia," used the 2000 Census citizen population age 18 and over. Id. at 360. The chart includes citizen figures for whites, African-Americans, and Hispanics or

---

[31] Martin testified that if he had been asked by Kish or Summer to present the figures he presented at the hearing, he would have done so. Dkt. No. [536] at 380-81.

[32] Martin was not able to identify the percentage of Hispanics in the Northern District who could satisfy all of the jury service requirements; he simply relied on citizenship statistics. Id. at 417-18. He conceded that the number of juror-eligible Hispanics would be smaller than the number of Hispanic citizens because not all Hispanic citizens meet the jury service requirements, but asserted that "[t]hat's true of all groups[.]" Id. at 418.

AO 72A
(Rev.8/82)

Latinos in the Gainesville Division and the Northern District of Georgia. Id. at 360-61; see also EHT Def. Exh. 17. White persons make up 93.31 percent of the age 18 and over citizens in the Gainesville Division; Hispanics or Latinos comprise 1.89 to 1.68 percent.[33] Id. at 361. Hispanic or Latino citizens 18 and older make up between 2.19 and 2.23 percent. Id. at 395. The chart also includes the sample of the qualified jury wheel which included 325 people in the Gainesville Division and 1975 people in the Northern District; two people, or .62 percent of that sample, identified themselves as Hispanic or Latino in the Gainesville Division, and 20 people, or 1.01 percent of the sample, identified themselves as Hispanic or Latino in the Northern District. Id. at 362, 385-86, 389. Martin arrived at his figures for the Northern District by adding up the figures from the four divisions since the court does not issue a composite JS-12 report for the entire district. Id. at 385.

Martin calculated an "absolute disparity" of 1.27 percent to 1.06 percent between these numbers by subtracting .62 percent from the range of 1.89 to 1.68 percent. Id. at 362. According to Martin there are problems with relying on

_____

[33] Martin explained that there is a range for that number because "the Census Bureau redacts numbers, small numbers so that people can't be identified from their tables[, and so] for some of the smaller counties, they have redacted some of the citizenship numbers for Hispanics or Latinos." Dkt. No. [536] at 361.

123

AO 72A
(Rev.8/82)

the absolute disparity, however, especially when a small population is involved, i.e., where a group constitutes less than 10 percent of a population. Id. at 362-63, 398. Therefore, "statisticians like to look at other measures that are more helpful, particularly when it comes to looking at small groups and big groups." Id. at 363. For example, statisticians can look at the "comparative disparity," which is a calculation of "absolute disparity over the population percentage," in order to determine a rate of underrepresentation. Id. at 364. Martin calculated a comparative disparity for the Gainesville Division for Hispanic or Latinos at 67.37 percent to 63.32 percent underrepresentation. Id. at 364-65. Those figures indicate that the Gainesville Division is "missing about two-thirds of that group you would have expected had the group mirrored the population." Id. at 365.

Martin's analysis also includes "standard deviations from expected," which is an indication of "the chances that this result just falls in a range that is associated with how likely that range is" and "how many standard deviations away from what we were expected we got." Id. at 365. Standard deviation analysis explains how likely it is to pull a jury with certain characteristics. Id. at 409. Martin explained: "You should be within one standard deviation 68 percent of the time. You should be within two standard deviations 95 percent of

124

AO 72A
(Rev.8/82)

the time, and then three standard deviations 95.5 percent of the time." Id. at

365-66. He calculated the standard deviations from the expected

Hispanic/Latino population in the Gainesville Division at 1.68 to 1.49 standard

deviations too low. Id. at 366.

For the Northern District, the 2000 Census citizen population of

Hispanics or Latinos age 18 and over was 2.23 percent to 2.19 percent, and the

percent of Hispanics or Latinos represented in the qualified jury wheel sample

was 1.01 percent, yielding an absolute disparity of 1.22 percent to 1.18 percent

underrepresentation. Id. at 367-68, 395. Using a comparative disparity basis,

Martin calculated a 54.62 to 53.82 percent underrepresentation, and 3.67 to 3.58

standard deviations too low. Id. at 368, 395-96. Martin explained, "Once you

get to three standard deviations off, that puts you in a range that you wouldn't

expect that to happen any more than .5 percent of the time." Id. at 368. Martin

considered these standard deviations to be statistically significant and indicated

to him that "it's not a random draw from the 2000 citizen age 18 and over

population." Id. at 368, 426. He also expressed concern that size of the sample

used to compare with the Census population figures was below what would

AO 72A
(Rev.8/82)

constitute a "good sample in terms of getting the margins of error." Id. at 366,
409-10.

Martin is critical of the Jury Plan's reliance on the voter registration list
as underinclusive and believes that supplementing the wheel with driver's
license, personal identification and other lists, as some state courts have done,
results in a more comprehensive and inclusive list. Id. at 368-69. He conceded,
however, that he had not conducted an analysis of voter registration rates
among Hispanics or non-Hispanics in the Northern District; he had no data
indicating that Hispanics are discriminated against in the voter registration
process; and he has also found underrepresentation even where multiple sources
were used to create jury lists. Id. at 420-23.

Martin also prepared a chart entitled "Characteristics of the Hispanic or
Latino Persons and Non-Hispanic or Latino Persons in the Gainesville Division
and the Northern District of Georgia," also based on 2000 Census data. Doc.
370-72; see also EHT Def. Exh. 18.  Martin's analysis shows that the majority
of Hispanic or Latino persons in the Northern District and Gainesville Division
are renters, while the majority of non-Hispanic/Latino persons reported living in
owner-occupied residences, and he opined that "if mobility is related to whether

126

you're renting or you're owner occupied, then more mobile folks, obviously, change their address more frequently." Id. at 372-73. He also found that the majority of Hispanic/Latino persons in the Northern District and Gainesville Division were Spanish-speaking; a greater percentage fell under the poverty line than non-Hispanics; and more worked in industries such as construction and manufacturing than non-Hispanics. Id. at 375-77; see also EHT Def. Ex. 18.

On cross-examination, Martin conceded that with the comparative disparity method of analysis, distortions in the results can occur with extremely small communities, or small changes in the number of persons in the group. Id. at 399-400. He also conceded that, although his concern with the court's benchmark of a 10 percent absolute disparity is that if the group at issue is under 10 percent the group could be completely excluded, that did not happen in this case. Id. at 401.

### D. Wesley B. Taylor

Wesley Taylor is the Assistant Secretary of State for the State of Georgia and Director of the Elections Division, which oversees elections and voter registration. Id. at 429-30. The Elections Division also provides voter

AO 72A
(Rev.8/82)

information to the federal courts in response to requests for information. Id. at 430-31; see, e.g., Gov't Ex. 2, 15.

In order to register to vote, a person must be at least 17-and-a-half years of age; must be a United States citizen; must be a resident of Georgia; and must not have been disenfranchised by one of the state constitutional provisions, i.e., must not be a felon serving a felony sentence or have been adjudicated mentally incompetent. Id. at 431-32. Voter registration applications are available in the Elections Division and online at the Secretary of State's website; people can register at the Department of Driver Services when they obtain or renew their driver's licenses or state identification card, at the library, at Department of Family and Children Services ("DFACS") offices, at public and private high schools and universities, and through third parties, such as political parties. Id. at 432.

Voter registration forms are in English, and they request identifying information such as name, driver's license number, county, and address. Id. at 433. The form also requests information on race, ethnicity, and gender, although providing that information is optional. Id. at 435. In 1996 and 2000, the Secretary of State only maintained information on whether a person was

128

white or black, male or female; no information on whether someone was Hispanic was maintained. <u>Id.</u> at 433-35; <u>see also</u> EHT Gov't Ex. 33.

Since 1996, no agency or enforcement body has expressed concern on the basis of race or ethnicity related to voter registration in Georgia, and no court or tribunal has found Georgia's voter registration practices to be discriminatory on the basis of race or ethnicity, nor is Taylor aware of any discriminatory registration practices. <u>Id.</u> at 436-38.

iv. 1991 Document Retention

### A. Paul Kish

Kish was asked whether there was a reason that the 1991 document retention issue was only raised in the reply brief to the Eleventh Circuit, and Kish responded, "I can't think of a single reason why[.]" Dkt. No. [534] at 20. In response to questioning about issues that should have been raised on appeal, Kish testified, "I know on the search issue, I thought we had a pretty darned good issue; and when the Eleventh Circuit pointed out that we hadn't done in the lower court what was needed to preserve the issue, yeah, I felt pretty bad about that, to tell you the truth." <u>Id.</u> at 72.

129

## B. Stephanie Kearns

Kearns was asked whether there was any reason not to raise in the initial brief to the Eleventh Circuit the issue of the 1991 car search and retention of documents, and she replied, "No. It was an issue we had litigated below. There was no reason not to raise it." Id. at 98-99. She further testified that the retention of documents issue was one she "wanted to present on appeal," but it was not raised until the reply brief. Id. at 139.

## C. Brian Mendelsohn

Mendelsohn was asked whether there was a reason not to raise the document-retention issue in the initial brief to the Eleventh Circuit, and he responded, "Not that I know of." Id. at 174-75.

## B. Discussion

28 U.S.C. § 2255 provides that "[a] prisoner in custody under sentence of a court established by Act of Congress claiming the right to be released upon the ground that the sentence was imposed in violation of the Constitution or laws of the United States, or that the court was without jurisdiction to impose such sentence, or that the sentence was in excess of the maximum authorized by law, or is otherwise subject to collateral attack, may move the court which imposed the

130

AO 72A
(Rev.8/82)

sentence to vacate, set aside or correct the sentence." With this standard in mind, the Court considers each of Petitioner's § 2255 claims.

### 1. Ineffective Assistance of Counsel

To prevail on an ineffective assistance of counsel claim, the defendant must prove that 1) "counsel's performance was deficient," and 2) "the deficient performance prejudiced the defense." Strickland v. Washington, 466 U.S. 668, 687 (1984). Both prongs must be proven to obtain relief. Id.

