**DEATH PENALTY CASE**
## IN THE UNITED STATES COURT OF APPEALS
## FOR THE ELEVENTH CIRCUIT

---

## CASE NO. 12-15132-P

_____

WILLIAM EMMETT LECROY, JR.,
Appellant/Petitioner,

v.

UNITED STATES OF AMERICA,
Appellee/Respondent.

---

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF GEORGIA, GAINESVILLE DIVISION

_____

**INITIAL BRIEF FOR THE APPELLANT**

_____

JOHN R. MARTIN
Martin Brothers, P.C.
Georgia Bar No.  473325
202 The Grant Building
44 Broad Street N.W.
Atlanta, GA 30303
(404) 522-0400

SANDRA MICHAELS
Martin Brothers, P.C.
Georgia Bar No.  504014
202 The Grant Building
44 Broad Street N.W.
Atlanta, GA 30303
(404) 522-0400
**Attorneys for Appellant**

**IN THE UNITED STATES COURT OF APPEALS
FOR THE ELEVENTH CIRCUIT**

| | | |
|---|---|---|
| **WILLIAM EMMETT LECROY, JR.,** | * | |
| | * | |
| **Appellant/Petitioner,** | * | |
| | * | |
| **v.** | * | **Case No. 12-15132-P** |
| | * | |
| **UNITED STATES OF AMERICA** | * | |
| | * | |
| **Appellee/Respondent.** | * | |

## <u>CERTIFICATE OF INTERESTED PERSONS</u>

The Appellant certifies that the following persons have an interest in the outcome of the instant appeal:

William Emmett LeCroy, Jr. – Appellant

John R. Martin – Appellant's counsel

William McKinnon – Appellee's counsel

Sandra Michaels – Appellant's counsel

Richard W. Story – District Court Judge

Joann Tiesler – Victim

i

## CERTIFICATION OF TYPE SIZE AND STYLE

Pursuant to Eleventh Circuit Rule 28-2(d), Appellant certifies that this Brief is typed in 14 point Times New Roman.

## STATEMENT REGARDING ORAL ARGUMENT

Counsel for Appellant William Emmett LeCroy, Jr. request oral argument in this death penalty case. This case raises important issues regarding the performance of counsel in considering and presenting mental health mitigation evidence at a capital sentencing, including whether it is a reasonable investigation to abandon expert evidence of mental illness for fear of a Government evaluation without knowing what a Government evaluation would reveal and instead to attempt to present a mental health mitigation case solely through argument of counsel without any evidence to support a mental health case, much less any evidence connecting the mental illness to the crime. The case also raises the question of whether the final balancing between aggravating and mitigating circumstances must be judged by a reasonable doubt standard under the federal death penalty scheme, an issue which this Court has never addressed. Argument from counsel should be helpful to the Court, especially with respect to the specific factual scenario of the case.

# TABLE OF CONTENTS

**PAGE**

CERTIFICATE OF INTERESTED PERSONS ................................................... i

CERTIFICATE OF TYPE SIZE AND STYLE ..................................................... ii

STATEMENT REGARDING ORAL ARGUMENT.......................................... iii

TABLE OF CONTENTS ................................................................................. iv

TABLE OF CITATIONS .................................................................................. vi

TABLE OF RECORD REFERENCES IN THE BRIEF………………………… ix

STATEMENT OF JURISDICTION..................................................................... xi

STATEMENT OF THE ISSUES......................................................................... 1

STATEMENT OF THE CASE............................................................................. 4

       A.     COURSE OF PROCEEDINGS…………………………………….. 4

       B.     FACTS………………………………………………………………… 5

           (1) Mental Health Evidence…………………………………………… 7

           (2) Risk of Escape Instruction………………………………………… 16

           (3) Reasonable Doubt Instruction as to the Final Weighing Decision   18

       C.     STANDARD OF REVIEW................................................................. 18

SUMMARY OF THE ARGUMENT..................................................................... 18

ARGUMENT AND AUTHORITY................................................................... 23

    A.     INEFFECTIVENESS OF COUNSEL IN FAILING TO
           INVESTIGATE AND PRESENT MENTAL HEALTH EVIDENCE.. 23

    B.     INEFFECTIVE ASSISTANCE OF COUNSEL IN FAILING
           TO OBJECT TO THE COURT'S INSTRUCTION REGARDING
           DEFENDANT'S CLAIMED FUTURE DANGEROUSNESS
           BECAUSE OF THE "RISK" OF ESCAPE…………………………. 42

    C.     INEFFECTIVENESS OF COUNSEL FOR FAILING TO REQUEST
           AN INSTRUCTION THAT THE FINAL BALANCING BE
           CONDUCTED BY THE REASONABLE DOUBT STANDARD… 44

CONCLUSION............................................................................................. 46

CERTIFICATE OF COMPLIANCE             46

CERTIFICATE OF SERVICE

# TABLE OF CITATIONS

**CASES**                                                                                    **PAGE**

Anderson v. Sirmons, 476 F.3d 1131 (10th Cir. 2007)……………………..    35

Apprendi v. New Jersey, 530 U.S. 466 (2000)………………………………..    21, 45

Baxter v. Thomas, 45 F.3d 1501 (1995)………………………………………    24

Ben-Shalom v. Ayers, 566 F.Supp.2d 1053 (E.D.Cal. 2008)………………    39, 41

Bond v. Beard, 539 F.3d 256 (3rd Cir. 2008)………………………………    33

California v. Brown, 479 U.S. 538 (1987)……………………………………    38

Cave v. Singletary, 971 F.2d 1513 (11th Cir. 1992)………………………..    24

Clisby v. State of Alabama, 26 F.3d 1054 (11th Cir. 1994)………………..    41

Cunningham v. Zant, 928 F.2d 1006 (11th Cir. 1991)……………………..    40

Evans v. Secretary, Dept. of Corrections, 703 F.3d 1316 (11th Cir. 2013).    34

Fairchild v. Workman, 579 F.3d 1134 (10th Cir. 2009)……………………    32, 33

Gray v. Branker, 529 F.3d 220 (4th Cir. 2008)……………………………    37

Harris v. Dugger, 874 F.2d 756 (11th Cir. 1989)…………………………    30

Hodge v. Kentucky, __ U.S. __, 133 S.Ct. 506 (2012)…………………..    41

Holsomback v. J.D. White, 133 F.3d 1382 (11th Cir. 1998)……………..    28

Hooks v. Workman, 689 F.3d 1148 (10th Cir. 2012)……………………..    36

Horton v. Zant, 941 F.2d 1449 (11th Cir. 1991)…………………………..    24

Jackson v. Herring, 42 F.3d 1364 (11th Cir. 1995)………………………..    30, 33

Johnson v. United States, 860 F.Supp.2d 663 (N.D.Iowa 2012)…………    34, 37, 42

Kimmelman v. Morrison, 477 U.S. 365 (1986)……………………………    42

Lawhorn v. Allen, 519 F.3d 1272 (11th Cir. 2008)………………………..    40, 41

Lusk v. Dugger, 890 F.2d 332 (11th Cir. 1994)……………………………..    18

Middleton v. Dugger, 849 F.2d 491 (11th Cir. 1988)………………………..    40

Ring v. Arizona, 536 U.S. 584 (2002)……………………………………… 21, 43, 45

Sears v. Upton, __ U.S. __, 130 S.Ct. 3529 (2010)……………………… 32

Smith v. Mullin, 379 F.3d 919 (10th Cir. 2004)........................................ 37

Terry v. Jenkins, 280 Ga. 341 (2006)………………………………………. 30

Stephens v. Kemp, 846 F.2d 642 (11th Cir. 1988)………………………. 40

Strickland v. Washington, 466 U.S. 668 (1984)…………………………… 19, 23, 24, 39, 40

Sullivan v. Louisiana, 508 U.S. 275 (1993)……………………………….. 22, 44, 46

United States v. Allen, 247 F.3d 741 (8th Cir. 2001)……………………. 43

United States v. Daryl Johnson, Case No. 02-C-6998 (N.D.Ill. 2010)……. 43

United States v. Gabrion II, 648 F.3d 307 (6th Cir. 2011)…………………. 44, 45

United States v. LeCroy, 441 F.3d 914 (11th Cir. 2006)…………………… 4, 5, 6, 17, 25, 43