Regarding performance, "[t]his requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed by the Sixth Amendment." Id. The court is to apply an "objective standard of reasonableness" and "[j]udicial scrutiny of counsel's performance must be highly deferential" without the benefit of hindsight. Id. at 688-89. In fact, "a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" Id. at 691. And the presumption is even stronger when trial counsel is experienced as they are here. See Chandler v. United States, 218 F.3d 1305, 1316 (11th Cir. 2000).

AO 72A
(Rev.8/82)

"[R]eliance on [one] line of defense to the exclusion of others is [a] matter of strategy." Id. at 1314 n.14. "If a defense lawyer pursued course A, it is immaterial that some other reasonable courses of defense (that the lawyer did not think of at all) existed and that the lawyer's pursuit of course A was not a deliberate choice between course A, course B, and so on. The lawyer's strategy was course A. And, our inquiry is limited to whether this strategy, that is, course A, might have been a reasonable one." Id. at 1316 n.16. As well, "[c]ounsel is not required to present every nonfrivolous defense; nor is counsel required to present all mitigation evidence, even if the additional evidence would not have been incompatible with counsel's strategy." Id. at 1319.

### A. Performance Prong

### i. Mitigation Evidence at Sentencing

Regarding mitigation evidence, the defense ultimately argues that counsel's actions fell below professional norms when they "failed to implement a strategy of defense based upon mental illness, fueled by physical, emotional and sexual abuse." Def.'s 2d Br., Dkt. No. [541] at 19. To that end, LeCroy's petition specifically raises four ineffectiveness claims regarding the presentation of mitigation evidence at his sentencing: 1) counsel should have met with Dr. Hilton

132

to discuss his written report; 2) Dr. Lisak should have evaluated the defendant; 3) counsel should have called Dr. Lisak as a "teaching witness" about the effect of childhood sexual abuse on adult men; and 4) counsel should have done more in their closing argument to connect this sexual abuse to the defendant's actions. The Defendant also argues in his briefing that his character witnesses were not properly prepped, that counsel should have proffered Dr. Lisak's opinion so that the Court would have ruled on its admissibility, and that counsel should have presented more evidence. Ultimately, the court must determine "whether there is a reasonable probability that, of the totality of [LeCroy's] evidence in mitigation has been heard, the sentencing jury . . . 'would have concluded that the balance of aggravating and mitigating circumstances did not warrant death.'" Cooper , 646 F.3d at 1331 (quoting Strickland, 466 U.S. at 695).

Defendant first argues that counsel was deficient when they did not follow-up with Dr. Hilton regarding his written psychiatric report or call him as a witness. Specifically, defendant argues that counsel should have further investigated the diagnoses of "magical thinking," "transient psychotic episodes," and signs of "paranoid schizophrenia" which, in Dr. Hilton's opinion, played a "direct role" in the Defendant's conduct. Def. 2d Br., Dkt. No. [541] at 20. Without talking to Dr.

133

AO 72A
(Rev.8/82)

Hilton, he argues, his counsel made an "uninformed strategic decision" not to call him. Id. at 24.

However, the Court does not find counsel's failure to contact Hilton deficient. First, counsel "was aware of what was in [Dr. Hilton's] report." EHT, Dkt. No. [534] at 50:3. And they knew that LeCroy was deemed competent and not insane–thus, his diagnoses would not provide an affirmative defense to the charges. Moreover, counsel did not ignore information that they learned in the report. Susan Miller went and spoke with Thomas Ledford about Wicca and "magical thinking." And, counsel only intended Dr. Hilton's evaluation to be a "test run"; they planned to use Dr. Lisak as their expert.

Most importantly, though, Dr. Hilton's report, as seen *supra*, was so detailed that a reasonable attorney did not need to speak with him to understand his diagnoses and the fact that he thought "magical thinking" was a cause of the event. Counsel did not make an uninformed decision. Rather, counsel strategically decided that the "magical thinking" theory–which would require them to abandon the more reasonable jurisdiction defense[34]–was not the best course to avoid the

---

[34]Defendant concedes that it was "more than reasonable to pursue a jurisdictional defense with respect to guilt/innocence." Def.'s Post-Hearing Br., Dkt. No. [541] at 18.

134

death penalty. Moreover, in reading the report, the narrative explanation of the crime is so gruesome and chilling that a reasonable attorney could decide that keeping the Defendant's own retelling of the crime from the jury was of utmost importance,[35] and no discussion with Dr. Hilton would have changed those facts. And even if the Defense had called Dr. Hilton to testify about LeCroy's sexual abuse as a motivating factor in the crime, Dr. Hilton promptly would have been asked about the Defendant's recitation of the facts–a scenario which counsel reasonably and strategically sought to avoid.

The Defendant cites Holsomback v. J.D. White, 133 F.3d 1382, 1386-89 (11th Cir. 1998), for the proposition that counsel was ineffective for failing to contact Dr. Hilton and follow up on his written report. Def.'s Post-Hearing Br., Dkt. No. [541] at 21. In Holsomback, the issue at trial was whether the defendant had sexually abused his son. Although the defendant urged his counsel to contact

---

[35]The Defendant spends much of his argument challenging the assertion that the evidence alone proved the killing was gruesome, and that hearing the facts in a narrative form from LeCroy's own mouth would not be any more prejudicial than the evidence itself. The Court does not find this argument persuasive. Counsel was reasonable in believing that for a group of lay people to hear that LeCroy sought out to kill Ms. Tiesler, laid in wait for her, raped and sodomized her as she plead with him, and brutally murdered her–and even went back for another weapon after she would not die quick enough–would inflame the jury. With the "botched burglary" defense, counsel could still argue the killing was neither premeditated nor intentional, a fact which the Court does not find unreasonable for counsel to consider.

135

the family doctor who had examined his son for signs of abuse, "counsel made no effort to interview Dr. Williams, the physician who had examined [his son], or to obtain the medical records from Dr. Williams's examination." Id. at 1385. As a result, the defense presented no medical testimony, but if he had contacted Dr. Williams, counsel would have discovered that the son lacked any physical signs of abuse. The Eleventh Circuit found that counsel's failure "to conduct any investigation into the conceded lack of medical evidence" substantiated a habeas claim.

However, unlike Holsomback, Defense counsel here clearly conducted an investigation into LeCroy's mental status, and they obtained the written report which Dr. Hilton prepared. This case is not like Holsomback where no medical evidence was present and where no investigation was conducted. Therefore, the Court does not find Holsomback persuasive and finds counsel's performance sufficient. Counsel did not need to hear from Dr. Hilton's mouth what they could read from his pen to be effective.

Second, the Defendant argues that Dr. Lisak should have evaluated LeCroy. He argues that counsel's decision not to let Dr. Lisak evaluate LeCroy was based upon an unfounded fear that the Government's evaluation would be terrible for the

136

Defendant. In the Defense's mind, counsel should have had Dr. Lisak evaluate LeCroy, let the Government complete its evaluation, and if the evaluations were not helpful, decide not call Dr. Lisak then, having full knowledge of the actual consequences of opening the door to the Government's expert. Def. Post Hearing Br., Dkt. No. [545] at 23-24. He also argues that even the Government's expert, Dr. Julie Medlin, conceded that a personal evaluation of the Defendant would be critical in determining whether a childhood sexual abuse report was valid. Def. Post Hearing Br., Dkt. No. [545] at 15-16.

The Court does not find that preserving Dr. Lisak as a teaching expert and attempting to avoid a Government evaluation was ineffective. Mendelsohn testified that they were "very scared" of a Government evaluation because the details of the crime would be revealed, and that the Government's expert's conclusions could "conceivably be worse" than Dr. Hilton's conclusions–the Government would not be "doing the Defense any favors." The Defense knew that if Dr. Lisak evaluated LeCroy, the Court would require LeCroy to be evaluated by the Government. But, they hoped that if Dr. Lisak only testified as a teaching expert, they would be able to introduce the mental health mitigation evidence without exposing the jury to LeCroy's "problematic diagnoses" and LeCroy's factual summary of the crime.

137

Moreover, as the Eleventh Circuit stated in <u>Chandler</u>, the Court's goal is not to evaluate between alternative scenarios; the goal is to determine if the chosen path was reasonable. <u>See</u> <u>Chandler</u>, 218 F.3d at 1316 n.16.

The Defense relies upon <u>Jackson v. Herring</u>, 42 F.3d 1350, 1368 (11th Cir. 1995), *inter alia*, for the proposition that "a legal decision to forego a mitigation presentation cannot be reasonable if it is unsupported by sufficient investigation." Therefore, he argues, because counsel did not definitively know that the Government evaluation would be worse, counsel's decision was "just the type of uninformed strategic decision to which the Court should give no deference." Def. Post Hearing Br., Dkt. No. [545] at 24. In <u>Jackson</u>, the defense totally failed to investigate or produce any mitigation evidence. In fact, counsel's one paragraph argument concerned that he was not sure he had done his job, and that the jury should not hold his performance against his client. <u>Id.</u> at 1363.

This case is inapposite of <u>Jackson</u>. Counsel here presented days worth of mitigation evidence, contacted experts, friends, and family, and attempted to make a decision which would strategically expose their client to the least amount of prejudicial evidence. By eliminating LeCroy's evaluation, the Defense sought to preserve Dr. Lisak and their ability to present him to the jury without introducing

138

diagnoses or facts which would be even more harmful. Counsel was not deficient when they did not allow LeCroy's evaluation.

Third, LeCroy argues that his counsel was ineffective when they failed to call Dr. Lisak to testify as a "teaching expert." Defendant argues that by not presenting an expert who could opine on LeCroy's sexual abuse, the jury was left without an explanation for why the crime occurred and why it was so brutal. Def.'s Post-Hearing Br., Dkt. No. [541] at 26-27. And, because there was no evidence which described the effect of childhood sexual abuse, counsel had nothing to use to "connect the dots" between the abuse and the crime at closing. Id. at 22.

Defense counsel decided not to call Dr. Lisak because they were concerned that, if they did, a "battle of the experts" would occur regarding whether LeCroy was even abused as a child. Namely, even though they thought that they could discredit Dr. Medlin's opinions on the reporting inconsistencies, they still strategically felt that the lay jury would be left with two conflicting opinions. And even if counsel could explain away Dr. Medlin's opinions, they were concerned that she could appear "polished enough" that the jury would believe her opinions.