United States v. LeCroy, 550 U.S. 905 (2007)………………………………. 4

United States v. LeCroy, 2012 WL 1114238 (N.D.Ga.. May 30, 2012)…. 5

United States v. O'Reilly, 2010 WL 653188*5 (E.D.Mich.)………………. 33

Walbey v. Quarterman, 309 Fed.Appx. 795 (5th Cir. 2009)………………. 42

## STATUTES

18 U.S.C. § 3593(e)………………………………………………………… 26, 45

28 U.S.C. § 2253(a)………………………………………………………… xi

28 U.S.C. § 2255………………………………………………………… xi, 4

## OTHER

**Eleventh Circuit Rules:**

Rule 28-2(d)………………………………………………………………….. i

**Federal Rules of Criminal Procedure:**

Rule 12.2(c)………………………………………………………………….    28

Rule 12.2(c)(4)……………………………………………………………    31, 33

**Federal Rules of Appellate Procedure:**

Rule 32(a)(7)………………………………………………………………….    48

## TABLE of RECORD REFERENCES in the BRIEF

| Brief Page # | | Docket # |
|---|---|---|
| 4 | Indictment | 1 |
| 4 | Verdict | 398 |
| 4 | Motion to Vacate | 493 |
| | Transcript of Jury Trial on 2/23/2004 | 428 |
| 9 | Govt. Exhibit 41A (from 2/23/2004) | |
| 13, 17, 30, 44 | Transcript of Jury Trial on 03/09/2004 | 437 |
| 4 | Govt.'s Response to Motion to Vacate | 508 |
| 4 | Defendant's Traverse to Govt.'s Response to Motion to Vacate | 511 |
| 6, 7, 8, 9 10, 11, 12, 13, 15, 16, 18, 27, 28, 29 | Transcript of Proceeding held on 1/11/2011 | 534 |
| 7, 8, 9, 10, 11, 12, 13, 14, 15, 16, 27 | Transcript of Proceeding held on 1/12/2011 | 535 |
| 9, 10 | Defendant's Exhibit 1, 2 (from1/12/2011) | |
| 9, 8 | Defendant's Exhibit 3 (from 1/12/2011) | |
| 15, | Transcript of evidentiary proceeding on 02/08/2010 | 537 |

| Brief Page # | | Docket # |
|---|---|---|
| 29 | Government's Exhibit 63 (from 2/8/2010) | |
| 5, 31, 32, 35, 36, 37 | Order Denying Motion to Vacate | 551 |
| 5 | Notice of Appeal | 555 |
| 5 | Motion and Memorandum for Certificate of Appealability | 556 |
| 5, 23 | Certificate of Appealability | 564 |

x

## **STATEMENT OF JURISDICTION**

The Eleventh Circuit Court of Appeals has jurisdiction to consider this appeal, pursuant to 28 U.S.C. §2253(a), in that this is the direct appeal of a final Order and Judgment in a 28 U.S.C. § 2255 action rendered by the United States District Court for the Northern District of Georgia where the District Court Judge issued a Certificate of Appealability.

## STATEMENT OF THE ISSUES

The District Court issued a Certificate of Appealability on the following issues:

*Ineffective Assistance - Mental Health Case*

(1) WHETHER PETITIONER'S RIGHT TO THE EFFECTIVE ASSISTANCE OF COUNSEL WAS VIOLATED WHEN HIS TRIAL COUNSEL FAILED TO ADEQUATELY INVESTIGATE AND PRESENT A MENTAL HEALTH CASE AT SENTENCING;

(2) WHETHER PETITIONER'S RIGHT TO THE EFFECTIVE ASSISTANCE OF COUNSEL WAS VIOLATED WHEN HIS TRIAL COUNSEL FAILED TO PROFFER PETITIONER'S TEACHING EXPERT'S TESTIMONY, WHICH WOULD HAVE ALLOWED THE DISTRICT COURT TO RULE ON THE SCOPE OF THE GOVERNMENT'S REBUTTAL EVIDENCE AND ON WHETHER THE GOVERNMENT WAS ENTITLED TO EVALUATE PETITIONER;

(3) WHETHER PETITIONER'S RIGHT TO THE EFFECTIVE ASSISTANCE OF COUNSEL WAS VIOLATED WHEN HIS TRIAL COUNSEL FAILED TO CONDUCT AND PRESENT AN ADEQUATE AND COMPREHENSIVE MITIGATION INVESTIGATION AND PRESENT CHARACTER WITNESSES WHO WERE PROPERLY PREPARED; AND

(4) WHETHER PETITIONER'S RIGHT TO THE EFFECTIVE ASSISTANCE OF COUNSEL WAS VIOLATED WHEN HIS TRIAL COUNSEL FAILED TO MAKE AN EFFECTIVE PENALTY PHASE CLOSING ARGUMENT REGARDING MITIGATION EVIDENCE ACTUALLY PRESENTED.

*Ineffective Assistance - Instruction on Future Dangerousness*

(5)     WHETHER PETITIONER'S RIGHT TO THE EFFECTIVE ASSISTANCE OF COUNSEL WAS VIOLATED WHEN HIS TRIAL COUNSEL FAILED TO OBJECT TO THE COURT'S INSTRUCTION REGARDING CLAIMED FUTURE DANGEROUSNESS BECAUSE OF THE "RISK" OF ESCAPE.

*Ineffective Assistance - Balancing of Factors Instruction*

(6)     WHETHER PETITIONER'S RIGHT TO THE EFFECTIVE ASSISTANCE OF COUNSEL WAS VIOLATED WHEN HIS TRIAL COUNSEL FAILED TO REQUEST AN INSTRUCTION REQUIRING THAT EACH JUROR, BEFORE IMPOSING THE DEATH PENALTY, FIND BEYOND A REASONABLE DOUBT THAT ALL AGGRAVATING FACTORS, BOTH STATUTORY AND NON-STATUTORY, OUTWEIGHED THE MITIGATING FACTORS PRESENTED BY THE DEFENSE.

Subsumed within these issues are the following:

(a)     WHETHER IT IS REASONABLE INVESTIGATION OF POTENTIAL MENTAL HEALTH ISSUES IN A CAPITAL CASE TO HAVE YOUR CLIENT EVALUATED BY A PSYCHIATRIST WHO PROVIDES AN OPINION ATTRIBUTING THE DEFENDANT'S CRIME TO MENTAL ILLNESS BUT THEN REJECTING HIS OPINION WITHOUT EVER DISCUSSING THE CASE WITH THE EXPERT.

(b)     WHETHER IT IS REASONABLE FOR AN ATTORNEY TO FOREGO MENTAL HEALTH EVIDENCE FOR FEAR OF A NEGATIVE GOVERNMENT EVALUATION, WITHOUT FIRST SEEING WHAT

2

THAT GOVERNMENT EVALUATION IS AND THEN DETERMINING THE RISKS VERSUS REWARDS IN PRESENTING MENTAL HEALTH EVIDENCE.

(c) WHETHER IT IS REASONABLE FOR COUNSEL TO FOREGO A MENTAL HEALTH EXPLANATION FOR A GRUESOME CRIME AND INSTEAD RELY ON "SOFT" MITIGATION BASED SOLELY ON A TROUBLED CHILDHOOD, WITH VAGUE INTIMATIONS OF SEXUAL ABUSE, BECAUSE THE PRESENTATION OF MENTAL HEALTH EVIDENCE WILL PROVIDE GRAPHIC DETAILS REGARDING THE CRIME WHICH ARE OTHERWISE ALREADY PRESENT IN THE EVIDENCE.

(d) WHETHER IT IS REASONABLE PERFORMANCE TO ATTEMPT TO MAKE A MENTAL HEALTH CASE BASED UPON CHILDHOOD SEXUAL ABUSE SOLELY THROUGH ARGUMENT OF COUNSEL WITHOUT ANY EVIDENCE TO CONNECT CHILDHOOD ABUSE WITH THE CRIME AND THEN FOR COUNSEL TO MISTAKE AS TO WHO WAS TO MAKE THE ARGUMENT AND AS A CONSEQUENCE NO ARGUMENT WAS IN FACT MADE

3

## STATEMENT OF THE CASE

## A.    COURSE OF PROCEEDINGS

Appellant Williams Emmett LeCroy, Jr. (hereinafter referred to as the "Defendant" or "Mr. LeCroy") was tried before a jury on an Indictment charging carjacking, where the victim, Ms. Joanne Lee Teisler, was killed. (R1). He was convicted and sentenced to death. (R398, 414, 417). This Court denied his direct appeal, United States v. LeCroy, 441 F.3d 914 (11th Cir. 2006), and the Supreme Court denied his petition for a writ of certiorari. United States v. LeCroy, 550 U.S. 905 (2007).

On April 22, 2008, Mr. LeCroy filed his Motion to Vacate, Set Aside or Correct Sentence By a Person in Federal Custody Pursuant to 28 U.S.C. §2255 (R493)(hereinafter "Motion to Vacate").  On January 9, 2009, the Government responded in the Government's Response to Defendant's Motion to Vacate, Set Aside or Correct Sentence by a Person in Federal Custody Pursuant to 28 U.S.C. §2255 (R508).  On February 11, 2009, the Defendant filed his Traverse to Government's Response to Defendant's Motion to Vacate, Set Aside or Correct Sentence by a Person in Federal Custody Pursuant to 28 U.S.C. §2255 (R511).

With respect to issues about which the District Court allowed the presentation of evidence, an evidentiary hearing was held on January 11, 12 and 13, 2010 and concluded on February 8, 2010. After briefing by the parties, the District Court entered

4

its Order denying the Defendant relief, but dismissing without prejudice the Defendant's claims regarding the constitutionality of the current federal execution protocols. (R551). <u>United States v. LeCroy</u>, 2012 WL 1114238 (N.D.Ga. May 30, 2012). The Defendant filed a timely Notice of Appeal (R555), as well as a Motion and Memorandum for Certificate of Appealability (R556), which was granted by the District Court as to the six issues listed in the Statement of the Issues. (R564).