139

The Court finds that counsel's decision not to call Dr. Lisak was a strategic one. Counsel knew from Dr. Medlin's report that she would testify that LeCroy had made up the abuse to seek sympathy and to receive prison benefits, and they knew that her testimony would change the entire focus of the Government's rebuttal to whether the abuse happened at all–not just the effect of that abuse. They also knew from talking to Dr. Lisak on a conference call that Dr. Medlin's opinion was a "hatchet job" that he could easily refute. Thus, they made an informed choice about whether to present Dr. Lisak. Ultimately, counsel decided that they would try and elicit as much information from the mental health witnesses as possible to avoid calling Dr. Medlin because–with a lay jury–a scientifically wrong opinion could be dressed up enough to be believable in their opinion. The Court finds that a reasonable attorney could have made the same decision.

Moreover, the Court notes that it heard testimony from both Dr. Lisak and Dr. Medlin at the evidentiary hearing and feels that the Defense's concerns were real. Even though Dr. Lisak and Dr. Hilton disagree with Dr. Medlin, her experience with sexual abuse perpetrators and citation of studies may well have convinced a lay jury that LeCroy only admitted sexual abuse in situations in which

140

he wanted sympathy or benefits. Therefore, the Court does not find that counsel was ineffective on this point.

Fourth, the Defendant argues that Kearns should have done more in her closing argument to connect the sexual abuse to the motivation of the crime. In the evidentiary hearing, both Kearns and Mendelsohn stated that they had hoped she would have said more about the abuse and intended to do so. However, as the Eleventh Circuit noted in Chandler, "[b]ecause the standard is an objective one, that trial counsel (at a post-conviction evidentiary hearing) admits that his performance was deficient matters little." 218 F.3d at 1316 n.16.

In the closing argument context, "[d]eficient performance is demonstrated by an attorney's failure to use the closing argument to focus the jury's attention on his client's character or any mitigating factors of the offender's circumstances, and by his failure to ask the jury to spare his client's life." Lawhorn v. Allen, 519 1272, 1295 (11th Cir. 2008) (citing Dobbs v. Turpin, 142 F.3d 1383, 1389 (11th Cir. 1998)). Here, the Defendant does not contest that counsel asked to spare his life. Rather, he argues that Kearns did not sufficiently draw out LeCroy's mitigating factor–that he was abused as a child.

AO 72A
(Rev.8/82)

Here, Kearns spent two pages of her closing on the sexual abuse issue and explained that the sexual abuse affected his self-esteem. And, likening his reporting failure to the then-timely Catholic priest scandal, explained why LeCroy would not have reported the abuse. The Court does not find her closing deficient. Under Lawhorn, counsel is only required to point the jury to mitigating factors–here, the sexual abuse. Counsel clearly did so, and half of the jury found as a mitigating factor that he was abused as a child.

As well, this case is unlike Stephens v. Kemp, 846 F.2d 642, 654-55 (11th Cir. 1988).[36] In Stephens, counsel was found deficient when they failed to discuss mental health evidence in their closing, and the jury was left with "no guidance concerning how they might take such facts into consideration in mitigation." 846 F.2d at 655. Here, however, counsel reminded the jury that he was sexually abused, explained why he would not report it, and explained how it affected him. While the Defense now wishes Kearns would have done more, it is unclear what more she could have said since there was nothing in evidence which would explain–beyond a common-sense understanding–how the abuse could have

---

[36]The Court recognizes that in Stephens the Eleventh Circuit addressed the closing argument failures under the prejudice prong of the Strickland standard. However, the Court finds the Circuit's reasoning persuasive under the performance prong as well.

142

affected him because no expert testified. Counsel is not able to offer evidence at the closing argument stage–only to argue it to the jury. And, even when viewing that fact in concert with why any explanation was not in evidence, the Court does not find a cumulative error. The Court does not find that no reasonable counsel would have said what Kearns did, and only what she did, at the sentencing.

Fifth, the Defendant argues that counsel should have proffered Dr. Lisak's teaching expert testimony so that the Court could have ruled on the scope of the Government's rebuttal evidence and whether the Government was entitled to evaluate LeCroy. Because the evidence was not proffered, the Eleventh Circuit refused to review whether the Government's expert would have been "overkill" on direct appeal. The Court also does not find that their failure to proffer was ineffective.

Counsel knew from Dr. Medlin's report what she would testify to based on the records alone–without an evaluation. And based on just this information, counsel knew that they did not want to call Dr. Lisak for strategic reasons, because calling him would turn the case into a "battle of the experts." Whether counsel proffered Dr. Lisak was irrelevant to their strategic choice–that they were not going to call Dr. Lisak–because, with what little Dr. Medlin knew about LeCroy,

AO 72A
(Rev.8/82)

she was able to produce a damning response. And, as Mendelsohn noted, the Government was not going to do them any favors, and any evaluation could conceivably lead to worse diagnoses for the defense and would certainly be at least as bad as it was in her written report. In other words, having a definitive ruling from the Court on whether Dr. Lisak could testify as a "teaching expert" without exposing LeCroy to a Government evaluation was ultimately an irrelevant inquiry because the Defense knew enough about Dr. Medlin's testimony that they would not have called Dr. Lisak. Therefore, the Court does not find their performance to be ineffective.

Sixth, the Defense argues that counsel did not present properly prepped character witnesses on LeCroy's behalf. In his initial brief and traverse, the Defendant argues that the "record reflects an implication" that many of his character witnesses were not properly prepped as their opinions were impeached when they were confronted with the facts of the Defendant's previous convictions and current crime. Thus, Defendant argues, the witnesses must not have been sufficiently prepped.

However, upon reviewing the record, the Court does not find that implication to arise out of the witnesses' answers. And, it is unclear whether a

144

AO 72A
(Rev.8/82)

witness is more or less believable when his character opinion is unaffected after he learns that someone has committed a brutal rape and murder. But, even assuming that they were not properly prepped, the Court will consider the resulting prejudice in a later section.

Finally, the Defendant argues that counsel should have investigated and presented more mitigation evidence. In comparing the sentencing testimony to the evidentiary-hearing testimony, the Court finds that like Strickland and Bobby v. Van Hook, ___ U.S. ___, 130 S. Ct. 13, 19 (2009), this is a case in which "defense counsel's 'decision not to seek more' mitigating evidence from the defendant's background 'than was already in hand' fell 'well within the range of professionally reasonable judgments.'" Van Hook, 130 S. Ct. at 19 (quoting Strickland, 466 U.S. at 699). Counsel knew the Defendant's diagnoses, and Dr. Hilton's written report sufficiently explained his opinions for counsel to make educated decisions. As well, after hearing the testimony, the Court does not find that counsel made an unreasonable decision in failing to call Dr. Lisak. See supra. Ultimately, counsel's countless hours of investigation and use of two psychologists is more than constitutionally sufficient.

AO 72A
(Rev.8/82)

ii. Jury Underrepresentation Issue

**A. The Parties' Contentions**

In Ground F of his "Grounds Requiring Relief," LeCroy asserts:

Mr. LeCroy was denied the effective assistance of counsel when his trial counsel failed to present "juror eligible" statistics regarding the Hispanic population in the Northern District of Georgia and Gainesville Division in support of his challenge to the method of selecting jurors in the Northern District of Georgia and Gainesville Division[.]

Dkt. No. [493] at 15. Defendant acknowledges that his trial counsel did challenge the method of selecting jurors in the Gainesville Division and the Northern District of Georgia on the ground that the Hispanic or Latino population was underrepresented "on the qualified wheel for the Northern District of Georgia from which the grand jury which returned the Indictment in this case was selected and from the qualified wheel in the Gainesville Division from which the petit jury was selected in this case." Id. However, Defendant argues:

Unfortunately, counsel unreasonably compared the representation of the Hispanic or Latino community in the Northern District of Georgia and the Gainesville Division with the age-eligible Hispanic or Latino populations of the Northern District and the Gainesville Division without adjusting this figure for United States citizenship, a requirement for jury eligibility. 28 U.S.C. § 1865(b)(1). As a

146

consequence, the Defendant did not present an adequate case for relief and his challenge was overruled by the District Court, without even a hearing, and the Eleventh Circuit refused even to consider this issue on appeal. United States v. LeCroy, 441 F.3d at 918, fn. 1. [sic].

Id. Defendant contends that his trial counsel "would have been able to show a substantial underrepresentation of the Hispanic or Latino population" if they had "presented figures adjusted for citizenship"—they would have been able to show that, according to 2000 Census figures, between 2.23% to 2.19% of the Hispanic or Latino population of the Northern District of Georgia was 18 years of age or older, "while only 1.01% of the qualified wheel for the District at large was Hispanic or Latino, resulting in a comparative disparity of between -54.62% [or -54.46 %] to 53.82 % [or 52.82%]," i.e., that "[m]ore than half of the Hispanic or Latino community failed to be represented on the District qualified wheel." Id. at 16; see also Dkt. No. [541] at 33. Further, Defendant asserts, trial counsel "would also have been able to show that the Hispanic or Latino population of the Gainesville Division, who are 18 years or older and citizens, was between 1.89% and 1.68%, based upon 2000 Census figures, while only [.62%] of the qualified wheel in the Gainesville Division was Hispanic or Latino, resulting in a comparative disparity of between minus 67.37% to minus 63.32% [or 63.22%],"

147

i.e., "that approximately two thirds of the Hispanic or Latino community failed to be represented on the qualified wheel for the Gainesville Division." Id. at 16-17; see also Dkt. No. [541] at 32-33. Furthermore, Defendant asserts that standard deviation analysis also indicates a systematic cause of the underrepresentation of Hispanics. Dkt. No. [541] at 33.

Defendant also argues that he has identified factors resulting in "the significant underrepresentation of the Hispanics in the Qualified Wheels," including the court's "reliance on the Voter Registration lists as the sole source for names of potential jurors and the mobility of the Hispanic community, compared to the community at large, so that there is a significant difference between the return rates on questionnaires when there is minimal follow up for non-delivered or non-returned questionnaires." Dkt. No. [541] at 40.