### B.    FACTS

This Court's opinion on direct appeal, <u>United States v. LeCroy</u>, 441 F.3d 914, 918-920 (11th Cir. 2006), details the evidence supporting the Defendant's guilt. Suffice it to say this evidence supported the Government's contentions made at trial, both as to guilt/innocence and as to sentencing, that the killing of Ms. Joann Tiesler was an unprovoked attack by a repeat offender in order to obtain a vehicle to escape from the consequences of his then probation. The defense never contended that Mr. LeCroy did not assault and kill Ms. Tiesler. They could not given the physical evidence found at the crime scene and at the time of Mr. LeCroy's arrest, as well as Mr. LeCroy's admissions to the crime. Accordingly, from the outset competent counsel would have recognized that sentencing was the sole issue in the case. Nevertheless trial counsel attempted to mount a "jurisdictional" argument in the guilt phase that the murder of Ms. Tiesler was not sufficiently connected to the "carjacking" of her vehicle to constitute a federal death penalty offense. According to this doomed defense, Mr.

5

LeCroy was simply burglarizing Ms. Tiesler's house when he was interrupted by her unexpectedly arriving home, resulting in an impulsive and spontaneous attack on her, followed by his escaping in her car, although this was not his original intent. United States v. LeCroy, 441 F.3d at 923-925.

Mr. LeCroy was represented at trial by a team of four lawyers, Stephanie Kearns, Paul Kish and Brian Mendelsohn with the Federal Defender Program, Inc., and Dan Summer, a private attorney in Gainesville, Georgia, where the trial was held. (R534-12, 85-86, 153-154). As the trial date approached, the attorneys took on various roles in defending the case. (R534-12-13, 86-87, 153). Mr. Kish and Mr. Summer were to handle the guilt/innocence defense. (R534-13, 86, 153-154). Although there was never a contention that Mr. LeCroy did not assault and murder Ms. Tiesler, the guilt/innocence defense focused on the jurisdictional argument described above that the murder was unconnected with the carjacking of Ms. Tiesler's vehicle. (R534-13, 86, 165). Mr. Summer's primary role was as a "local counsel," because of his familiarity with the Gainesville area. (R534-86-87, 154). He was available to assist in selecting the jury. (R534-13, 86, 154). Ms. Kearns and Mr. Mendelsohn were to handle the penalty phase of the trial. (R534-18-19, 86-87, 89, 154).

Ms. Kearns worked primarily with Jan Vogelsang, the defense mitigation expert, in developing a family history, which included substantial evidence of physical and emotional abuse, as well as other family dysfunctions. (R534-87, 154-155). Mr.

6

Mendelsohn's focus was with respect to the expert witnesses. (R534-154). Ms. Kearns and Mr. Mendelsohn were to present this evidence to the jury and handle the penalty phase closing argument.

### (1)    Mental Health Evidence

The pretrial mitigation investigation revealed not only a substantial history of physical and emotional abuse by the family, but also incidents of bizarre sexual behavior and sexual abuse. (R535-190-191). The most important incident of sexual abuse was an incident when Mr. LeCroy was only 8 years old and was sexually abused by a babysitter, who he knew only as "Tinkerbell." (R535-191, 200-202). Records from Mr. LeCroy's prior incarcerations indicated that he had reported this sexual abuse and had discussed it with at least two mental health professionals, including a Dr. Marti Carlson, who was a prison psychiatrist where the Defendant was housed at the El Reno Federal Correctional Institution, in Fort Worth, Texas. (R534-88-90)(R535-303, 312-314).

Dr. Carlson was contacted by the defense and confirmed Mr. LeCroy's report of childhood sexual abuse. (R535-303-304). Although, as Ms. Kearns conceded, she did not have "a background in mental health" (R534-90), it was nevertheless believed by the defense that sexual abuse, combined with the other abuses that the Defendant had suffered as a child, would constitute a mental health mitigation defense at sentencing. (R534-17, 90-91, 157).

Indeed, Mr. LeCroy reported to the defense that his attack on Ms. Tiesler was directly related to the sexual abuse he had suffered as a child. While residing with his parents in the Cherry Log Mountain Community in North Georgia, he had encountered Ms. Tiesler, a nearby neighbor, on a couple of occasions and became convinced that she was in fact the "Tinkerbell" who had abused him as a child. He believed that he had been cursed by this abuse and that "Tinkerbell" was responsible for the troubles he had encountered throughout his life and would continue in the future. He became obsessed with Ms. Tiesler, who he believed to be "Tinkerbell," and believed somehow that he could force her to remove the spell that she had over him if he confronted her and made her lift this curse. As a consequence, he broke into her house, laid in wait for her and confronted her about the sexual abuse. When she refused to acknowledge that she was in fact "Tinkerbell" and refused to lift the spell he believed that she had cast upon him, he attacked her, thinking that this would cause her to lift the spell. He then panicked and fled the scene in Ms. Tiesler's car, taking some of her clothing in hopes that they could be used in lifting the spell. He only realized later that Ms. Tiesler was not "Tinkerbell," when he learned she had Christian CD's in her car. Ashamed about what he had done he wrote a note asking to be forgiven for her murder, which was found in the car after his arrest. (R534-156)(R535-198-204)(R535-Defense Exhibit 3, pp. 9-12)(R428-752).

Having heard this explanation for what had happened and having reviewed the

8

records of Mr. LeCroy's reports while he was incarcerated of sexual abuse as a child the defense obviously realized the attack on Ms. Tiesler was the result of mental illness, especially as it related to childhood sexual abuse, not the burglary gone bad that the defense contended in the guilt/innocence case. (R534-17, 90-91, 156-157)(R535-298). As a consequence, they arranged for Mr. LeCroy to be evaluated by Dr. Michael Hilton, a well-respected forensic psychiatrist in Atlanta, who the Federal Defender Program had often used to evaluate clients. (R534-13-15, 91)(R535-182-185). Dr. Hilton was provided the prison records that had previously been amassed with respect to Mr. LeCroy's reports of sexual abuse, as well as other records regarding his family history, including information regarding physical and emotional abuse as a child. (R534-15, 30-33, 35-36, 92; R535-188; Defendant's Exhibit 3). Dr. Hilton also interviewed Mr. LeCroy personally. (R535-188).

Dr. Hilton reached a diagnosis which attributed the attack on Ms. Tiesler to various mental disorders of the Defendant, including "borderline personality disorder" and "schizotypal personality disorder," which often leads to "paranoid schizophrenia" and may include "transient psychotic episodes or near psychotic episodes." (R535-195-198, 206; Defendant's Exhibit 3, p. 16). Dr. Hilton provided the defense with reports of his conclusions, but none of the defense attorneys, including Mr. Mendelsohn, who was handling the expert witnesses, ever met with Dr. Hilton to discuss with him his findings. (R534-16, 80, 91, 142, 156)(R535-292; Defendant's Exhibits 1, 2, 3). While

9

Dr. Hilton was clear that Mr. LeCroy was competent and legally responsible for his actions (R535, Defendant's Exhibits 1 and 2), he also concluded that "but for the mental illnesses" that he diagnosed, Mr. LeCroy would never have committed the attack on Ms. Tiesler, important mitigation evidence. In short, the murder of Ms. Tiesler was "the product of (Mr. LeCroy's) mental illnesses." (R535-205, 216-217). Defense counsel, however, never knew of this explanation that the attack on Ms. Tiesler was the direct result of mental illness, not simple cruelty, as the Government contended, because they never talked to Dr. Hilton. (R534-143-144(R535-293).

Defense counsel testified that they did not believe that Dr. Hilton's diagnoses would be all that "compelling" (R534-103-104)(R535-263, 293), although they reached this conclusion from merely reading his reports and never spoke with him to determine exactly how persuasive his testimony could have been, such as his unequivocal conclusion that the murder would never have occurred but for the mental illnesses he diagnosed. Instead, they decided to present a mitigation case based upon the prison records, perhaps augmented by the testimony of the mental health providers Mr. LeCroy saw in prison. They would then present expert testimony from Dr. David Lisak, known to be one of the leading experts in the country concerning the effects on an adult of childhood sexual abuse. (R534-93, 156-157, 167). However, Dr. Lisak would not actually evaluate Mr. LeCroy, but would simply testify as a "teaching expert" with respect to what is generally known about how childhood sexual abuse can

10

affect adults. (R534-46, 59, 94-95, 159-160). The defense decided not to have Dr. Lisak actually evaluate the Defendant, because they knew that this would trigger the government's right to its own independent evaluation of Mr. LeCroy and they did not trust the types of experts that the Government typically retained for an independent Government evaluation. The same unreasonable fear prevented them from offering the testimony of Dr. Hilton. (R534-45-47, 60, 94, 107-110, 129, 159)(R535-268-269). After all, under Rule 12.2(c)(4) of the Federal Rules of Criminal Procedure, the defense can wait until reviewing a Government evaluation before making a final determination to present expert testimony and if a decision is made in light of the Government evaluation not to present expert testimony, nothing from the Government evaluation would have been admissible. This procedure provides the defense the opportunity to make a fully informed decision with respect to the presentation of expert testimony, that is the specifics of both a defense and government evaluation, without any risk to the defense should a decision be made not to present expert evidence.