Defendant concludes:

In sum, had counsel merely perfected this issue by causing citizenship eligible figures to be presented, as opposed to merely general population figures, they would have presented a meritorious jury challenge case, which would have required the dismissal of the Indictment and/or the staying of any proceedings in the case until the deficiencies had been corrected. 28 U.S.C. § 1867(a). As a consequence, the Defendant's rights under the Sixth Amendment to the United States Constitution and under the Jury Act, were denied.

148

> Obviously, there is a reasonable probability that but for the deficient performance of counsel there would have been a different result in the case, i.e., dismissal of the Indictment and/or staying the proceedings until the constitutional and statutory deficiencies had been corrected, or if relief had not been granted at the district court level, reversal of this convictions and sentences upon appeal.

Id. at 40-41.

The Government argues that, even if "Defendant's trial counsel presented the analysis offered at the evidentiary hearing, the Defendant still would not have been able to satisfy the Constitutional or statutory requirements of a fair cross-section claim" because "Defendant is unable to show that Hispanics were unfairly or unreasonably represented in the relevant jury pools, or that they were systematically excluded from them, as required under Duren v. Missouri, 439 U.S. 367 U.S. 357, 364, 99 S. Ct. 664, 58 L.Ed. 2d 579 (1979) and the Jury Service and Selection Act ("JSSA"), 28 U.S.C. §§ 1861-1878." Dkt. No. [542] at 45.

## B. Applicable Standards

The Sixth Amendment to the United States Constitution guarantees an accused "the right to a speedy and public trial, by an impartial jury of the State and district wherein the crime shall have been committed . . . ." U.S. CONST. amend.

149

AO 72A
(Rev.8/82)

VI. "The Sixth Amendment secures to criminal defendants the right to be tried by an impartial jury drawn from sources reflecting a fair cross section of the community." Berghuis v. Smith, 130 S. Ct. 1382, 1387 (2010) (citing Taylor v. Louisiana, 419 U.S. 522 (1975)); see also United States v. Grisham, 63 F.3d 1074, 1078 (11th Cir. 1995) ("The Sixth Amendment guarantees a criminal defendant the right to be indicted and tried by juries drawn from a fair cross-section of the community."), cert. denied, 516 U.S. 1084 (1996). Although the Sixth Amendment does not explicitly require a "fair cross section of the community," this requirement "is derived from the traditional understanding of how an 'impartial jury' is assembled. That traditional understanding includes a representative venire, so that the jury will be . . . 'drawn from a fair cross section of the community.'" Holland v. Illinois, 493 U.S. 474, 480 (1990) (quoting Taylor, 419 U.S. at 527).

The JSSA also requires "that all litigants in Federal courts entitled to trial by jury shall have the right to grand and petit juries selected at random from a fair cross section of the community in the district or division wherein the court convenes." 28 U.S.C. § 1861. "A criminal defendant has the right to challenge an indictment on the ground that it fails substantially to comply with the provisions of the [JSSA]." United States v. Rodriguez, 776 F.2d 1509, 1510 n.1 (11th Cir.

150

1985) (citing 28 U.S.C. § 1867(a), (d)). "The standard for determining a violation of the statutory fair cross-section requirement is the same as that applied in assessing a sixth amendment fair cross-section violation." Id. (citing United States v. Pepe, 747 F.2d 632, 648 n.17 (11th Cir. 1984)).

To make out a *prima facie* case of violation of the "fair cross-section" requirement, a defendant must show:

> (1) that the group alleged to be excluded is a "distinctive" group in the community; (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) that this under-representation is due to systematic exclusion of the group in the jury-selection process.

Duren, 439 U.S. at 364. "The burden of proving a fair-cross-section violation falls on the defendant," Berryhill v. Zant, 858 F.2d 633, 638 (11th Cir. 1988), and if the defendant fails to establish even one element of the *prima facie* case, then the Sixth Amendment "fair cross-section" challenge fails. Pepe, 747 F.2d at 649.

### C. Analysis

Defendant argues that his counsel's performance was deficient because they "unreasonably compared the representation of the Hispanic or Latino community

151

AO 72A
(Rev.8/82)

in the Northern District of Georgia and the Gainesville Division with the age-eligible Hispanic or Latino populations of the Northern District and the Gainesville Division without adjusting this figure for United States citizenship, a requirement for jury eligibility." Dkt. No. [493] at 15; see also Dkt. No. [541] at 30-32. Defendant asserts that this failure resulted in the District Court's rejection of his fair cross-section challenges and the Eleventh Circuit's refusal to consider the issue on appeal.[37] Id. Defendant does not explain how his trial counsel's performance was deficient under Strickland, other than to assert that his challenge would have been meritorious if the citizenship figures had been presented, see Dkt. [541] at 40, a claim discussed *infra*. The Government does not address whether

---

[37] The Eleventh Circuit wrote:

LeCroy also filed a challenge to the method of selecting jurors in the Northern District of Georgia, specifically in the Gainesville Division. He claimed that Hispanics were under-represented in the master jury wheel from which the petit jury and grand jury is drawn. LeCroy's claim fails because he failed to proffer any evidence of the relevant population--the percentage of the Hispanic population that is eligible for jury service. Our cases have held that the relevant comparison is the difference between the percentage of the distinctive group among the population eligible for jury service and the percentage of the distinctive group on the jury wheel. United States v. Grisham, 63 F.3d 1074, 1078 (11th Cir. 1995); United States v. Pepe, 747 F.2d 632, 649 (11th Cir. 1984). Thus, we need not address LeCroy's several arguments challenging the jury selection.

LeCroy, 441 F.3d at 918 n.1.

152

counsel's performance was deficient, but instead argues that "defendant cannot show prejudice based on his trial attorneys' performance because even if trial counsel had presented the figures Defendant now presents, defendant would still not have been entitled to an evidentiary hearing on his fair cross section claim." Dkt. No. [541] at 41; see also Dkt. No. [542] at 45.

The court questions whether Defendant has demonstrated that his trial counsel's performance was deficient, for purposes of analysis under Strickland, by failing to present statistical evidence concerning citizenship in support of Defendant's pretrial jury cross section challenges. As observed *supra*, Defendant does not address Strickland's standards for determining whether counsel's performance was deficient or apply those standards to this case. Moreover, Defendant's counsel did not inadvertently fail to present citizenship figures in challenging the jury pool composition, as Mr. Kish's habeas hearing testimony seems to suggest. See Dkt. No. [534] at 18-19, 74, 77. Instead, Defendant's counsel argued strenuously in pretrial motions that the proper comparison for purposes of determining underrepresentation of particular groups was a comparison between the percentage of that group in the jury wheel (by sample) with the percentage of that group in the age-limited total population, not the jury

153

AO 72A
(Rev.8/82)

eligible population, citing and quoting Eleventh Circuit and Supreme Court authority in support of that argument. See Dkt. No. [35] at 8-11. It is not surprising that counsel would urge the court to adopt that analysis in light of the fact that by using total population figures, as opposed to jury eligible (i.e., citizenship) figures, the statistical disparity is larger, compare EHT Def. Ex. 90 with Ex. 17; see also Dkt. No. [536] at 408, thus strengthening Defendant's case that Hispanics are underrepresented such that he satisfies his *prima facie* case under Duren.

On the other hand, as observed in LeCroy, the Eleventh Circuit has repeatedly explained that the proper comparison is "between the percentage of the distinctive group among the population **eligible for jury service** and the percentage of the distinctive group on the jury wheel." 441 F.3d at 918 n.1 (emphasis added); see also Grisham, 63 F.3d at 1078; Rodriguez, 776 F.2d at 1511; Pepe, 747 F.2d at 649.

In light of the court's finding that Defendant has not shown prejudice, discussed *infra*, and the parties' failure to address the performance prong at any length, the court will assume for the sake of discussion that trial counsel's failure to limit their statistical comparison to Hispanic citizens rendered their performance deficient. See, e.g., Price v. United States, No. 10-11477, 2012 U.S. App. LEXIS

154

1347, at * 5 (11th Cir. Jan. 26, 2012) (unpublished decision) ("Even if we assume that the failure to identify and interview Perry before the trial date constituted deficient performance, Price failed to demonstrate that he suffered prejudice as a result.").

### iii. Firewall/Jury Selection Expert Violation

Defendant argued in his pre-hearing motion and traverse that the Government violated the Court-issued, mental-health firewall as trial counsel knew to hire a jury-selection expert on the sexual abuse issue. However, following a hearing on the matter, the Defendant did not address the new evidence in his post-hearing brief or reply, instead incorporating by reference his pre-hearing arguments. The Court finds that by failing to address the evidentiary-hearing evidence, Defendant has abandoned his firewall and jury expert challenge. However, out of an abundance of caution, the Court will address the merits of the firewall and jury expert challenges.

The Court finds that the Government did not breach the Court-ordered firewall. The Government produced evidence that Raymond Burby prepared a statement for the jury consultant which included childhood sexual-abuse as a

AO 72A
(Rev.8/82)

possible defense five days before the firewall was instituted. And he gleaned this defense from the prison records which the Government had already discovered. Moreover, Judge Vineyard testified that the only information they received from firewall-counsel Plummer was the name of the Government's expert so that they could vet her, which was disclosed to the Defendant and the Court prior to trial. As well, the Defendant has produced no evidence that hiring a jury-selection expert was in any way inappropriate in itself. In sum, because there was no breach in the firewall, counsel was not ineffective for not raising the issue on appeal.

### iv. Claimed Future Dangerousness Instruction

The Defendant next argues that counsel were ineffective when they failed to object to the Court's future dangerousness charge. The Defense makes three arguments for ineffectiveness: 1) the Court should have instructed that the jury could only find aggravation if there was a "likelihood" of escape as opposed to a "risk" of escape; 2) that "the issue of future dangerousness is limited to the possibility of dangerousness solely with respect to the Defendant's conduct behind bars"; and, 3) that the Government's argument that it could not appropriately house an escape risk like LeCroy was a "demonstrably unfair argument."