The upshot of these decisions was that, despite the fact that Dr. Hilton was prepared to present substantial evidence with respect to mental illness, including his opinion that the crime never would have occurred but for the mental disorders with which the Defendant suffered, he was never interviewed by defense counsel, much less called as a witness. Instead, the defense opted to present a "documentary" case of sexual abuse from prison records. Dr. Lisak would then provide a general gloss

11

regarding how childhood sexual abuse might affect an adult. No expert testimony would be presented directly tying the sexual abuse, or any mental illness condition suffered by the Defendant, to the specific crime for which he was certainly to be convicted. Instead, Dr. Lisak would be "an expert who could educate the jury in the overall field of child sexual abuse" and who could testify to the "lasting effects" to "individuals who have suffered from this experience." Although as a "teaching expert" Dr. Lisak would not be able to "connect" his expert opinions "to the actual crime or help explain the actual crime," as Mr. Mendelsohn testified, the "hope" was that the "lawyers would be able to draw inferences from what we got out of Dr. Lisak and the facts that we put into the record to then argue it to the jury." (R534-159-160).

Even this questionable plan fell apart when the defense was required to give Rule 12.2 notice of the expert testimony of Dr. Lisak and the defense was then presented with the report of Government expert Dr. Julie Medlin, raising questions about the validity of the reports by Mr. LeCroy in prison of childhood sexual abuse. (R534-95-96, 102, 124-125)(R535-273, 278). Counsel then made the decision not to call Dr. Lisak, or even to proffer his testimony to determine the extent to which the District Court would allow him to testify, so that all the defense was left with was what defense attorney Kish described as "shards" of evidence of childhood abuse based solely upon Mr. LeCroy's reports of sexual abuse in prison records, without any of the prison mental health providers being allowed to testify to any diagnoses or opinions

12

they may have had as a consequence of the sexual abuse. (R534-17, 96-97, 123, 149)(R535-274). No expert would testify as to the impact on an adult of childhood sexual abuse, much less how this sexual abuse played a part in the Defendant's crime. Instead, Ms. Kearns and Mr. Mendelsohn expected to be able to tie together the sexual abuse as a mitigation factor in closing argument. They would in Mr. Mendelsohn's words, take "the place of the expert in testifying, so to speak, in closing argument, in connecting the dots between the offense and the sexual abuse." (R534-96-97, 168-169)(R535-299).

This even more questionable fall back plan fell apart when apparently due to miscommunication between Mr. Mendelsohn and Ms. Kearns, no consistent and coherent argument by counsel was made in closing argument at sentencing based upon the "shards" of evidence of sexual abuse actually received into evidence. (R534-97, 169). Mr. Mendelsohn believed that he was supposed to speak in his closing argument at sentencing only with respect to the Government's case in aggravation, while Ms. Kearns was going to handle all of the mitigation arguments. (R534-145-146, 169)(R535-260). But only four short paragraphs of her closing argument even touched on the issue of sexual abuse and all that Ms. Kearns actually argued is that sexual abuse may have deprived Mr. LeCroy of his "self esteem." (R437-2715-2716)(R534-146). This was hardly a compelling argument "connecting the dots" between the sexual abuse and the actual crime committed by Mr. LeCroy. As Mr. Mendelsohn testified,

13

"I'm not sure whether she had expected me to do it or I had expected her to do it, but

somehow it didn't happen." (R535-170).[1]

---

[1]The entire closing argument concerning sexual abuse is as follows:

"And, again, I think if you look at his history, what you see and what – the family history, what Jan Vogelsang and what Dr. Carlson, I think, more importantly shows to you is that you have someone who has a basic moral fiber. His entire childhood through that divorce he was a good kid. He was doing well in school. He sought out ROTC, it's in the writings, he seeks out ROTC because it gives him something that he is missing, those boundaries that Jan Vogelsang described there were a lack of. He seeks it out on his own. He knows that ROTC is healthy for him, it has discipline, it builds his self-esteem, the self-esteem that is in the pits. And you know he has virtually no self-esteem.

And what does he attribute that to? The baby-sitter, to the sexual abuse he suffered as a child. And the Government may - - Mr. Burby made a big deal yesterday of one of the witnesses about he never described the child molestation to anybody. He didn't tell anybody. His family didn't know about it.

Come on, this is 2004. You know, we all watch TV. If we haven't read books about it, why do we have all these priests that are now being accused of sexual abuse for things they did 20 years ago? Because children don't talk about it. For whatever reasons, whatever happens. That doesn't mean it didn't happen.

Why would he be talking about sexual abuse by a teenager when he's in therapy with Dr. Carlson? He's not in therapy to get out of jail. He's not in therapy to cut his sentence short. He has no benefit to gain from the therapy or the D.A.P. program that he was involved in in El Reno except self-improvement or to relieve himself, learn how to deal with his anger and get beyond his anger so that his life will be better emotionally. There's no motive to lie about the baby-sitter. And he's talking about the baby-sitter in '92 and he's talking about the baby-sitter in '99. But it's a significant event because it robbed him of his self-

14

Had the defense allowed Mr. LeCroy to have been evaluated by Dr. Lisak, not only would he have provided his expert testimony that the Defendant had actually been sexually abused, something that the Government contested, but would have further offered expert testimony, from one of the leading experts in the country on the subject, as to how this sexual abuse, especially when combined with physical and emotional abuse otherwise proven in the case, would have offered an explanation, although not an excuse or a justification, for the attack on Ms. Tiesler. (R537-573-588, 604-605). Dr. Hilton would have provided an even clearer connection between the crime and mental illness, based upon his expertise as a forensic psychiatrist. (R535-205, 216-217).

Moreover, because of the decision by the defense to advise the Defendant not to agree to an independent Government evaluation, the defense was denied the opportunity to present any mental health evidence. (R534-161-163). While the results of a Government evaluation may or may not have been troublesome and may have been sufficient to justify a decision not to present mental health evidence, we will never know because the decision was made not to present that evidence without even knowing what a Government evaluation would have revealed (R534-141), much less what Dr. Hilton would have provided or what Dr. Lisak could have testified to if he had evaluated the Defendant. Moreover, because the Government could have had their

esteem. That's the impact it had on him. We know that from what he's written."(R437-2715-2716).

15

expert personally evaluate the Defendant during the §2255 proceedings, the Government's failure to do so in order to present a rebuttal case leaves unanswered what a Government evaluation would have revealed.

In addition, while the account of Mr. LeCroy of his attack on Ms. Tiesler is graphic and gruesome, and Dr. Hilton and Dr. Lisak would have been required to recount what the Defendant had told them as part of their evaluation, the Government's case, based upon the autopsy and the crime scene evidence and photographs, left no doubt that the attack on Ms. Tiesler was brutal and not merely a spontaneous response after the Defendant had been interrupted by her while burglarizing her house. (R534-114-118)(R-535-280-283, 261-262). As Mr. Mendelsohn conceded, there was no reasonable argument that the aggravating factors alleged by the Government had not been proven beyond a reasonable doubt by the physical evidence itself and the fact that an evaluation would require experts to talk about the details of the events would have added no more gruesome details than what the jury had already learned from the physical evidence. (R535-283-292). Indeed, the physical evidence left the jury to speculate about the details of the cruelty of the attack, allowing them to imagine the worst possible scenarios, while the testimony of the experts would have at least offered a context or explanation for the attack, albeit one that was driven by delusions and obsessions borne of mental illness.

### (2)    Risk of Escape Instruction

16

In both its opening and concluding sentencing arguments, counsel for the Government contended to the jury that a death sentence should be imposed because of the claimed inability of the Bureau of Prisons not to secure the Defendant unless he was placed on death row at the United States Penitentiary in Terre Haute, Indiana. They claimed that he might be transported to a local jail, similar to what happened with some prison witnesses in the case (R437-2679, 2718), and that the only way to be certain that he will not be an escape risk would be for him to be "sentenced to death," where he will held in a "single cell" and "in the most secure facility he can be held in among some twenty some odd inmates who are all known" and not "be one of the 154,000 roaming around federal prisons within this country." (R437-2723-2724).

Given this demonstrably unfair argument by the Government, urging the jury to sentence the Defendant to death because of a claim that the Government itself would be unable properly to secure the Defendant without his being placed on death row, it was incumbent upon defense counsel to assure a proper instruction from the District Court. But trial counsel failed to object to the District Court's instruction that the jury in deciding sentence should consider whether the Defendant was a potential danger to the general public, even though he would be incarcerated for life, if they found that he was an escape "risk," without any explanation of the type of "risk" to which the Court was referring. Trial counsel raised questions about this charge at trial, but failed to make a timely exception to the Court's instruction. (R437-2760). As a consequence,

17

this Court failed to consider the Defendant's argument on any standard of review other than a plain error standard. United States v. LeCroy, 441 F.3d at 930-931. During the evidentiary hearing on the Motion to Vacate, Ms. Kearns and Mr. Mendelsohn testified that there was no reason not to perfect this issue with an exception at trial. (R534-99, 173-174). As Mr. Mendelsohn testified, counsel just "forgot to say the magic words." (R534-174).

### (3)     Reasonable Doubt Instruction as to the Final Weighing Decision

Finally, trial counsel failed to request an instruction telling the jury that it must find that aggravating circumstances outweigh the mitigating factors presented by the defense beyond a reasonable doubt before they can sentence the Defendant to death. During the evidentiary hearing the trial attorneys testified that there was no strategic reason not to raise this at the trial or on appeal. (R534-23-24, 99, 175).

### C.     STANDARD OF REVIEW

In that the Defendant raises issues of ineffectiveness of counsel, which are mixed questions of fact and law, the appeal is subject to plenary review. Lusk v. Dugger, 890 F.2d 332 (11th Cir. 1994).