156

First, the Court finds that counsel's failure to object to the Court's phrasing was not ineffective. "Generally, district courts have broad discretion in formulating jury instructions provided that the charge as a whole accurately reflects the law and the facts,' and [the Circuit] will not reverse a conviction on the basis of a jury charge 'unless the issues of law were presented inaccurately, or the charge improperly guided the jury in such a substantial way as to violate due process.'" U.S. v. Prather, 205 F.3d 1265, 1270 (11th Cir. 2000).

Because counsel did not object at trial, the Eleventh Circuit conducted a plain error review instead of an abuse of discretion review on this phrasing question. See id. (stating that for phrasing questions, the court conducts an abuse of discretion review). In so doing, the Eleventh Circuit found that "[i]n light of LeCroy's history of attempted escapes and the judge's clear instructions to the jury requiring that it find a risk of escape 'beyond a reasonable doubt,' we cannot conclude that there is a reasonable probability that the different standard urged by LeCroy would have resulted in a different outcome. Moreover, the jury found every other aggravating factor alleged by the government, and such findings are amply supported in the record." Lecroy, 441 F.3d at 931.

AO 72A
(Rev.8/82)

Based on this finding, the Court finds that even if counsel had objected to the instruction, the Eleventh Circuit would not have reversed his conviction. Like this Court, the Circuit found that the combination of the "beyond a reasonable doubt" standard with the "risk of escape" wording mitigates the Defendant's claim that the jury could have only found a "fanciful" risk of escape to warrant aggravation. Moreover, the Defendant cites no authority that "likelihood of escape" was required phraseology. As well, even assuming likelihood of escape was warranted, there was ample evidence in the record to support a likelihood of escape considering that LeCroy had arguably attempted escape in both Minnesota and the Lumpkin County prison. Thus, the Court cannot find that a reasonable attorney would have objected to the charge.

Second, the Court finds that allowing the jury to consider the risk to the general public if they found beyond a reasonable doubt that he was an escape risk was not improper. The Defendant cites United States v. Allen, 247 F.3d 741, 788 (8th Cir. 2000), rev'd on other grounds, 536 U.S. 953 (2002), for the proposition that "where the defense was arguing for life without parole sentencing, the issue of future dangerousness is limited to the possibility of dangerousness solely with respect to the Defendant's conduct behind bars." Def.'s Post-Hearing Br., Dkt. No.

158

[541] at 46. However, <u>Allen</u> actually stands for the opposite position. In <u>Allen</u>, the Defendant argued that because the Government only argued his risk to "society" and not the prison population, the Government did not present enough evidence to support the future-dangerousness aggravating factor. 247 F.3d at 788. The <u>Allen</u> Court first confirmed that <u>Simmons v. South Carolina</u>, 512 U.S. 154, 172 (1994) only required that when a future dangerousness aggravating factor was used, the jury must be told if the defendant is parole ineligible. Noting that this was done, the Court then stated "[a] defendant in prison for life is still a risk to prison officials and to other inmates, and even though a life sentence without parole greatly reduces the future danger to society from that particular defendant, there is <u>still a chance that the defendant might escape from prison or receive a pardon or commutation of sentence</u>." <u>Id.</u> Therefore, the Court found that the Government's presentation of the defendant's risk to society generally was sufficient to support the factor. <u>Id.</u> at 788-89.

The Defendant's other citation for this principle is also not persuasive. <u>See</u> <u>United States v. O'Reilly</u>, 545 F. Supp. 2d 630, 638 (E.D. Mich. 2008). In <u>O'Reilly</u>, the Eastern District of Michigan did state that when the jury is to choose between life without parole and the death penalty, "'district courts appear to have

159

uniformly held that the government is limited to presenting evidence on future dangerousness [as it applies to life in prison].'" 545 F. Supp. 2d at 638 (quoting United States v. Rodriguez, No. 2:04-CR-55, 2006 WL 487117 at *5 (D.N.D. Feb. 28, 2006)). However, that case did not consider an escape-risk defendant; rather, the government only presented evidence of crimes the defendant intended to commit once released. See id. When courts have considered a risk of escape, they have been willing to consider the threat to society as it is society who would be threatened should the defendant escape. See Allen, 247 F.3d at 788. And, courts have even been willing to consider the threat to society when the defendant is not a known escape-risk. See United States v. Brown, No. 3:06-CR-14-01-RLY/WGH, 2008 WL 4965152 (S.D. Ind. Nov. 18, 2008) ("the Defendant's prior convictions, bad acts, and lack of remorse are relevant as to his future dangerousness to prison inmates and to society as a whole") (emphasis added).

Moreover, the Supreme Court has made clear in Simmons that all that is compelled on a future dangerousness instruction when the defendant cannot receive parole is that the Court advise the jury that parole is not an option–not that the relevant threat population must be limited to prison. 512 U.S. at 172. At bottom, it would be illogical not to consider the risk of escape to the general

160

AO 72A
(Rev.8/82)

population, as once the defendant has escaped, he is no longer a risk to the prison population because he is free.

Last, the Defendant argues that defense counsel was caught off guard by the Government's improper and disingenuous argument that it cannot appropriately house LeCroy in the general population without a risk of escape. First, the Court notes that the Defendant cites no authority for this proposition. And, it is unclear how the Government would prove a risk of escape without arguing that it could not house him. If the Government could affirmatively house every defendant, no one would ever be an escape risk. Therefore, based on the foregoing, the Court does not find counsel's failure to object ineffective.

### v. Balancing of Factors Instruction

Defendant next argues that counsel was ineffective when they failed to request a jury instruction which would have required the jury to find beyond a reasonable doubt that the aggravating factors, both statutory and non-statutory, outweighed the mitigating factors. He argues that under Ring v. Arizona, 536 U.S. 584 (2002) and its progeny, the jury's balancing determination is a factual one which must be determined beyond a reasonable doubt by the jury pursuant to the

161

Sixth Amendment. The Court is mindful that this in an ineffective assistance of counsel claim; this Court's inquiry concerns whether a reasonable attorney would have requested the instruction in 2004, at the time of the trial.

In reviewing the federal cases cited by the parties and in conducting its own research, the Court has only found two cases which arguably dealt with this issue in dictum prior to LeCroy's trial. In United States v. Higgs, 353 F.3d 281, 298-99 (4th Cir. 2003), the Fourth Circuit was tasked with determining whether statutory and non-statutory aggravating factors must be alleged in the indictment. In explaining why it would only require one statutory aggravator to be alleged and no non-statutory ones, the Fourth Circuit stated that anything beyond one aggravating factor "may fairly be viewed as sentencing considerations." Id. at 299. As well, the Circuit noted that it would not require non-statutory factors to be alleged because "non-statutory aggravators do not increase the available punishment to which a defendant might be subjected." Id. at 298. This argument is the pre-cursor for the prevailing view in this country that once the jury has found the statutory intent and aggravation requirements, the defendant is "death eligible" and the jury has already determined beyond a reasonable doubt the facts needed to support a death sentence. See United States v. Sampson, 486 F.3d 13, 32 (1st Cir. 2007). Any

162

additional concerns are sentencing ones which are not constitutionally within the province of the jury. See Profitt v. Florida, 428 U.S. 242, 252 (1976)(plurality opinion)("[I]t has never [been] suggested that jury sentencing is constitutionally required.").

The Eastern District of Virginia, also in addressing Ring's effect on indictments, found in dicta that non-statutory aggravating factors at the selection stage do not "'increase the penalty for a crime beyond the prescribed statutory maximum.'" United States v. Lentz, 225 F. Supp. 2d 672, 682 (E.D. Va. 2002) (citing Apprendi v. New Jersey, 530 U.S. 466, 490 (2000)). That court also quoted Apprendi for the proposition that mitigators equally are not subject to the Ring/Apprendi rule. Id. at 490 n.4 ("If the defendant can escape the statutory maximum by showing, for example, that he is a war veteran, then a judge that finds the fact of veteran status is neither exposing the defendant to a deprivation of liberty greater than that authorized by the verdict according to the statutes, nor is the jury imposing upon the defendant a greater stigma than that accompanying the jury alone."). The court noted a distinction between intent and statutory aggravators–which must be alleged in the indictment as they increase the punishment–and non-statutory aggravators and mitigators–which do not. Id. at 681.

163

While not addressing balancing head-on, the Court finds that these opinions would have lead a reasonable attorney to believe that Ring and its progeny would not apply to the FDPA's balancing. However, even if counsel had requested such an instruction, the Court finds–in keeping with the Middle District of Georgia–that the Eleventh Circuit would have found it unnecessary. See United States v. Natson, 444 F. Supp. 2d 1296, 1304 (M.D. Ga. 2006). In Natson, Judge Land found that, based upon the Eleventh Circuit's opinion in United States v. Brown, 441 F.3d 1330, 1368 (11th Cir. 2006), the Eleventh Circuit would not find the FDPA's balancing process subject to Ring and its progeny. Judge Land relied on the following language to support the proposition that the Eleventh Circuit would likely hold that the "final balancing phase findings do not expose the defendant to the death penalty, but that he is exposed to that penalty when the jury finds beyond a reasonable doubt that he had the requisite mens rea along with the existence of one statutory aggravating factor":

> The non-statutory aggravating factors, although relevant to determining whether a jury decides to impose the death penalty, do not make a defendant statutorily eligible for any sentence that could not be otherwise imposed in their absence. "They are neither sufficient nor necessary under the FDPA for a sentence of death." (citation omitted). This rule comports with recent Supreme Court precedent because a non-statutory aggravating factor does not "increase the penalty for a crime beyond the prescribed statutory

164

maximum," see Apprendi v. New Jersey, 530 U.S. 466, 490, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000), nor does it somehow allow the imposition of a more severe sentence than could have been imposed without it. (citation omitted). Thus, a non-statutory aggravating factor is not one of those "facts legally essential to the punishment" that must be included within the indictment. (citation omitted).

Natson, 444 F. Supp. 2d at 1304. This Court agrees with this assessment and also notes that is consistent with all but one circuit's holding on this issue. See United States v. Fields, 516 F.3d 923, 950 (10th Cir. 2008); United States v. Fields, 483 F.3d 313, 346 (5th Cir. 2007) (unrelated Fields); Sampson, 486 F.3d at 31-32.