### SUMMARY OF THE ARGUMENT

Defendant LeCroy essentially raises three claims of ineffective assistance of trial counsel: (1) Trial counsel were ineffective in investigating and presenting a mental

illness mitigation case. (2) Trial counsel failed to except to the District Court's inadequate instruction regarding the Defendant's future dangerousness due to an ill-defined "risk" of escape. (3) Trial counsel failed to request an instruction that the final balancing of aggravating and mitigating circumstances under 18 U.S.C. §3593(e) be determined by a reasonable doubt standard. These errors, singularly and in combination, sufficiently prejudiced the defense to require relief under the two prong standard of Strickland v. Washington, 466 U.S. 668 (1984).

With respect to a mental illness mitigation case, trial counsel learned that the Defendant had been subjected to both physical and sexual abuse as a child and obtained an evaluation from a respected forensic psychiatrist, Dr. Michael Hilton, who provided a lengthy report detailing the Defendant's mental illnesses, including borderline personality disorder and schizotypal personality disorder, which included features similar to "paranoid schizophrenia," such as "magical" thinking and "transient psychotic episodes." In Dr. Hilton's expert opinion these mental illnesses played a direct role in the Defendant's crime, which would not have occurred but for the mental illnesses he had diagnosed.

Despite Dr. Hilton's opinions explained in his written report, trial counsel never spoke with him in order to understand fully the evidence he could provide in mitigation. Trial counsel instead unreasonably decided to present its mental health case purely through statements that the Defendant had made to mental health professionals

19

who had seen him during previous incarcerations and through a "teaching expert," Dr. David Lisak, who had not personally evaluated the Defendant, but could testify generally about the effects on an adult of childhood sexual abuse. The excuse for proceeding this way was the fear of a Government evaluation should they present expert evidence from mental health professionals who had actually personally evaluated the Defendant. But the consequence of this unreasonable decision was that the defense abandoned a mental health mitigation case that connected the Defendant's mental illnesses to the crime without knowledge of what a Government evaluation would have revealed. Whatever decision was made, it was not a strategic decision because it was not fully and reasonably informed.

Moreover, the jury never heard any argument connecting the Defendant's mental illnesses to the crime because this unreasonable plan was never implemented, due to the fact that trial counsel never called the "teaching expert" due to ungrounded fears of a Government rebuttal. Instead, trial counsel decided, again unreasonably, to attempt to make the connection between child sexual abuse and the crime through argument of counsel, even though there was no evidence in the record to support that connection. And even this final unreasonable plan was not implemented because of miscommunication between trial counsel as to who was to attempt to make the argument so that <u>no argument connecting mental illness to the crime was ever made</u>.

The failure of trial counsel to make an informed decision as to the presentation

20

of mental illness evidence and even to implement the questionable strategy devised was deficient performance which denied the Defendant the only viable mitigation case available. Had a mental illness case been presented, the jury would have learned that the Defendant's crime was the product of mental illness and there is a reasonable probability that at least one juror would have opted for a sentence of life without parole instead of death.

In addition, the Government improperly argued that absent a death sentence, there was no way the Government could guarantee that he would be securely confined in the Bureau of Prisons, thereby creating their own aggravating circumstance of future dangerousness to the public at large. In light of this improper argument, trial counsel should have assured that the District Court charged the jury that any claimed "risk" of escape must be real instead of a mere possibility. Counsel failed to except to the District Court's inadequate charge and, as a consequence, this issue was reviewed on appeal by this Court solely on a plain error standard. Had a proper exception been made, there is at least a reasonable probability that this Court would have found reversible error, given the improper arguments made by the Government.

Finally, trial counsel failed to request a charge that the final balancing between aggravating and mitigating circumstances be judged by the reasonable doubt standard. Under the holdings and logic of the <u>Apprendi v. New Jersey</u>, 530 U.S. 466 (2000) and <u>Ring v. Arizona</u>, 536 U.S. 584 (2002) line of cases, any fact or mixed question of law

21

and fact must be found by the fact finder beyond a reasonable doubt. The final balancing is just such a finding of fact or mixed question of law and fact and trial counsel should have requested such an instruction. Since the failure to give a reasonable doubt instruction when required is a structural error not subject to harmless error review, Sullivan v. Louisiana, 508 U.S. 275, 281 (1993), there is at least a reasonable probability that had counsel performed properly at trial or on appeal the result of the death penalty sentencing would have been different.

## ARGUMENT AND AUTHORITY

### A.    INEFFECTIVENESS OF COUNSEL IN FAILING TO INVESTIGATE AND PRESENT MENTAL HEALTH EVIDENCE.

Claims A, B and L in the Motion to Vacate and Issues 1 through 4 of the District Court's Certificate of Appealability (R564), as well as subsumed Issues (a) through (d), relate to the effectiveness of trial counsel with respect to potential mental health evidence at sentencing. Claims of ineffective assistance of counsel are governed by the familiar two-pronged test of Strickland v. Washington, 466 U.S. 668 (1984). In order to obtain relief for ineffective assistance of counsel a defendant must establish (1) "that counsel's performance was deficient" in that it "fell below the objective standards of reasonableness," under "prevailing professional norms," 466 U.S. at 687-688, and (2) "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. 466 U.S. at 694. It is not necessary for a defendant to show "that counsel's deficient conduct more likely did not alter the outcome of the case." 466 U.S. at 694. Instead, "[a] reasonable probability is a probability sufficient to undermine confidence in the outcome." 466 U.S. at 694. In determining prejudice the Court should not look at each claimed error individually, but should consider the cumulative effect of counsel's errors. Strickland, 466 U.S. at 687 ("A defendant must show that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable")(emphasis added).

23

In determining whether counsel's performance fell below professional norms, a strategic decision made with full knowledge of the consequences of the decision which is then actually implemented by counsel, is unchallengeable, if the decision is at least a reasonable choice. But an uninformed strategic decision is not due any deference, especially if the supposed strategy was not even implemented. Strickland v. Washington, 466 U.S. 668, 690-691 (1984)("[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgment support the limitations on investigation."); Baxter v. Thomas, 45 F.3d 1501, 1514 (1995)("[O]ur case law rejects the notion that a 'strategic' decision can be reasonable when the attorney has failed to investigate his options and make a reasonable choice between them.") (citing and quoting Horton v. Zant, 941 F.2d 1449, 1462 (11th Cir. 1991)). Moreover, a strategic choice must itself be reasonable in the particular circumstance of the case. Cave v. Singletary, 971 F.2d 1513, 1518 (11th Cir. 1992)("Further, we wish to emphasize the district court's observation that the mere incantation of the word 'strategy' does not insulate attorney behavior from review. The attorney's choice of tactic must be reasonable under the circumstances.").

Trial counsel here were faced with a case where there was no viable defense to the rape and killing of Ms. Tiesler. Mr. LeCroy's DNA was found in Ms. Tiesler's

body. He was arrested intending to cross the border into Canada in her stolen vehicle. Blood matching Ms. Tiesler was found on his shirt in the car. Also found in his car was a note expressing remorse for her murder. The Defendant confessed to a minister in Minnesota shortly after his arrest. This was only the most damning of the evidence against him.

Despite the overwhelming evidence of guilt, counsel nevertheless pursued a jurisdictional defense with respect to guilt/innocence, based upon an argument that the theft of Ms. Tiesler's vehicle was not sufficiently connected with the attack upon her. But this defense was doomed from the outset because of the evidence that the Defendant was resisting the conditions of his probation requiring him to undergo sex offender evaluation, the fact that the only transportation he had available was a motorcycle which could not sustain a long trip, and the fact that the family car was not available to him because his mother and step father had not left the keys in the house. United States v. LeCroy, 441 F.3d at 924.

Instead, this was from the outset a penalty case and the defense needed to offer the jury some reason why the ultimate penalty of death should not be imposed. After all, the physical evidence from the autopsy and the crime scene photographs supporting a lengthy and brutal assault belied an impulsive attack by Mr. LeCroy upon being surprised by Ms. Tiesler. The jury was left waiting for some explanation from the defense, although not an excuse or justification, for the assault that the physical

evidence clearly proved had occurred other than the Government's claim that it was a gratuitous and savage attack by a criminal needing a vehicle. That explanation, mental illness borne of sexual, physical and emotional abuse, was available to the defense, but never presented due to a failure to investigate the alternatives available to the defense with respect to this evidence and the unreasonable miscalculations, miscommunications and misunderstandings of trial counsel in preparing and presenting a mitigation case, as detailed below.

Trial counsel had done their job in conducting an extensive investigation of the Defendant's background. They had uncovered evidence of Mr. LeCroy's chaotic, dysfunctional and abusive, both physically and emotionally, childhood, as well as evidence of sexual abuse as a child, including Mr. LeCroy's reports to mental health professionals while he was incarcerated long before the crime charged that he had been sexually abused by a female babysitter. Counsel also understood that this type of evidence could form a compelling case which could convince at least one juror, all that was necessary, that a sentence of life without parole, rather than a sentence of death, would be an appropriate sentence. 18 U.S.C. §3593(e). Nor was this mitigation case inconsistent with the guilt phase defense that the crime was not motivated by the need to steal a car. Where counsel's actions broke down, falling beneath professional norms, was in failing to implement a strategy of a defense based upon mental illness, fueled by physical, emotional and sexual abuse.