Since the parties have briefed this issue, the Sixth Circuit has created a circuit split, finding that the FDPA's balancing is subject to Ring and its progeny. See U.S. v. Gabrion II, 648 F.3d 307, 325-29 (6th Cir. 2011).[38] However, because this is an ineffective assistance of counsel claim, this Court's focus is on counsel's effectiveness at the time of the trial–not today. The Eleventh Circuit has stated "that counsel cannot be deemed ineffective for failing to anticipate a change in the law. (citation omitted). Even if a claim based upon an anticipated change in the law is reasonably available at the time counsel failed to raise it, such failure does not constitute ineffective assistance. (citation omitted)." Bajorski v. U.S., 276 Fed.

---

[38]However, the Court notes that this opinion has been vacated, and a rehearing *en banc* was granted November 17, 2011. The Sixth Circuit, sitting *en banc*, has yet to issue its opinion.

165

App'x 952, 954 (11th Cir. 2008). Here, we do not even face a change in controlling law but rather a split in persuasive law. Therefore, the Court is also not convinced that the new circuit split in any way affects ineffectiveness here, and is not convinced that this opinion would affect the Eleventh Circuit's view. Therefore, counsel's failure to request this instruction was not deficient.

### vi. 1991 Document Retention

On appeal, Defendant argued that the 1991 stop of his vehicle violated the Fourth Amendment, and therefore, the evidence seized following that stop should have been suppressed. LeCroy, 441 F.3d at 925. The court rejected that contention and found that the stop, arrest, and search were permissible, and therefore, the seized evidence was properly admitted into evidence. Id.  In a footnote, the court noted the following:

> In one paragraph of his reply brief, LeCroy appeared to raise the argument that even if the search of his vehicle was valid, the police violated his 4th Amendment rights when they retained the documents found in his car after the completion of his prosecution for burglary. Because it was not fairly presented in LeCroy's briefs, we decline to address the argument.

Id. at 925 n.8.

166

AO 72A
(Rev.8/82)

In Ground G of his "Grounds Requiring Relief," Defendant asserts:

> The Defendant was denied effective assistance of counsel on appeal when counsel failed fairly to present adequately the issue regarding the retention of documents found in Defendant's car pursuant to a law enforcement search.

Dkt. No. [493] at 18.

The Government argues that "Defendant's Fourth Amendment theory is a novel one that has no support in the case law." Dkt. No. [508] at 51. The Government argues that, to its knowledge, "no reported case has held that lawfully seized property that is retained by law enforcement is subject to suppression because the retention of the property violated the Fourth Amendment," although it acknowledges two out-of-circuit district court cases that "held that retention of seized property may violate the Fourth Amendment." Id. at 51-52 & n.6. The Government argues that Defendant cannot show that his counsel's performance was deficient, i.e., "that no competent attorney would fail to do what trial counsel allegedly failed to do in the instant case," in light of the lack of authority to support Defendant's argument. Id. at 52. The Government also argues that Defendant cannot demonstrate prejudice "because if defendant had properly raised the issue previously, his motion to suppress the writings would have still been denied" in

light of his failure to seek the return of his property for ten years and apparent abandonment of that property. Id. at 53.

Defendant contends that "[t]he failure to perfect a valid constitutional issue can constitute ineffective assistance of counsel," and notes his counsel's testimony that "there was no strategic reason not to raise this issue on appeal." Dkt. No. [541] at 42-43.  With respect to the performance prong of Strickland, Defendant contends that the out-of-circuit district cases noted by the Government, Fox v. Van Oostereun, 987 F. Supp. 597 (W.D. Mich. 1997) and Roderick v. City of Gulf Port, Mississippi, 144 F. Supp. 2d 622 (S.D. Miss. 2000), show "that the retention of seized property, here for over ten years, constituted a violation of the Defendant's Fourth Amendment rights sufficient to require suppression." Id. at 43.

The court finds that Defendant has not shown that his counsel's performance was deficient in not seeking to suppress the 1991 seized documents on the ground that their continued retention violated the Fourth Amendment, or in failing to make the argument in their initial brief to the Eleventh Circuit that they should have been suppressed on that ground. Defendant has pointed to no relevant authority to support his claim that the documents should have been suppressed because they were unlawfully retained in violation of the Fourth Amendment. At the time of

AO 72A
(Rev.8/82)

Defendant's trial and appeal, there was no Supreme Court or Eleventh Circuit authority that stated, or even suggested, that suppression of lawfully seized evidence retained by law enforcement gave rise to a Fourth Amendment claim or that such evidence should be suppressed.[39] More recently, the Eleventh Circuit found that the continued retention of lawfully seized evidence does **not** give rise to a Fourth Amendment claim. See Case v. Eslinger, 555 F.3d 1317, 1330 (11th Cir. 2009).  Therefore, Defendant's counsel were not deficient for failing to make that argument.

In Case, the court rejected the plaintiff's argument "that the retention of his seized property violated the Fourth Amendment," because the officer had probable cause to seize the property. 555 F.3d at 1330.  The court further explained, "[a] complaint of continued retention of legally seized property raises an issue of procedural due process under the **Fourteenth Amendment**[.]" Id. (emphasis added). The court pointed out that in Bruce v. Beary, 498 F.3d 1232 (11th Cir. 2007), the court found that the continued retention of property following an **illegal** seizure would be a constitutional violation, but the court "did not say that the

---

[39] Although the out-of-circuit decisions in Fox and Roderick indicate the viability of a Fourth Amendment claim for retention of seized property, those cases do not address the suppression of evidence.

169

retention of **legally** seized property violates the Fourth Amendment." Case, 555 F.3d at 1330 (emphasis added). The court also noted that in Byrd v. Stewart, 811 F.2d 554 (11th Cir. 1987), the court "distinguished a complaint under the Fourth Amendment 'that the search and seizure itself was unlawful,' from a complaint 'that the officers have failed to return the items seized without due process of law,' which is a cause of action under the Fourteenth Amendment." Case, 555 F.3d at 1330 (quoting Byrd, 811 F.2d at 554-55). Finally, the court found that, even if the plaintiff "had stated a claim that the retention of the legally seized property violated the Fourteenth Amendment, that claim would fail because Florida provided Case an adequate postdeprivation remedy." Id. (quoting Lindsay v. Storey, 936 F.2d 554, 561 (11th Cir. 1991)("Even assuming the continued retention of plaintiffs' personal property is wrongful, no procedural due process violation has occurred if a meaningful postdeprivation remedy for the loss is available.")).

In this case, the District Court and the Eleventh Circuit have found that the seizure of the documents from Defendant's vehicle in 1991 was not illegal. Therefore, under relevant Eleventh Circuit authority, Defendant has, at most, a Fourteenth Amendment claim for the continued retention of that property, not a

170

AO 72A
(Rev.8/82)

Fourth Amendment claim. However, as noted in <u>Byrd</u>, Georgia "has provided an adequate post deprivation remedy when a plaintiff claims that the state has retained his property without due process of law," i.e., an action under O.C.G.A. § 51-10-1 for deprivation of personalty possession. 811 F.2d at 555 n.1 (finding that the plaintiff's procedural due process claim against police officers for failure to return seized items would be barred by <u>Parratt v. Taylor</u>, 451 U.S. 527 (1981) because Georgia provides an adequate post deprivation remedy); <u>see also</u> <u>Jones v. Morton</u>, No. CV509-028, 2009 U.S. Dist. LEXIS 76922, at *2-3 (S.D. Ga. Aug. 27, 2009) (finding the plaintiff's due process claim barred because O.C.G.A. § 51-10-1 provides an adequate post deprivation remedy). Therefore, even if Defendant now asserted that the retention of the documents violated the Fourteenth Amendment, that claim would fail.[40] <u>See</u> <u>Woodbury v. City of Tampa Police Dep't</u>, No. 8:10-CV-0772-30AEP, 2010 U.S. Dist. LEXIS 62502, at *13 (M.D. Fla. June 8, 2010) ("To the extent that Mr. Woodbury challenges the continued retention of his recorder, the Eleventh Circuit has consistently held that so long as *some* adequate

---

[40] There is no evidence that Defendant took any action to retrieve the seized papers, or that he filed suit pursuant to O.C.G.A. § 51-10-1 for the deprivation of his property.

AO 72A
(Rev.8/82)

postdeprivation remedy is available, no procedural due process violation has occurred."), adopted by 2010 U.S. Dist. LEXIS 62586 (M.D. Fla. June 23, 2010).

Accordingly, the court finds that Defendant has not shown that his appellate counsel's performance was deficient by failing to argue in its initial brief (or even at trial) that the documents at issue should have been suppressed due to their wrongful retention, in light of the lack of Eleventh Circuit authority in support of such an argument. See Black v. United States, 373 F.3d 1140, 1144 (11th Cir. 2004) (explaining "[i]f the legal principle at issue is unsettled, . . . counsel will not have rendered deficient performance for an error in judgment"), cert. denied, 543 U.S. 1080 (2005).

### vii. Failure to Raise Additional Issues on Appeal

In his traverse, the Defendant argues that this ground incorporates by reference all previously alleged ineffectiveness issues which were not raised on appeal. As the Court has not found any of the non-appealed performance deficient, the Court also does not find the failure to raise those issues on appeal deficient.

172

### B. Prejudice

Even assuming counsel's performance was deficient, the Court finds that the Defendant was not prejudiced by the alleged failures. To prove prejudice, the defendant must prove that counsel's "errors actually had an adverse effect on the defense." Strickland, 466 U.S. at 693, 695. This requires that the defendant prove "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Id. at 694. In the death-penalty sentencing context, "the question is whether there is a reasonable probability that, absent the errors, the sentencer–including the appellate court, to the extent it independently reweighs the evidence–would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." Id. at 695.

The Defendant argues that by presenting Dr. Hilton and Dr. Lisak's testimony, the jury would have learned that the murder would not have occurred but for mental illness. Citing Justice O'Connor's concurring opinion in California v. Brown, 479 U.S. 538, 545 (1987), the Defendant argues that this evidence would have been relevant "because of the belief, long held by this society, that defendants who commit criminal acts that are attributable to a disadvantaged

173

background, or to emotional or mental problems, may be less culpable than those who have no such excuse." Id. Thus, he argues, there is a "reasonable probability" that one juror would have returned a different verdict.