Counsel caused the Defendant to be evaluated by a well-respected local forensic psychiatrist, Dr. Michael Hilton, who found Mr. LeCroy to be competent and not legally insane at the time of the event. But he also provided an extensive report describing mental illnesses, including borderline personality disorder and schizotypal personality disorder, which in Dr. Hilton's opinion offered an explanation as to how Mr. LeCroy could have come to commit the crime for which he was obviously guilty. These disorders include "magical" thinking, "transient psychotic episodes," and features similar to "paranoid schizophrenia" (R535-197-198), which might cause Mr. LeCroy to conclude in his confused and deluded state that Ms. Tiesler was in fact the babysitter that had molested him as a child and who had cast a spell upon him which was the cause of all of his troubles as an adult, which only she could remove.

However, counsel never met with Dr. Hilton and explored with him the full ramifications of the diagnoses he found, as well as the reasons for his conclusions, and the possible mitigation testimony he could have provided, such as his conclusions that mental illness played a "direct role" in the crime and that the murder would not have "occurred but for" the mental illnesses he had diagnosed. (R535-204-205). Instead, counsel, who admittedly were not mental health experts themselves (R534-90), dismissed the report as offering diagnoses which were not sufficiently "compelling," based solely on the written reports themselves. (R535-293). They did this in the face of the fact that the account that Mr. LeCroy provided Dr. Hilton was the exact same

27

account of the events which he had described to counsel. (R534-156). Cf., Holsomback v. J. D. White, 133 F.3d 1382, 1386-1389 (11th Cir. 1998)(Counsel ineffective for failing to contact examining physicians in an aggravated sodomy case who had reported no physical evidence of the crime. A claimed strategic reason not to follow up on the written reports was rejected.).

Instead of working with Dr. Hilton to appreciate the full context of his conclusions, counsel merely jettisoned his report, as well as the possibility of presenting any expert testimony regarding mental health issues directly related to the Defendant and is crime. Their alternative plan was merely to present the evidence regarding Mr. LeCroy's dysfunctional upbringing, including the reports of sexual abuse made to mental health professionals while the Defendant was in prison, and hopefully provide a gloss with respect to this information from a "teaching expert," who would testify only generally about what is known about how childhood sexual abuse can affect adults, without that expert testimony being specifically tied to the Defendant or his crime. (R534-159-160).

The decision not even to talk with Dr. Hilton about his conclusions was not reasonable and an inadequate investigation and this unreasonableness was compounded when the alternative replacement plan was not even carried out. This alternative plan broke down when the defense was required to provide a Rule 12.2 notice of the nature of Dr. Lisak's testimony and the Government then provided them, at the close of the

28

guilt/innocence phase, with a report from Dr. Julie Medlin raising questions about the validity of Mr. LeCroy's report of sexual abuse. (R537-Government's Exhibit 63). Even though Dr. Lisak, a leading national expert on the effects on adults of childhood sexual abuse, explained to counsel how he could have easily refuted Dr. Medlin's report[2], the defense instead completely abandoned any expert testimony regarding mental health issues, the only realistic mitigation case available to respond to what was clearly a difficult murder/rape case. Without any expert testimony to explain the impact of the abuse that Mr. LeCroy had suffered as a child, counsel was left only with the option of somehow trying to "connect the dots" in closing argument, with the attorneys "taking the place of the expert." (R534-96-97-169).

This strategy was itself questionable and unreasonable under the circumstances, because without any expert testimony as to Mr. LeCroy's mental illness there were no "dots" to connect. But even if it could somehow be excused as marginally sufficient under prevailing professional norms, something the Defendant strongly contests, it was never in fact implemented, apparently due to miscommunication between Ms. Kearns and Mr. Mendelsohn. Mr. Mendelsohn believed that Ms. Kearns would drive the point

---

[2]Dr. Lisak described Mr. Medlin's report as "nonsense" and a "hatchet job by somebody who really didn't know what she was talking about." He was "shocked at some of the references she was citing," because they are not "real studies." (R534-166-167). This evidence was readily available to refute Dr. Medlin's unfounded and unscientific conclusions.

home regarding the effect of sexual and other abuse suffered by the Defendant, as apparently Mr. Kish also believed would happen, but the actual closing argument on this subject includes only four short paragraphs and all that Ms. Kearns argued was that somehow the sexual abuse might have affected the Defendant's "self-esteem." (R437-2715-2716). This was hardly a compelling case for a sentence other than death, even though the defense had significant evidence of mental illness directly related to the crime which could have given at least one juror reasons to reach a verdict other than death. Jackson v. Herring, 42 F.3d at 1364-1368 (Counsel ineffective for failing to conduct an adequate mitigation investigation due to a "misunderstanding" between the defendant's two counsel as to who was responsible for this investigation); Harris v. Dugger, 874 F.2d 756, 763 (11th Cir. 1989)("Here, counsel's failure to present or investigate mitigation evidence resulted not from an informed judgment, but from neglect. Each lawyer testified that he believed that the other was responsible for preparing the penalty phase of this case."); Terry v. Jenkins, 280 Ga. 341, 344 (2006)(Counsel found to be ineffective due to the failure to conduct an adequate investigation because counsel "miscommunicated about the role each was to play" in the defendant's defense.).

The issue is not whether counsel conducted a mental health investigation. They clearly did. The issue is whether to abandon that evidence and instead launch a doomed effort to finesse the issue through a "teaching expert" was a reasonably informed

30

decision without ever meeting with the psychiatrist who evaluated the Defendant or knowing what a Government evaluation would show. Counsel could have submitted their client to a Government evaluation and if it turned out badly, still attempted the "teaching expert" ploy. With the protections of Rule 12.2(c)(4), the defense would have been no worse off than they turned out to be. The gravamen of the Defendant's ineffective assistance of counsel claim was that the decision to jettison a robust mental health defense was made without knowledge of what the real stakes were, i.e. what the defense experts would say and what a Government evaluation would reveal.

Despite the evidence presented by the Defendant, the District Court nevertheless concluded that counsel's failure to present a viable mental health case in mitigation, based in part on childhood sexual abuse, as confirmed by Dr. Lisak, and other severe mental illnesses, which in Dr. Hilton's opinion were the catalyst for the crime which would not have occurred but for these mental illnesses, was nevertheless reasonable. Among the reasons cited by the District Court to support the reasonableness of counsel's actions were (1) fear of a government evaluation, even though a decision was made to forego mental health evidence without ever knowing exactly what that evaluation would be (R551-137), (2) concerns that the expert testimony would necessarily include a recounting of gruesome details regarding the crime, although these details were starkly proven in the physical evidence and graphically exploited by the prosecution in closing argument (R551-134-135), and (3) fear of the testimony of

31

the government expert, Dr Medlin, even though her evaluation was in the opinion of Dr. Lisak "a 'hatchet job' that he could easily refute," because to a lay jury "a scientifically wrong opinion could be dressed up enough to be believable in their opinion." (R551-139-140, 143-144).

As to the first justification offered by the District Court, Mr. Mendelsohn and Ms. Kearns testified that they were fearful from their past experience that a Government evaluation would not have been helpful and perhaps even more damaging than the evidence that they could present, even though they did not even know the extent of Dr. Hilton's testimony, because they never talked to him, nor was Dr. Lisak ever allowed to interview the Defendant. While a Government evaluation may or may not have been harmful, there was no way for any of trial counsel to know for sure until an evaluation actually occurred. If the evaluation by a Government mental health expert had been so persuasive and damning that it trumped any expert testimony by defense experts, then an informed decision might reasonably be made not to pursue mental health evidence through an expert. The Defendant would have been no worse off than he was ultimately in this case. But to make this decision in a vacuum without even knowing what the results of a Government evaluation would be, or even what specifically Dr. Hilton or Dr. Lisak, if he had personally evaluated Mr. LeCroy, would have opined, is just the type of uninformed strategic decision to which the Court should give no deference. Sears v. Upton, __ U.S. __, 130 S.Ct. 3259, 3265 (2010)("That a

32

theory might be reasonable, in the abstract, does not obviate the need to analyze whether counsel's failure to conduct an adequate investigation before arriving at this particular theory prejudiced Sears."); <u>Jackson v. Herring</u>, 42 F.3d at 1368 ("[A] legal decision to forego a mitigation presentation cannot be reasonable if it is unsupported by sufficient investigation."); <u>Bond v. Beard</u>, 539 F.3d 256, 289 (3rd Cir. 2008)("Strategy is the result of planning informed by investigation, not guesswork."); <u>Fairchild v. Workman</u>, 579 F.3d 1134, 1150 (10th Cir. 2009)(The failure of counsel to follow up on mental issues presented in the expert's report by discussing them with the expert "plausibly suggests that no reasoned decision was made not to present such evidence at trial, or if a decision was made, it was made before counsel possessed sufficient knowledge to weigh the potential importance of the evidence.").

After all, Rule 12.2(c) of the Federal Rules of Criminal Procedure grants a capital defendant the right to review a government evaluation before making a final decision as to presenting expert mental health testimony at sentencing and Rule 12.2 (c) (4) specifically protects a capital defendant from any statement made during the government evaluation, any testimony of an expert based on any statement, and any "other fruits of the statement" from being admitted into evidence, unless the defendant decides to introduce expert evidence at sentencing in a capital case. <u>See</u>, <u>e.g.</u>, <u>United States v. O'Reilly</u>, 2010 WL 653188*5 (E.D. Mich.). And in this context the "once burnt, twice shy" excuse, because of a prior bad experience with a government

33

evaluation, is "simply not good enough," when without even knowing what the government evaluation would show in this case counsel abandoned mental health evidence and as a consequence effectively doomed any mitigation case connected to the actual crime.  Johnson v. United States, 860 F.Supp.2d 663, 886 (N.D.Iowa, 2012).