However, LeCroy's mental-illness evidence was the ultimate double-edged sword. First, none of the evidence affected his competency or offered an affirmative defense–LeCroy knew that killing Tiesler was wrong when he did it. And, like Reed, "the testimony that would have been presented was just as likely to have resulted in aggravation against rather than mitigation for" LeCroy. 593 F.3d at 1245. In reviewing Drs. Hilton and Lisak's testimonies, the Government would have had definitive proof to satisfy all of the aggravating factors: LeCroy went out to kill Tiesler; he tortured her; he seriously and physically abused her; he planned the crime, going from house to house to obtain supplies; he laid in wait for her; and, now, he realizes that he did not kill Tinkerbell. By realizing that he did not kill Tinkerbell, he is a potential threat to society should he escape–and there is evidence that he has attempted to do so before–because Tinkerbell is still out there. LeCroy did not break the spell as intended. Moreover, Dr. Hilton testified that LeCroy is not cured, could be a danger to the other prisoners whom he has had

174

thoughts of killing (since the crime), and could be a danger to any female guard whom he mistook for Tinkerbell.

Beyond proving the aggravators, the use of this testimony would have also contradicted the defense's theory to avoid federal jurisdiction–the "botched burglary defense." This defense was the only route counsel saw to avoid guilt as it attacked the federal nexus–the carjacking. And, Defendant admits that this defense was "more than reasonable to pursue." Def.'s Post-Hearing Br., Dkt. No. [541] at 18. Had Dr. Hilton and Dr. Lisak testified, counsel would have lost all credibility after asserting the botched burglary defense during guilt/innocence and then claiming mental illness during sentencing based on evidence that is totally inconsistent with that defense.

As well, while the additional evidence would have provided a cause for the crime, the antisocial personality diagnosis would not be "good mitigation evidence." Reed, 593 F.3d at 1246. Dr. Hilton testified that LeCroy's Millon revealed that he was likely to be defiant and untrustworthy, he possessed a deficient conscience which could evince a recklessly violent disposition, and he exhibited malicious and hostile tendencies which might lead him to sexually dominate weaker inmates. All of these diagnoses cut in favor of solitary

175

AO 72A
(Rev.8/82)

confinement and death over housing him in the general population. And, after hearing the contradictory testimonies of Drs. Lisak and Medlin, it is not clear that there is a "reasonable probability" that the jury or even one more juror would have believed that LeCroy was even sexually abused.[41] With the defense expert's testimony comes rebuttal. Id. at 1247 ("This includes aggravating evidence to which the proposed mitigating evidence would have opened the door.")

Moreover, the Eleventh Circuit has noted that "some death penalty cases almost certainly cannot be won by defendants because sometimes the *best* lawyering, not just reasonable lawyering, cannot convince the sentencer to overlook the facts of a brutal murder–or, even a less-brutal murder–for which there is strong evidence of guilt in fact." Lawhorn, 519 F.3d at 1295 (citing Clisby v. State of Alabama, 26 F.3d 1054, 1057 (11th Cir. 1994) (internal punctuation omitted)). This is such a case. And that would have only been exacerbated if Dr. Hilton had had to testify, line-by-line, to the chilling replaying of the crime. There

[41]Note that even without Drs. Lisak and Hilton's testimony, six jurors found that LeCroy was sexually abused as a child. It is speculative to predict whether this number would have increased or decreased if the jury had been exposed to a "battle of the experts" on the issue.

176

is a difference between extrapolating what happened from crime-scene evidence and hearing the defendant's admission–all doubt as to intent is removed.

Moreover, the Court does not find that Kearns' closing argument was prejudicial. Counsel argued that the Defendant was remorseful for his crime, that life imprisonment for a remorseful defendant was appropriate, that the Defendant had a terrible upbringing, and that he was scarred by childhood abuse. Above all, counsel argued for mercy. Counsel did what the law requires of her.

This is also not a case where counsel chose not to produce any mitigation evidence. Counsel called Jan Vogelsang who conducted a thorough family history and opined on the various violence risk-factors which LeCroy's family exhibited. Counsel called a prison expert to opine on the BOP's safety and nine prisoners who had lived with LeCroy to testify about his prison behavior. They also called family and friends who testified about LeCroy's relationships with them and asked for mercy. But, most importantly, counsel called mental health professionals who had worked with LeCroy and factually testified about his mental health issues. The jury had his mental health before them at the time of sentencing.

177

The Court also finds that counsel's witness preparation did not prejudice the Defendant. Out of all the prison witnesses, only Clyde Denbo and Kurt Lattimer testified that their opinion of LeCroy was lessened after they heard about this crime. However, they both testified that the LeCroy they actually knew–not a hypothetical one which they were asked about on cross–would not be a safety risk in prison. These men had not seen LeCroy since he left prison the first time, and their opinions would not be as relevant as the inmates who had lived with him in Lumpkin County, none of whom said that they were afraid of him. Moreover, seven witnesses testified about his prison conduct did not state that this crime affected their opinion of LeCroy. No reasonable probability exists that additional witness preparation would have changed the jury's decision.

The court also finds that even if Defendant's counsel had presented the citizenship-adjusted juror pool analysis now presented through Mr. Martin, there is not a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland, 466 U.S. at 694.

In the first place, Martin's most recent analysis, taking into account citizenship figures, fails to satisfy Defendant's burden of establishing "that the representation of [Hispanics] in venires from which juries are selected is not fair

AO 72A
(Rev.8/82)

and reasonable in relation to the number of such persons in the community," the

second element of his *prima facie* case under Duren. 439 U.S. at 364. For the 1997

Qualified Jury Wheel, Martin calculated an absolute disparity between age-eligible

Hispanic citizens in the wheel (by sample) and the age-eligible Hispanic citizens

in the Gainesville Division of 1.32 to 1.36 percent, and for the 2001 Qualified Jury

Wheel, the absolute disparity was 1.06 to 1.27 percent. See EHT Def. Ex. 17. "

'Absolute disparity' is determined by subtracting the percentage of [the distinctive

group] in the jury pool . . . from the percentage of [the distinctive group] in the

local, jury-eligible population[.]" Smith, 130 S. Ct. at 1390. The Eleventh Circuit

has consistently found that a defendant cannot satisfy the second element of a fair

cross-section challenge when the absolute disparity between the percentages does

not exceed 10 percent. See United States v. Carmichael, 560 F.3d 1270, 1280 (11th

Cir. 2009) ("Under black letter Eleventh Circuit precedent, '[i]f the absolute

disparity between these two percentages is ten percent or less, the second element

is not satisfied[.]'") (quoting Grisham, 63 F.3d at 1078-79), cert. denied, 130 S. Ct.

1093 (2010); Rodriguez, 776 F.2d at 1511 ("Although precise mathematical

standards are not possible, this circuit has consistently found that a prima facie

179

case of underrepresentation has not been made where the absolute disparity between these percentages does not exceed ten percent.").

Defendant argues, however, that the court should take a flexible approach and take into account the results of Martin's comparative disparity[42] and standard deviation analysis which show significant underrepresentation of Hispanics from the jury wheel. Dkt. No. [541] at 32-33, 37-39.

The court finds that Defendant's comparative disparity and standard deviations are insufficient to meet his burden under Duren. In the first place, the Eleventh Circuit has consistently found that absolute disparity is the appropriate method of comparison in Sixth Amendment fair cross-section claims. See Carmichael, 560 F.3d at 1280 (relying on absolute disparity method); Grisham, 63 F.3d at 1078-79 (same); Pepe, 747 F.2d at 649 ("[W]e are only concerned with the 'absolute disparity' produced by the selection process.") (citing United States v. Maskeny, 609 F.2d 183, 190 (5th Cir. 1980) (rejecting comparative disparity and standard deviation analysis)).

---

[42] " 'Comparative disparity' is determined by dividing the absolute disparity . . . by the group's representation in the jury-eligible population[.]" Smith, 130 S. Ct. at 1390.

AO 72A
(Rev.8/82)

In <u>Smith</u>, the Court considered arguments concerning the merits of the absolute disparity, comparative disparity, and standard deviation methods for determining whether a group was underrepresented. 130 S. Ct. at 1393. The Court acknowledged that "neither <u>Duren</u> nor any other decision of this Court specifies the method or test courts must use to measure the representation of distinctive groups in jury pools," explained that "[e]ach test is imperfect," and then declined "to take sides today on the method or methods by which underrepresentation is appropriately measured." <u>Id.</u> at 1393-94; <u>see also</u> <u>United States v. Pritt</u>, No. 6:09-CR-110-Orl-28KRS, 2010 U.S. Dist. LEXIS 63470, at *28 (M.D. Fla. June 8, 2010) (explaining that "nothing in the *Smith* decision provides any support for a wholesale departure from the well-established law in the Eleventh Circuit regarding the requirements for a fair cross-section claim."), <u>aff'd</u> 2012 U.S. App. LEXIS 1714 (11th Cir. Jan. 31, 2012) (finding, *inter alia*, that "[t]he Supreme Court [in <u>Smith</u>] did not 'actually abrogate' " the court's prior precedent concerning the use of the absolute disparity method).

Furthermore, even if the court were to consider the results of Defendant's comparative disparity analysis, his results do not support a finding that Hispanics were underrepresented in the jury pool, particularly in light of the small percentage

AO 72A
(Rev.8/82)

of Hispanics who meet the age and citizenship requirements to be jurors. See, e.g., Pepe, 747 F.2d at 649 n.18 (explaining that the court "consider[s] deviation from proportional representation in absolute rather than comparative terms for sixth amendment no fair cross-section purposes, because the relative measure may distort the significance of the deviation" and noting that the comparative disparity was 67.3 percent in that case); United States v. Weaver, 267 F.3d 231, 243 (3d Cir. 2001) (finding that, although the results of the comparative disparity analysis—40.01 percent disparity and 72.98 percent disparity— were "quite high," the results were "of questionable probative value" because African-Americans and Hispanics "comprise such a small percentage of the population"), cert. denied, 534 U.S. 1152 (2002).