The second excuse offered by the District Court was that it was reasonable not to call as a witness, Dr. Hilton, who actually evaluated the Defendant, or Dr. Lisak, if he had evaluated him, because they would have then been required to describe the details of the Defendant's account of his attack on Ms. Tiesler. But, here again, calling Dr. Hilton or Dr. Lisak and having them recount the details provided by the Defendant would have not made the factual situation counsel faced any worse than it already was. The autopsy and the crime scene photographs were sufficient to prove an extended and brutal attack on Ms. Tiesler while she was conscious, and in some sense were worse than the precise details of the Defendant's description of the event, because the jurors would inevitably speculate as to the worst scenarios possible. The jury already knew that it was a brutal rape/murder and Dr. Hilton's or Dr. Lisak's testimony would not have made that situation any more difficult than it already was.  Evans v. Secretary, Dept. of Corrections, 703 F.3d 1316, 1342 (11th Cir. 2013) (Martin, J, dissenting). ("To the extent the postconviction aggravating evidence is just more of the aggravating evidence the jury already knew about Mr. Evans's background, it is not reasonable to find Mr. Evans's new mental health mitigation "more harmful than helpful." The

34

Florida Supreme Court's determination that the postconviction mitigation evidence presented a "double-edged sword" is objectively unreasonable because it fails to recognize the fact that the jury was already well-acquainted with the aggravating edge of the sword, when the same was not true of the mitigating edge."). On the other hand, Dr. Hilton and Dr. Lisak would have provided an explanation of mental illness, which, although not a justification or excuse for the attack, could have persuaded at least one juror to impose a sentence other than death. Anderson v. Sirmons,  476 F.3d 1131, 1148 (10th Cir. 2007)("In this particular case, the absence of the readily available mitigation evidence left the jury with no explanation for the murders other than the prosecution's assertion Anderson was 'evil.'").

The third excuse that a fear that a scientifically invalid opinion might be "dressed up" to be persuasive to a jury is hardly an excuse for abandoning the one viable mitigation case available to the defense. (R551-139-140, 143-144). Is this Court prepared to condone defense lawyers eliminating from the case the only hope for a life sentence for fear of junk science which can be "dressed up" to be foisted on the jury? Of course, lawyers have to make tough choices at times, but to choose to abandon a defense because juries can sometimes be fooled by a phony expert cannot be reasonable, especially in a death case. Instead, the only reasonable choice is to expose a fraudulent expert, which can only bolster the defense and undermine the prosecution. Moreover, if the mere existence of contrary evidence, no matter how specious, was

35

sufficient to defeat an ineffectiveness claim in a §2255 proceedings, then no relierf would ever be required.

Moreover, while Dr. Medlin was prevented from evaluating the Defendant pretrial nothing prevented the Government from having her evaluate the Defendant prior to the evidentiary hearing. While as the District Court noted that "with the defense expert's testimony comes rebuttal" (R551-176), but the quality of that rebuttal must be in the record not merely speculative. The Government had the chance to put on that rebuttal but only put on Dr. Medlin's testimony based on a limited record review.

Finally, and most important of all, while from the slender and self-serving evidence offered some of the jurors may have found that LeCroy had suffered childhood sexual abuse, they were never offered any causal link between that abuse and the crime other than counsel's claim it may have caused "low self-esteem," hardly a compelling explanation. As a consequence, counsel failed to humanize the Defendant and to present any case that he was less morally culpable on account of mental illnesses that were obviously not his choice but instead the result of sexual and other abuse against him when he was a child and the most vulnerable. Hooks v. Workman, 689 F.3d 1148, 1204 (10th Cir. 2012)("Counsel in a capital case must explain to the jury why a defendant may have acted as he did—must connect the dots between, on the one hand, a defendant's mental problems, life circumstances, and personal history and on

36

the other hand, his commission of the crime in question."); Smith v. Mullin, 379 F.3d 919, 943-944 (10ᵗʰ Cir. 2004)("The jury in Mr. Smith's case never received an explanation for his behavior. As described by the State, at the guilt phase Mr. Watson (the attorney) threw medical evidence at the jury and hoped something would stick."); Gray v. Branker, 529 F.3d 220, 235 (4ᵗʰ Cir. 2008)("Counsel did not present a cohesive case for the mental or emotional disturbances-indeed it was barely mentioned in closing argument at sentencing."); Johnson v. United States, 860 F.Supp.2d at 887 ("While trial counsel may have laid a trail of bread crumbs for the jurors to follow concerning Johnson's mental state up to and shortly after the offenses, the trail disappeared at the critical juncture, the time of the offenses, and it was wishful thinking to imagine that the jurors would necessarily make the desired connections without specific guidance.")

And the District Court contradicted itself in finding that the decision by counsel to forgo expert mental health evidence and for counsel alone to argue that childhood sexual abuse played a significant part in explaining the crime was nevertheless reasonable.  Despite first claiming it was reasonable for counsel alone to make the connecting argument, the District Court then excused the failure of counsel even to implement this plan when each thought the other would make this argument from the meager evidence that was available because "there was nothing in evidence which would explain – besides a common-sense understanding – how the abuse could have

affected him because no expert testified." (R551-142-143). But this is exactly what made the actions of the counsel unreasonable and deficient in the first place.

With respect to the question of prejudice, the mental health evidence that was readily available to the defense but never presented due to the ill-informed and objectively unreasonable decisions of defense counsel would have provided the jury with some explanation for what was otherwise an inexplicable attack upon Ms. Tiesler. The evidence would not have only explained why the attack occurred but would have offered an explanation as to the brutality of the attack. In short, the jury would have learned that the assault on Ms. Tiesler was not a gratuitous and unprovoked act of evil, as the Government contended, but was the "product" of mental illness and would have never occurred but for the sexual and other abuse which the Defendant had suffered and which had caused him to develop mental disorders, the symptoms of which included "magical" thinking and "transient psychotic episodes." As Justice O'Connor observed in <u>California v. Brown</u>, 479 U.S. 538, 545 (1987), such mitigation evidence is relevant "because of the belief, long held by this society, that defendants who commit criminal acts that are attributable to a disadvantaged background, <u>or to emotional or mental problems</u>, may be less culpable than those who have no such excuse." (Emphasis added).

The question is not whether at least one juror would certainly have returned a verdict other than death if he or she had heard this evidence, or even whether it is

likely or probable that at least one juror would have returned a verdict other than death. The question is whether there is "a reasonable probability" that at least one juror would have returned a different verdict had the juror heard relevant mental health evidence which was never presented by counsel, that is a "probability sufficient to undermine confidence in the outcome" of the case. Strickland v. Washington, 466 U.S. at 694. At bottom, the issue is whether during the sentencing phase of the trial the prosecution's case for death was met with the type of "adversarial testing" necessary for us confidently to conclude that the Defendant received a "fair trial" with respect to sentencing. Id. at 685.

Here, the prosecution's case for death was unrebutted because no cohesive, coherent and compelling case was made to explain how the Defendant's individual background and character, including the mental illnesses from which he suffered, related, at least in mitigation and in extenuation, to the attack on Ms. Tiesler. Counsel failed to investigate all reasonable alternatives before making critical strategic decisions about the presentation of expert testimony. There was a misunderstanding between counsel as to how what evidence they did have could be used to persuade the jury. As a consequence, counsel failed in their constitutional duty to provide the jury with the complete and individualized picture of the Defendant's mental illnesses, and how these mental illnesses led to the crime, perhaps, the one and only reason which could persuade at least one juror under the circumstances of this case to render a

39

verdict other than death.

The Defendant did not receive a "fair trial" consistent with constitutional standards and at which the jury had a full and individualized picture of Mr. LeCroy, both aggravating and compelling mitigating circumstances, such as mental illness, in determining sentence. The Government's case for death was not subjected to the "adversarial testing process" which our system relies upon "to produce a just result." Strickland, 466 U. S. at 685-687.  Mr. LeCroy was denied constitutionally effective assistance of counsel at sentencing and a new sentencing should be ordered. Cunningham v. Zant, 928 F.2d 1006, 1019 (11th Cir. 1991)(Failure to develop evidence of mild retardation and brain injury "prejudiced Cunningham's ability to receive an individualized sentencing," which is the "primary purpose of the penalty phase."); Stephens v. Kemp, 846 F2d 642, 652 (11th Cir. 1988) ("Our reading of the record convinces us that, under the circumstances of this case, trial counsel's failure to investigate, present and argue to the jury at sentencing any evidence of appellant's mental history and condition constituted error 'so serious that counsel was not functioning as the 'counsel' guaranteed by the Sixth Amendment'"); Middleton v. Dugger, 849 F2d 491, 494-495 (11th Cir. 1988) (Failure to develop evidence of "schizoid personality" diagnosis and evidence that the defendant was "sexually assaulted while at a school for boys" found to be constitutionally ineffective assistance of counsel.  This Court concluded, "This kind of psychiatric evidence, it has been held,

40

has the potential for altering the causal relationship that can exist between mental illness and homicidal behavior."); Gray v. Branker, 529 F.3d at 235 ("Evidence of mental disturbance of the type omitted at Gray's sentencing (paranoid personality disorder) can be persuasive mitigating evidence for jurors considering the death penalty, and this evidence can determine the outcome."); Ben-Shalom v. Ayers, 566 F.Supp.2d 1053, 1120 (E.D.Cal. 2008)("It is manifest that to counter the effect of the aggravating circumstances of the crime [counsel] was obligated to show something mitigating about Ben-Shalom's mental state during his homicidal actions. This required that he fulfill his 'sacrosanct duty to conduct a full and complete mitigation investigation before making tactical decisions'....What was missing was evidence explaining why Ben-Shalom committed his awful crime and an effort on [counsel's] part to develop that evidence.")(citation omitted).