Similarly, the court declines to rely on Defendant's standard deviation analysis to demonstrate underrepresentation because the Eleventh Circuit has not adopted use of that analysis. See Smith, 130 S. Ct. at 1393 (explaining that "to [the Court's] knowledge, 'no court has accepted a standard deviation analysis alone as determinative in Sixth Amendment challenges to jury selection systems'" (quoting United States v. Rioux, 97 F.3d 648, 655 (2d Cir. 1996)); see also Maskeny, 609 F.2d at 190 (declining "appellant's invitation to focus on comparative or standard

182

deviation disparity" analysis). Furthermore, as Martin explained, the use of a small sample as was the case here results in a higher margin of error, Dkt. No. [563] at 366, 409-10, and therefore, the court does not find the standard deviation analysis to be probative of Hispanic underrepresentation in the jury wheel such that Defendant was deprived of a fair cross-section of the community.

The court also finds that Defendant has not met his burden of showing that Hispanics are systematically excluded from the jury pool, i.e., the third element of his *prima facie* case under Duren. Defendant takes issue with the court's exclusive use of voter registration lists for building the master jury wheel, see Dkt. No. [541] at 40, but even if the court assumes that Hispanic persons are less likely to register to vote, he has presented no evidence that Hispanic citizens are discriminatorily prevented from registering to vote. Therefore, he has not shown systematic exclusion of Hispanics from the jury wheel through the court's reliance on the voter registration lists. See Carmichael, 560 F.3d at 1279 ( "'The circuits are in complete agreement that neither the Act nor the Constitution require that a supplemental source of names be added to voter lists simply because an identifiable group votes in a proportion lower than the rest of the population.'")

183

(quoting United States v. Orange, 447 F.3d 792, 800 (10th Cir. 2006) (internal quotation omitted)).

Defendant also argues that unique characteristics of the Hispanic population, including increased mobility through renting, language issues, income, and professions, result in a lower rate of return of their juror questionnaires (and presumably corresponding exclusion from the qualified jury wheel). See Dkt. No. [541] at 39-40. The court finds Defendant's argument to be based on speculation; there is no evidence as to the rate of return of the questionnaires by race or ethnicity, particularly in light of Ms. Moses' testimony that the Clerk cannot determine the race or ethnicity of the persons who do not return the questionnaires. Dkt. No. [536] at 482. Nor is there any evidence that the court's Jury Plan resulted in the lower rate of return by Hispanic persons, assuming that the rate of return is lower. See, e.g., Rioux, 97 F.3d at 658 ("There is systematic exclusion when the underrpresentation is due to the system of jury selection itself, rather than external forces. The inability to serve juror questionnaires because they were returned as undeliverable is not due to the system itself, but to outside forces, such as demographic changes."); see also Carmichael, 560 F.3d at 1279 (declining to find a JSSA violation where the Jury Administrator did not have a routine practice for

184

following up on questionnaires that were returned as undeliverable). Furthermore, the Supreme Court in <u>Smith</u> rejected the argument that the County's "reliance on mail notices, [and] its failure to follow up on nonresponses," among other things, satisfied the systematic exclusion element, explaining that "[n]o clearly established precedent of this Court supports Smith's claim that he can make out a prima facie case merely by pointing to a host of factors that, individually or in combination, *might* contribute to a group's underrepresentation." 130 S. Ct. at 1395-96 (emphasis in original).

Accordingly, the court finds that, even if Defendant's trial counsel had made the presentation Defendant now makes in support of his Sixth Amendment and JSSA challenge based on the alleged underrepresentation of Hispanics in the court's jury wheel, the outcome would be the same—rejection of his challenge—because he has not met his burden of showing that the representation of Hispanics was "not fair and reasonable in relation to the number of such persons in the community," and that the alleged underrepresentation was "due to systematic exclusion of the group in the jury-selection process," as required by <u>Duren</u>. 439 U.S. at 364. Therefore, he has not satisfied the prejudice prong of <u>Strickland</u>.

185

The Court also finds that Defendant was not prejudiced by the retention of the 1991 evidence. As to prejudice, Defendant argues, "given their provocative language, especially the so-called 'hit list' in which the Defendant claimed to have planned to 'rape, rob and pillage' in order to be 'ruthless and famous,' the Court cannot be confident that but for the failure to suppress the evidence, there was not at least a reasonable probability of a different result as to sentencing, especially when this failure is considered cumulatively with the other errors of counsel described herein and in the Defendant's previous pleadings." Id. at 43-44. But, as discussed *supra*, the retention of the documents does not support a claim under the Fourth Amendment, nor does Defendant present a viable Fourteenth Amendment claim because he had an adequate post-deprivation remedy, and there is no evidence that he pursued that remedy, i.e., an action under O.C.G.A. § 51-10-1. Accordingly, he has not shown a constitutional violation that would warrant the suppression of the documents, and therefore, he has not shown that there is a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland, 466 U.S. at 694.

186

Based on the foregoing, the Court does not find that counsel's cumulative "errors actually had an adverse effect on the defense." Strickland, 466 U.S. at 693, 695. Defendant's ineffective assistance of counsel claims are **DENIED**.

2. Constitutionality of the FDPA

In Ground I of his "Grounds Requiring Relief," Defendant asserts:

> The Defendant's death sentence should be set aside because the Federal Death Penalty Act, 18 U.S.C. § 3591, et. seq. (the "FDPA") is unconstitutional under the Fifth, Sixth, and Eighth Amendments to the United States Constitution, both on its face and as applied to this case, because it does not require that the aggravating factors required for the imposition of the death penalty be alleged in the indictment.

Dkt. No. [493] at 21. In Ground J, Defendant asserts:

> The FDPA is unconstitutional, both on its face and as applied in this case, due to the failure of the FDPA to require that non-statutory aggravating factors be alleged in the indictment, or even if the FDPA is constitutional on its face, because of the failure to allege non-statutory aggravating factors in the indictment in this case.

Id. at 22. Defendant concedes that these issues were "raised by the Defendant in the District Court and on appeal and resolved against the Defendant." Id. at 21-22; see also Dkt. Nos. [103, 253, 328]; LeCroy, 441 F.3d at 920-23. However, Defendant asserts that the United States Supreme Court has never specifically

187

AO 72A
(Rev.8/82)

addressed these issues, and therefore, Defendant raises them in his motion in order to preserve them in the event that the Supreme Court later takes up this issue and decides it differently than the District Court and the Eleventh Circuit. Id. at 21-23.

In light of the Eleventh Circuit's finding that statutory and non-statutory aggravating factors are not required to be alleged in the indictment and its rejection of Defendant's constitutional challenges to the FDPA, see LeCroy, 441 F.3d at 921-23, the court also rejects Defendant's contention that the FDPA is unconstitutional because it does not require that statutory and non-statutory aggravating factors be alleged in the indictment.

### 3. Constitutionality of Current Execution Protocols

In Ground K, Defendant asserts:

> The Defendant's protections against cruel and unusual punishment would be violated should he be executed pursuant to current Bureau of Prisons and Department of Justice protocols.

Dkt. No. [493] at 23. Defendant argues "that the current procedures and protocols of the United States to execute citizens sentenced to death violate the Eighth Amendment protections against cruel and unusual punishment and requests the opportunity to make the required evidentiary showing." Id. Defendant contends

AO 72A
(Rev.8/82)

that "given the opportunity to present relevant evidence, a hearing on which he was denied by the District Court,[43] he can show that the lethal injection procedures and protocols which the United States intends to follow in putting the Defendant to death are cruel and unusual in violation of the Eighth Amendment, in part because they pose a 'substantial risk' of serious pain and suffering, thereby prohibiting the Government from killing the Defendant using these means." Id. at 23-24.

In response, the Government "submits that this issue is not ripe for consideration at this time" in light of the need to resolve Defendant's Section 2255 motion, including the appellate process, which "will take more than a year to resolve." Dkt. No. [548] at 59. Furthermore, the Government asserts that there is litigation pending in the United States District for the District of Columbia on this issue that "will be resolved during the time that this court and the Eleventh Circuit address the other issues raised in defendant's motion." Id. at 59-60. "Therefore, the government submits that without prejudicing defendant's right to litigate this issue at a later time, the court should defer hearing evidence and ruling on this issue at this time." Id. at 60.

---

[43] Defendant moved before trial to declare the federal death penalty unconstitutional on a number of grounds, including cruel and unusual punishment. Dkt. No. [104]. That motion was denied. Dkt. Nos. [281, 329].

189

In his post-hearing brief, Defendant agrees with the Government that this issue "is premature for the Court to consider, because it may not be necessary to address this claim should relief be granted on other grounds and given the fact that there is litigation pending in the United States District Court for the District of Columbia on this very issue which will likely find its way to the United States Supreme Court." Dkt. No. [541] at 51.

In light of the parties' representations, the court denies Defendant's motion on this ground without prejudice as it is premature.

<u>4. Failure to Disclose Exculpatory Evidence</u>

Defendant also argues his right to due process was violated when the Government did not turn over exculpatory evidence under <u>Brady v. Maryland</u>, 373 U.S. 82 (1963). In his traverse, the Defendant stated that because he does not have access to the prosecution's files, he could not say what information was not disseminated to him before trial. Def.'s Trav., Dkt. No. [511] at 39. However, he stated that he would demand the Government's new counsel to review the Government files, and if any information was discovered, he would amend his Motion to Vacate. As he has not done so, the Court finds that there is no evidence

190

the Government did not turn over exculpatory evidence, and as a result, no evidence that LeCroy's constitutional rights were violated. Petitioner's failure to disclose claim is **DENIED**.

## C. CONCLUSION

Based on the foregoing, Petitioner's §2255 petition is **DENIED**. However, his challenge to the constitutionality of the current federal execution protocols is **DISMISSED, without prejudice**.

**SO ORDERED** this  30th  day of March, 2012.

_____

**RICHARD W. STORY**
United States District Judge

191

AO 72A
(Rev.8/82)