Nor can it safely be said that this case was unwinnable on the issue of sentence, no matter what causal relationship could be shown between the crime and mental illness, as the District Court speculated. (R551-176). After all, in the case cited by the District Court, Lawhorn v. Allen, 519 F.3d 1272, 1296 (11th Cir. 2008), this Court nevertheless found sufficient prejudice from an inadequate closing argument to order relief despite "the shocking evidence of the crime." And Clisby v. State of Alabama, 26 F.3d 1054, 1057 (11th Cir. 1994), cited in Lawhorn, involved a vicious murder by a defendant who had killed before, the single most aggravating factor in a death case.

41

See, also, Hodge v. Kentucky, __ U.S. __, 133 S.Ct. 506, 510 (2012)("More fundamentally, the Kentucky Supreme Court appears to believe that in cases involving "violent and cruel murders," it does not matter that the "malefacto[r]" had a "terrible childhoo[d]"; the jury would return a death sentence regardless. App. to Pet. for Cert. 11. That view is contrary to our cases applying Strickland 's prejudice prong."); Walbey v. Quarterman,  309 Fed.Appx. 795, 804 (5th Cir. 2009) ("Almost without exception, the cases we see in which conviction of a capital crime has produced a death sentence arise from extremely egregious, heinous, and shocking facts. But, if that were all that is required to offset prejudicial legal error and convert it to harmless error, habeas relief ... would virtually never be available, so testing for it would amount to a hollow judicial act."); Johnson v. United States, 860 F.Supp.2d at 684 (The court granted sentencing relief due to the failure to present mental health evidence connected to the crime, as here, in a case involving the brutal murders of five individuals, including two children 10 and 6 years old.).

**B.    INEFFECTIVE ASSISTANCE OF COUNSEL IN FAILING TO OBJECT TO THE COURT'S INSTRUCTION REGARDING DEFENDANT'S CLAIMED FUTURE DANGEROUSNESS BECAUSE OF THE "RISK" OF ESCAPE**

Counsel can, of course, be ineffective when they fail to perfect a meritorious legal issue, absent some strategic reason not to. Kimmelman v. Morrison, 477 U.S. 365 (1986). Here, no timely exception was made to the Court's instruction regarding the

Defendant's claimed escape "risk" and as a consequence this Court refused to consider this claim under any standard other than a plain error standard. United States v. LeCroy, 441 F.3d at 930-931.

The problem with the Court's instruction is that although it may be proper for the jury to consider the Defendant's possible future dangerousness to the public if there was a substantial danger that the Defendant might escape, e.g. United States v. Allen, 247 F.3d 741, 788 (8th Cir. 2001), the instruction given by the Court left the jury without any guidance as to the degree of evidence that the jury should have in determining the substantiality of such a "risk." The word "risk" is so elastic and ill-defined, that it could include the mere possibility of an escape, no matter how fanciful, as opposed to what the defense counsel requested, which was an instruction that the jury must find beyond a reasonable doubt that there was a "likelihood" of escape. This is especially true given the improper argument by Government counsel claiming that the Government itself would be unable to secure the Defendant should he receive a life sentence, thereby creating aggravating circumstances through its own conduct. See, United Sates v. Daryl Johnson, Case No 02 C 6998 (N. D. Ill.) (2010) (R556-1) (Relief granted because counsel ineffective in failing to challenge the Government's false claims concerning its ability to prevent a defendant from posing a danger to others "on the street or in prison."). But due to counsel's inattention, they failed adequately to perfect this issue.

43

With respect to prejudice, the Court should consider the context of the failure to provide the jury with sufficient guidance. Here, the Government not only made an improper argument, not objected to by counsel, that the Defendant could only be securely incarcerated while on death row, but this error was then exacerbated by the Court's "risk" instruction. After all, much of the Government's sentencing argument was directed at the claimed future dangerousness of the Defendant to the public should he escape, which the Government was allowed to exploit not only with its improper argument but with an instruction from the Court, not excepted to by counsel, allowing for the mere "risk" of escape, no matter how fanciful, to be considered by the jury in determining future dangerousness to the public. (R437-2677-2680, 2718-2719, 2726). Had this issue been properly perfected at trial and on appeal, there is at least a reasonable probability of a different result, requiring the Court, when combined with all of the other ineffective assistance of counsel errors set out herein, to order a new sentencing.

**C.    INEFFECTIVENESS OF COUNSEL FOR FAILING TO REQUEST AN INSTRUCTION THAT THE FINAL BALANCING BE CONDUCTED BY THE REASONABLE DOUBT STANDARD**

With respect to the failure of counsel to request an instruction that the jury must find the final balancing between aggravating and mitigating circumstances beyond a reasonable doubt, this issue was addressed by a panel of the Sixth Circuit in United States v. Gabrion II, 648 F.3d 307, 325-329 (6th Cir. 2011). While rehearing en banc

44

has been granted in Gabrion II, vacating the decision, the Sixth Circuit has yet to announce an en banc decision. Nevertheless, it should have been obvious to counsel, based upon Ring v. Arizona, 536 U.S. 584 (2002) and its progeny, that the Defendant was entitled to this instruction.

As explained in the panel decision in Gabrion II, pursuant to 18 U.S.C. §3593(e), a jury cannot impose a death sentence unless they find "whether all the aggravating factor or factors found to exist sufficiently outweigh all the mitigating factor or factors found to exist to justify a sentence of death, or in the absence of a mitigating factor whether the aggravating factor or factors alone are sufficient to justify a sentence of death." By its very terms the jury must make a final factual determination before imposing a sentence of death, which should not be "left to the jury to answer intuitively." Gabrion II, 648 F.3d at 315. Instead, this final finding that aggravating factors outweigh mitigating factors "is an element of the death penalty and must be found beyond a reasonable doubt, the same constitutional standard required of all findings of fact and mixed questions of law and fact." Id.

This conclusion flows inexorably from the holdings and logic of the Apprendi v. New Jersey, 530 U.S. 466 (2000) and Ring v. Arizona, 536 U.S. 584 (2002) line of cases. Under §3593(e) a death sentence cannot be returned unless the jury determines as a matter of fact or as a mixed question of law and fact that aggravating factors outweigh mitigating factors, and as Justice Scalia explained in his concurring opinion

45

in <u>Ring</u>, "All facts essential to the imposition of the level of punishment that the defendant receives—whether the statute calls them elements of the offense, sentencing factors, or Mary Jane—must be found by the jury beyond a reasonable doubt." <u>Ring</u>, 536 U.S. at 610.

This failure of counsel to request an instruction consistent with the clear constitutional law expressed in <u>Ring</u> sufficiently prejudiced the Defendant so that relief should be granted. After all, the failure to deliver a required reasonable doubt instruction is structural error not amenable to the harmless error analysis. <u>Sullivan v. Louisiana</u>, 508 U.S. 275, 281 (1993). In short, if this issue had been properly perfected, the failure to give the required reasonable doubt instruction would have mandated reversal.

## <u>CONCLUSION</u>

Based on the factual and legal contentions herein, the Defendant respectfully requests that the Court reverse his sentence of death and remand this case for a resentencing.

[signatures on next page]

46

This 11th day of March, 2013.

                        Respectfully submitted,

                        s/John R. Martin
                        John R. Martin
                        MARTIN BROTHERS, P.C.
                        202 The Grant Building
                        44 Broad St., N.W.
                        Atlanta, GA  30303
                        (404) 522-0400
                        jack@martinbroslaw.com

                        s/Sandra Michaels
                        Sandra Michaels
                        202 The Grant Building
                        44 Broad St., N.W.
                        Atlanta, GA  30303
                        (404) 522-0400
                        slmichaels@mindspring.com

                        **ATTORNEYS FOR**
                        **APPELLANT LECROY**

47

## **CERTIFICATE OF COMPLIANCE**

Pursuant to Fed.R.App.P. 32(a)(7), I certify that the number of words in this brief, as counted by my word-processing system, is 11,260 words.

s/John R. Martin
John R. Martin

## <u>CERTIFICATE OF SERVICE</u>

This is to certify that I have this day served Assistant United States Attorney William McKinnon, United States Attorney's Office, 600 Richard Russell Federal Building, 75 Spring Street, N.W., Atlanta, Georgia 30303 with a copy of the within and foregoing **Initial Brief of the Appellant** by depositing in the United States Mail in a properly addressed envelope with sufficient postage affixed thereon to assure delivery.

This 11th day of March, 2013.


s/John R. Martin
John R. Martin