No. 12-15132-P

# IN THE UNITED STATES COURT OF APPEALS FOR THE ELEVENTH CIRCUIT

**WILLIAM EMMETT LECROY, JR.,**

*Plaintiff-Appellee,*

*v.*

**UNITED STATES OF AMERICA,**

*Defendant-Appellant.*

On appeal from the United States District Court
for the Northern District of Georgia
No. 2:02-CR-038-RWS Superseding

## BRIEF OF APPELLEE THE UNITED STATES OF AMERICA

SALLY QUILLIAN YATES
*United States Attorney*

WILLIAM L. MCKINNON, JR.
*Assistant United States Attorney*

600 United States Courthouse
75 Spring Street, S.W.
Atlanta, GA 30303
(404) 581-6000

No. 12-15132-P

*William Emmett LeCroy, Jr. v. United States of America*

## CERTIFICATE OF INTERESTED PERSONS
## AND CORPORATE DISCLOSURE STATEMENT

In addition to the persons listed in the Certificate of Interested Persons and Corporate Disclosure Statement included with Appellant's brief, the United States submits that the following people and entities have an interest in the outcome of this appeal:

Burby, Joey – Former Assistant United States Attorney

Honorable, Russell Vineyard – Former Assistant United States Attorney

Sommerfeld, Lawrence R. – Assistant United States Attorney

United States of America

Yates, Sally Quillian – United States Attorney

C - 1 of 1

## STATEMENT REGARDING ORAL ARGUMENT

The United States agrees that the Court should grant oral argument in this appeal of the district court's order denying Appellant's 28 U.S.C. § 2255 motion to vacate his federal death sentence.

## TABLE OF CONTENTS

Certificate of Interested Persons and Corporate Disclosure Statement ................................................................................C-1

Statement Regarding Oral Argument ................................................. i

Table of Contents ............................................................................ ii

Table of Citations ...........................................................................iv

Statement of Jurisdiction ................................................................ix

Statement of the Issues ................................................................... 1

Statement of the Case ..................................................................... 3

    A. Course of Proceedings and Disposition Below ..................... 3

    B. Statement of the Facts .......................................................... 4

        1. Offense Conduct .............................................................. 4

        2. Sentencing Hearing--Government's Case ......................... 8

            a. Victim Impact ............................................................. 8

            b. Escape Risk ............................................................... 10

            c. Hit List ..................................................................... 11

        3. Sentencing Hearing--Defendant's Case ......................... 12

            a. Rebuttal to Risk of Escape ....................................... 12

            b. Inmate Character Witnesses ..................................... 13

            c. Contacts with Psychologists in Prison and Reports of Childhood Sexual Abuse .......................................... 14

            d. Biopsychosocial Assessment ..................................... 16

        4. Evidentiary Hearing ...................................................... 17

            a. Dr. Michael Hilton .................................................... 17

            b. Trial proceedings regarding mental health evidence. ................................................................... 22

   c. Dr. Medlin's report. ................................................... 24

  C. Standard of Review ............................................................. 25

Summary of the Argument ................................................................. 26

Argument and Citations of Authority ............................................. 29

1. The district court did not err in finding that trial counsel was not constitutionally ineffective when they chose a reasonable trial strategy, and did not change the outcome of the case ...... 29

  A. Defendant has failed to satisfy his burden of proof that his trial team's performance was deficient. ............................... 30

   1. The trial team's strategic decision to rely upon a botched burglary defense was reasonable. .................................... 32

   2. The decision to utilize Dr. Lisak as a teaching expert on the effects of childhood sexual abuse on adult behavior during the sentencing phase was reasonable. ................ 35

   3. The mid-trial decision not to call Dr. Lisak was also reasonable. ........................................................................ 41

   4. Defense counsel's closing argument more than satisfies constitutional scrutiny. .................................................... 44

  B. Defendant also has failed to carry his burden of proving prejudice. ........................................................................... 49

2. The district court did not err in finding that counsel was not constitutionally ineffective in failing to object to the jury instruction on future dangerousness to the public. ................. 57

3. The district court did not err in finding that the trial team was not constitutionally ineffective for failing to request an instruction that the jury must find beyond a reasonable doubt that the aggravating factors outweigh the mitigating factors. .. 61

Conclusion ....................................................................................... 65

Certificate of Compliance and Service ........................................... 66

# TABLE OF CITATIONS

**Federal Cases**

*Apprendi v. New Jersey,*

530 U.S. 466, 120 S. Ct. 2348 (2000) ...............................61, 62, 63

*Arizona v. Ring,*

536 U.S. 584, 122 S. Ct. 2428 (2002) ..........................61, 62, 63, 64

*Burger v. Kemp,*

483 U.S. 776, 107 S. Ct. 3114 (1987) ............................................. 30

*Clisby v. State of Alabama,*

26 F.3d 1054 (11th Cir. 1994)........................................................ 51

*Cummings v. Sec'y Dep't of Corr.,*

588 F.3d 1331 (11th Cir. 2009)...................................................... 54

\**Ford v. Strickland,*

696 F.2d 804 (11th Cir. 1983)................................................... 63, 64

*Gaskin v. Sec'y Dep't of Corr.,*

494 F.3d 997 (11th Cir. 2007)........................................................ 54

*Hagins v. U.S.,*

267 F.3d 1202 (11th Cir. 2001)...................................................... 30

*Jurek v. Texas,*

428 U.S. 262, 96 S. Ct. 2950 (1976) .............................................. 59

\*Citations primarily relied upon. 11th Cir. R. 28-1(e).

iv

*Kimmelman v. Morrison,*

    477 U.S. 365, 106 S. Ct. 2574 (1986) .............................................. 42

*King v. Strickland,*

    748 F.2d 1462 (11th Cir. 1984) ....................................................... 29

*\*Lawhorn v. Allen,*

    519 F.3d 1272 (11th Cir. 2008) ..................................... 45, 48, 50, 55

*LeCroy v. U.S.,*

    550 U.S. 905, 127 S. Ct. 2096 (2007) .............................................. 3

*Lynn v. U.S.,*

    365 F.3d 1225 (11th Cir. 2004) ....................................................... 25

*Penry v. Lynaugh,*

    492 U.S. 302, 109 S. Ct. 2934 (1989) ............................................. 45

*\*Reed v. Secretary, Florida Department of Corrections,*

    593 F.3d 1217 (11th Cir. 2010) ............................................... passim

*Robinson v. Moore,*

    300 F.3d 1320 (11th Cir. 2002) ....................................................... 54

*\*Strickland v. Washington,*

    466 U.S. 668, 104 S.Ct. 2052 (1984) ...................................... passim

*U.S. v. Arias,*

    984 F.2d 1139 (11th Cir. 1993) ....................................................... 59

*Citations primarily relied upon. 11th Cir. R. 28-1(e).

*U.S. v. Brown,*

 441 F.3d 1330 (11th Cir. 2006) ....................................................... 61

*\*U.S. v. Chandler,*

 218 F.3d 1305 (11th Cir. 2000) ...............................................30, 31, 32

*U.S. v. Diaz,*

 248 F.3d 1065 (11th Cir. 2001) ....................................................... 33

*U.S. v. Fields,*

 483 F.3d 313 (5th Cir. 2007) .......................................................... 63

*U.S. v. Fields,*

 516 F.3d 923 (10th Cir. 2008) ......................................................... 63

*U.S. v. Gabrion,*

 648 F.3d 307 (6th Cir. 2011) ........................................................ 64

*U.S. v. Higgs,*

 353 F.3d 281 (4th Cir. 2003) .......................................................... 62

*U.S. v. LeCroy,*

 441 F.3d 914 (11th Cir. 2006) ..................................................... 3, 57

*U.S. v. Mitchell,*

 502 F.3d 931 (9th Cir. 2007) .......................................................... 63

*\*U.S. v. Prather,*

 205 F.3d 1265 (11th Cir. 2000) ....................................................... 59

*Citations primarily relied upon. 11th Cir. R. 28-1(e).

*U.S. v. Runyon,

   707 F.3d 475 (4th Cir. 2013) ............................................................. 63

U.S. v. Sampson,

   486 F.3d 13 (1st Cir. 2007) ............................................................... 63

U.S. v. Turner,

   871 F.2d 1574 (11th Cir. 1989) ........................................................ 59

Windom v. Sec'y Dep't of Corr.,

   578 F.3d 1227 (11th Cir. 2009) ........................................................ 54

Wong v. Belmontes,

   558 U.S. ___, 130 S. Ct. 383 (2009) ................................................ 52

Woodson v. North Carolina,

   428 U.S. 280, 96 S. Ct. 2978 (1976) ................................................ 45

**Federal Statutes**

18 U.S.C. § 2119(3) ............................................................................... 3

18 U.S.C. § 3231 ...................................................................................ix

18 U.S.C. § 3593(e) ............................................................................. 62

28 U.S.C. § 1291 ...................................................................................ix

28 U.S.C. § 2255 ........................................................................ passim

28 U.S.C. § 2255(d) ..............................................................................ix

**Federal Rules**

Fed. R. App. P. 4(a)(1)(B) ....................................................................ix

*Citations primarily relied upon. 11th Cir. R. 28-1(e).

Fed. R. App. P. 32(a)(5) .......................................................................... 66

Fed. R. App. P. 32(a)(6) .......................................................................... 66

Fed. R. App. P. 32(a)(7)(B) ..................................................................... 66

Fed. R. App. P. 32(a)(7)(B)(iii) ............................................................... 66

*Citations primarily relied upon. 11th Cir. R. 28-1(e).

No. 12-15132-P

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE ELEVENTH CIRCUIT

WILLIAM EMMETT LECROY, JR.,

*Plaintiff-Appellee,*

*v.*

UNITED STATES OF AMERICA,

*Defendant-Appellant.*

## STATEMENT OF JURISDICTION

(A) The district court had subject matter jurisdiction over the underlying criminal case based on 18 U.S.C. § 3231.

(B) The court of appeals has jurisdiction over this direct appeal from the order of the district court denying defendant relief under 28 U.S.C. § 2255 pursuant to 28 U.S.C. § 2255(d) and 28 U.S.C. § 1291.

(C) While not jurisdictional, the notice of appeal was timely filed on October 2, 2012, within 60 days of the entry of the district court's August 6, 2012, order denying defendant's motion to alter the judgment denying Appellant relief pursuant to 28 U.S.C. § 2255, Fed. R. App. P. 4(a)(1)(B).

ix

(D) This appeal is from a final order that disposes of all the parties'
claims arising from defendant's motion to set aside his death
sentence pursuant to 28 U.S.C. § 2255.

## STATEMENT OF THE ISSUES

1. Whether the district court erred in finding that defendant failed to carry his burden of proving that his trial team rendered deficient performance and that the outcome of the sentencing trial would have been different therefor based upon defendant's trial team's failure to present mental health evidence that linked defendant's commission of the rape and murder of Joann Tiesler with a mental illness when the team made informed, strategic, and reasonable decisions to forego such evidence because it would conflict with a jurisdictional defense that the team intended to pursue and where testimony about defendant's mental illness would have opened the door to considerable evidence in aggravation of punishment being presented to the jury.

2. Whether the district court erred in finding that defendant failed to carry his burden of proving that his trial team rendered deficient performance and that the outcome of the sentencing trial would have been different therefor based upon defendant's trial team's failure to object to an instruction that the jury must find defendant posed a risk of escape, rather than

1

a likelihood of escape, where the jury was instructed that it had to make such a finding beyond a reasonable doubt.

3. Whether the district court erred in finding that defendant failed to carry his burden of proving that his trial team rendered deficient performance and that the outcome of the sentencing trial would have been different therefor based upon defendant's trial team's failure to request an instruction that the jury must find beyond a reasonable doubt that the aggravating factors outweigh the mitigating factors when such an instruction was not the law at the time of the trial and the balancing of aggravating and mitigating factors does not increase the maximum sentence and is not a finding of fact.

## STATEMENT OF THE CASE

### A. Course of Proceedings and Disposition Below

On May 15, 2002, a grand jury for the Northern District of Georgia returned an indictment charging defendant with taking a motor vehicle from the person and presence of Joann Lee Tiesler by force and violence resulting in her death in violation of 18 U.S.C. § 2119(3). (Doc. 1). On August 13, 2002, the grand jury returned a superseding indictment which added death-eligibility special findings. (Doc. 32). On December 20, 2002, the government served on defendant notice of its intention to seek the death penalty. (Doc. 88).

The trial commenced on February 17, 2004. (Doc. 375). On March 1, 2004, the jury found defendant guilty. (Doc. 398). On March 10, 2004, the jury returned its verdict sentencing defendant to death. (Doc. 413). Defendant filed a motion for a new trial on March 17, 2004. (Doc. 420). The district court denied defendant's motion for new trial on October 12, 2004. (Doc. 445).

Defendant filed notice of appeal on October 25, 2004. (Doc. 448). On March 2, 2006, this Court affirmed defendant's conviction and sentence. *United States v. LeCroy,* 441 F.3d 914 (11th Cir. 2006). Defendant petitioned the United States Supreme Court for a writ of certiorari on November 6, 2006. The Court denied the writ on April 23, 2007. *LeCroy v. U.S.,* 550 U.S. 905, 127 S. Ct. 2096 (2007).

3

Defendant timely filed his Section 2255 motion on April 22, 2008. (Doc. 493). An evidentiary hearing was held on January 11-13, and February 8, 2010. (Doc. 534-537). On March 30, 2012, the district court entered its order denying defendant Section 2255 relief. (Doc. 551). On April 27, 2012, defendant filed a motion to alter judgment, (Doc. 553), which the district court denied on August 6, 2012. (Doc. 554).

## B. Statement of the Facts

### 1. Offense Conduct

On August 21, 2001, defendant was released from custody after serving over ten years in federal and state prisons following convictions for aggravated assault, burglary, child molestation, statutory rape, and unlawful possession of a sawed-off shotgun. (Doc. 429-924-27, 931-32). Upon his release, defendant began serving a three year term of supervised release, and moved into the home of his mother and step-father, Sam and Donna Houston, on Cherry Log Mountain, a community of log cabins used mainly as weekend and summer homes. (Doc. 429-839-40, 842, 846, 925-26).

As a condition of supervised release, defendant was ordered to undergo a psychosexual evaluation. (Doc. 429-930-33). However, defendant walked out of the psychosexual evaluation. (Doc. 429-937-38, 987, 1000). Defendant's probation officer warned defendant that

4

he would have to undergo the evaluation or risk being sent back to prison. (Doc. 429-954). Defendant indicated he would submit to the evaluation, but instead, made plans to abscond from federal supervision. (Doc. 429-954, 956).

On the back of the letter scheduling his original psychosexual evaluation, defendant wrote a list of items under the heading "need to acquire," which included binoculars, boots, gloves, rifles, guns, ammunition, and food and water for a minimum of three days. (Doc. 429-865-66; Gov. Ex. 67). Defendant proceeded to acquire some of these items by breaking into unoccupied cabins on Cherry Log Mountain near his home. (Doc. 429-1046, 1087). From one cabin he stole a shotgun and numerous shells. (Doc. 429-1046). From another he stole medical supplies, such as peroxide and antibiotic cream. (Doc. 430-1087). Defendant also needed a vehicle because his only means of transportation was a used motorcycle that recently had broken down and been repaired. (Doc. 429-853, 855, 888, 951). Defendant's options for obtaining a vehicle nearby were limited to stealing one from a few year-round residents, one of whom was Joann Tiesler, a 30 year-old nurse practitioner who lived alone in a log cabin within walking distance of the Houstons' residence. (Doc. 428-628-30; Doc. 429-842-44, 850-52). Defendant knew where Ms. Tiesler lived, because his mother and step-father had shown him the homes where

the full-time residents of Cherry Log Mountain lived, including Ms. Tiesler's residence. (Doc. 429-850-52).

On Sunday, October 7, 2001, while Ms. Tiesler was away from her home on a shopping trip, defendant broke into her residence armed with a loaded shotgun, a Gerber folding knife, and plastic cable ties. (Doc. 428-721, 727, 738, 740-41, 747-48, 750; Doc. 429-904; Doc. 430-1193-95).

Ms. Tiesler arrived home before dark around 6:00 p.m. (Doc. 428-643-44, 665-69). She unloaded items from her Ford Explorer, and was carrying them inside her residence when defendant violently attacked her. (Doc. 428-647, 657, 721, 774). During the assault, defendant struck Ms. Tiesler in the back of her head with the shotgun and discharged it in the hallway outside her bedroom. (Docs. 428-738-41; Doc. 430-1321). Defendant tied Ms. Tiesler's ankles together and bound her hands behind her back with the plastic cable ties. (Doc. 428-721). Injuries to Ms. Tiesler's wrists indicate that she struggled to free herself from the plastic cable ties. (Doc. 430-1323). Defendant stripped Ms. Tiesler's pants down to her ankles, forced her to kneel at the foot of her bed, and raped her from behind. (Doc. 428-715,721,732-33; Doc. 430-1324). DNA testing of vaginal swabs from Ms. Tiesler's body revealed the presence of defendant's sperm. (Doc. 431-1391-92, 1408). Defendant also anally sodomized Ms. Tiesler so

6

severely that it caused contusions around the circumference of her rectum. (Doc. 430-1325-26). Defendant used the electrical cord of a carbon monoxide detection device to strangle Ms. Tiesler, leaving a bruise that encircled her neck, but it did not cause her death. (Doc. 428-637, 721-22; Doc. 430-1316-18).

After inflicting these injuries, defendant pulled Ms. Tiesler's head back, put his knife to her neck, and slit her throat, creating a gaping wound from which she bled to death. (Doc. 428-722, 732-33; Doc. 430-1311, 1314-16). Defendant used such extreme force in doing so, that he completely severed Ms. Tiesler's external jugular vein, right internal jugular vein and right carotid artery, penetrating to her cervical vertebrae. (Doc. 430-1315). While Ms. Tiesler was face down in her own blood, defendant plunged his knife into her back five times and then wiped the blade off on her shirt. (Doc. 428-725-28, 749-50; Doc. 430-1318-21). Defendant left Ms. Tiesler lying exposed on her bed to be discovered the next day by a co-worker and real estate agent after she failed to report for work. (Doc. 428-683, 687, 690).

The only items defendant took from Ms. Tiesler's home were both sets of keys to her Ford Explorer, her vehicle, and perhaps some cash from her purse. (Doc. 428-639-42, 743).

7

Defendant was apprehended two days later at the U.S.-Canadian border driving Ms. Tiesler's vehicle. (Doc. 430-1157-60). Inside the vehicle, law enforcement agents found the Gerber folding knife defendant used to kill Ms. Tiesler. (Doc. 428-747-49). DNA testing of the knife revealed the presence of Ms. Tiesler's blood on it. (Doc. 431-1408-09). In addition, agents found two notes defendant had written on the back of a torn map. (Doc. 428-751). One note stated, "Please call the police and report this vehicle as stolen. Thanks, The Thief." Just below that another note stated, "Please, please, please forgive me Joanne ... you were an angel and I killed you. Now I have to live with that and I can never go home. I am a vagabond and doomed to hell..."[1] (Gov.Ex.41A; Doc. 428-752).

## 2. Sentencing Hearing–Government's Case

### a. Victim Impact

Joann Tiesler's mother, best friend, brother, and a friend and patient described how she graduated with excellent grades from college and graduate school with a degree as a nurse practitioner. (Doc. 433-1730-31, 1753). Ms. Tiesler's mother described her daughter's dream of establishing a women's clinic in the west and that

---

[1] Ellipses in original.

how shortly after her murder a women's clinic in the Montana reached out to her to see if she was interested in working there. (Doc. 433-1733, 1337-38). She described how her daughter enjoyed being in nature, how she liked to hike and walk, how she herself enjoyed accompanying her daughter on walks, and how she missed the opportunity to continue to do so. (Doc. 433-1724). Ms. Tiesler's mother presented a card that her daughter sent her shortly before her murder that succinctly described how she lived her life and the dreams that she had for the future. (Doc. 433-1738). The card read, "I want to live where nature is astonishing; waterfalls, simple life, reaching out and helping others, part of a practice out west. Mom is around, too. Children safe to grow up, travel, time for self and family, animals; is it possible?" (*Id.*).

Ms. Tiesler's mother testified that she and her daughter were very close and that her children were her life and half her life was gone because of Joann's murder. (Doc. 433-1744). She could not be alone in her house and she was afraid to take walks. (*Id.*). She received grief counseling, and was taking medication and receiving counseling for post-traumatic stress disorder because of Joann's murder. (Doc. 433-1744-45).

Ms. Tiesler's best friend from college described her spiritual life and the impact that her relationship with God had on her own

personal spiritual journey. (Doc. 433-1752-53). She and a friend from the community described how dedicated Ms. Tiesler was to her career and how much she helped others through her work and on her personal time. (Doc. 433-1757, 1763-65).

### b. Escape Risk

While defendant was awaiting trial in this case, he attempted to escape from the custody of a local jail where he was being housed by the U.S. Marshal Service. (Doc. 433-1892). Defendant managed to escape from a solitary confinement cell by knocking a hole in the concrete wall of the isolation cell large enough to crawl through. (Gov. Ex. 163; Doc. 433-1897-1903). Defendant wrote a note on the cell wall taunting his jailers about his planned escape. (Gov. Ex. 164; Doc. 433-1900-06). Defendant's escape attempt was thwarted when a jailer discovered the hole in the wall while responding to a report that an inmate had been observed in the mechanical chase area outside the isolation cell. (Doc. 433-1898). On more than one occasion during his incarceration at the local jail, defendant broke out of another holding area by climbing into the ceiling where he gained access to the cell of a female inmate. (Doc. 433-1893-96). While defendant was initially detained in Minnesota, jailers discovered two metal hooks in defendant's cell which he had removed from a shower curtain. (Doc. 434-1954-55).

10

### c. Hit List

In 1990 and 1991 defendant committed a series of residential burglaries in Cobb County and Paulding County, Georgia. (Gov. Ex. 167, Doc. 433-1799-1800). During the course of the investigation, a writing was recovered from defendant's vehicle that stated in part "kill Dallas [Georgia] policeman," and "kill police officer." (Gov. Ex. 155; Doc. 433-1802-03). The writing also had an arrow leading from the phrase "kill Dallas policeman" to the following, "PCSO, CCPO, CCSO, GBIO, FBIO, Ron Denson." (*Id.*).

While defendant was serving time in state prison, his father received documents from his case that included a list of names that was referred to by the District Attorney at defendant's sentencing hearing as a "hit list." (Gov. Ex. 154; Doc. 434-1935-36). Defendant's father visited defendant in prison, showed him the "hit list," and asked what it was about. (Doc. 434-1936). Defendant stated that it was a list of names of persons who had messed with him his whole life. (*Id.*). Defendant's father did not ask anything further about the "hit list," however, on the night that he learned that Joann Tiesler had been murdered and his son was missing, he called a person whose name was on the list to warn her about what had happened. (Doc. 434-1945).

11

### 3. Sentencing Hearing~Defendant's Case

#### a. Rebuttal to Risk of Escape

Shanna Nicole Smith was a female inmate with whom defendant had regular contact while they were housed in the Lumpkin County jail. (Doc. 434-2006-09). In her opinion defendant could have escaped at any time, but did not and defendant never mentioned having an intention to escape. (Doc. 434-2011-12). A prisoner who escaped from the Lumpkin County jail was placed in a pod with defendant after he was captured. (Doc. 434-2038). Although defendant was aware that the prisoner had escaped previously, defendant never discussed plans to escape even though he understood escape would not have been difficult. (Doc. 434-2038-39).

Dr. Randall Atlas was qualified as an expert in jail security and architectural security. (Doc. 434-2048). He conducted an evaluation of the design and construction of the Lumpkin County jail from the standpoint of its security. (Doc. 434-2049). He noted that the cells had blind spots that were not viewable by the deputies in the control room and that prisoners were able to remove ceiling tiles and sheetrock between the cells, thus, enabling them to leave the cells. (Doc. 434-2054-62). As a result of the design and construction of the jail, inmates were able to move freely between the cellblock units. (Doc. 434-2079). Dr. Atlas was also familiar with the design and

12

construction of federal prisons, and noted that federal prisons were not constructed in the same manner as the Lumpkin County jail. (Doc. 434-2084).

Donald Romine, a retired federal prison official, was qualified as an expert in security of federal prisons. (Doc. 435-2195). He testified that an inmate sentenced to life without the possibility of parole would be assigned to a penitentiary and that the design and construction of federal penitentiaries make escape so difficult that there had not been an escape from a federal penitentiary in nearly 14 years. (Doc. 435-2200-03, 2220). Mr. Romine also described the procedures that federal prisons employ to prevent violence among inmates and noted that federal prisons were "very successful" in preventing violence among inmates. (Doc. 435-2222). Mr. Romine testified that in his opinion, an inmate with a good prison record would not later become a violent predator in prison. (Doc. 435-2223-25).

### b. Inmate Character Witnesses

Nine inmate witnesses testified that they knew defendant in prison and that based upon their interactions with him in prison, they did not believe that defendant was a violent person. (Doc. 234-2011, 2015, 2039-40 2100, 2103-05, 2127-31, 2138-39, 2149-50, 2156-58, 2182-84). Through these witnesses trial counsel repeatedly brought

out instances of defendant's good character, his attendance at religious services, defendant's attempts to improve his life while in prison, and defendant's leadership of self-improvement activities among the inmates with whom he came in contact. (*Id.*).

### c. Contacts with Psychologists in Prison and Reports of Childhood Sexual Abuse

Dr. Gary Ganahl worked as a psychological consultant for the Georgia Department of Corrections and conducted an evaluation of defendant in prison following a suicide attempt. (Doc. 435-2251-52). Defendant presented a history of physical abuse by his father and sexual abuse when he was eight years old by a female babysitter. (Doc. 435-225). Defendant reported that he attempted to commit suicide because he was feeling isolated and had lost contact with people important in his life. (Doc. 435-2257).

Anita Novey was a drug treatment specialist with the Bureau of Prisons who had defendant in a substance abuse therapy group. (Doc. 435-2271-74). She noted that defendant was dealing with problems related to anger management, low self-esteem, interpersonal communication skills, and antisocial behavior. (Doc. 435-2280). Ms. Novey suggested to defendant ways that he could deal with these problems. (Doc. 435-2281-84). She found defendant to be "almost a model participant" in her program. (Doc. 435-2282). Even though

14

defendant had to be removed from Mr. Novey's group when he expressed romantic feelings for her, she continued to see him in the institution and never felt physically fearful of him. (Doc. 435-2287).

Dr. Marti Carlson was a clinical psychologist at the same institution. (Doc. 435-2302-03). Defendant reported to her symptoms which were consistent with "major depression such as insomnia, suicidal ideations, decrease in appetite, decrease in energy, loss of interest [in] activities he used to enjoy, feeling depressed, and feeling hopeless. (Doc. 435-2320). He also reported a history of depression and prior suicide attempts. (*Id.*). She referred defendant to a psychiatrist for medication and began individual therapy sessions with defendant. (Doc. 435-2321-22). Defendant reported to her that his upbringing involved beatings by his father, little time spent with his father, and frequent moves because of his father's gambling losses and business setbacks. (Doc. 435-2325). Defendant also reported that when he was eight he was sexually abused on two occasions by a female babysitter. (Doc. 435-2326). Defendant stated that this sexual abuse caused him to have feelings as an adult of being a loner, prone to violence, hiding his feelings, avoiding attachments, being irresponsible, loss of self-esteem and being uncomfortable in social settings. (Doc. 435-2327).

15

### d. Biopsychosocial Assessment.

Jan Vogelsong, a professional, clinical, social worker, completed a biopsychosocial assessment of defendant and his family. (Doc. 436-2508-09). A biopsychosocial assessment is a method of collecting extensive information on a person and his family that typically covers several generations, and involves interviewing family members and friends, visiting the community where the family lived, and reviewing records generated on the subject and his family. (Doc. 436-2509).

After conducting her assessment, Ms. Vogelsong identified factors from defendant's childhood and youth that put defendant at risk for committing serious crimes as an adult. (Doc. 436-2571). These factors included: (1) a family history of mental, emotional, and behavioral problems; (2) defendant's mother was abandoned as a baby and left to grow up in destitute circumstances; (3) defendant's father was raised with no consequences for aggressive and illegal behavior; (4) defendant was born to teenaged parents with no skills or resources of their own; (5) defendant's early childhood strengths were ignored and rejected; (6) defendant suffered physical and emotional abuse at the hands of his father; (7) defendant moved multiple times when he was a child; (8) as an adolescent defendant lived in an environment in which there were negative messages about women and sex; (9) defendant's father modeled a relationship between anger and sex; (10)

16

defendant was sexually assaulted by a babysitter; (11) defendant's father constantly threatened to hurt or kill him; (12) weapons were kept in the home where defendant's father made threats to kill; (13) defendant's father raped defendant's mother who was submissive and fearful of her husband; (14) defendant grew up in a home environment that lacked boundaries and limits; (15) defendant's father was never required to suffer consequences for his illegal and aggressive behavior; (16) defendant was disciplined for a lack of loyalty, rather than for bad behavior; (17) defendant's father forced defendant to tell his mother that his father threatened her; (18) defendant was not given the opportunity as a child to form relationships outside the family; and (19) there was no intervention for the family violence and neglect that defendant experienced as a child and teenager. (Doc. 436-2573-81).

### 4. Evidentiary Hearing

#### a. Dr. Michael Hilton.

Defendant was represented by four lawyers at his death penalty trial--Paul Kish, Stephanie Kearns and Brian Mendelsohn from the Federal Defender Program, and Dan Sumner from Gainesville, Georgia. (Doc. 534-12). Major decisions about trial strategy were made collectively by all four attorneys. (Doc. 535-274).

17

The trial team employed Dr. Michael Hilton to conduct a psychiatric evaluation of defendant in March 2003. (Doc. 454-186). The trial team wanted an assessment of what a psychiatrist would conclude regarding defendant's mental state based upon a forensic examination. (Doc. 454-266). The trial team never intended to call Dr. Hilton as a witness at trial, but rather Dr. Hilton's report was intended to guide the team in future decisions about how to proceed. (*Id.*).

During Dr. Hilton's examination, defendant provided a detailed and graphic description of his rape and murder of Joann Tiesler. (Doc. 551-24-25; Def. Ex. 3, pp. 10-11). Defendant told Dr. Hilton that he believed that Joann Tiesler was the babysitter who sexually abused him twenty years before and that he blamed the babysitter for many of the problems that he had had as an adult. (Doc. 551-21). Because of his beliefs in witchcraft, defendant came to believe that the babysitter had placed a spell on him, and that he would have to force the babysitter (Ms. Tiesler) to reverse the spell. (*Id.*). On the day of the murder, he stole a shotgun, and armed with the shotgun, broke into Ms. Tiesler's cabin and waited for her to return. (Doc. 551-23). When she did return, defendant struck her from behind with the shotgun, which caused it to discharge into the ceiling. (*Id.*). Defendant bound her, then raped her. (Doc. 551-24). Defendant demanded that she

18

"undo it [reverse the spell]," but Ms. Tiesler did not understand what he wanted her to do. (*Id.*). Defendant got angry and insisted that she knew what he meant. (*Id.*). Finally, defendant started strangling Ms. Tiesler with a cord to the point that she could not breathe, telling her to undo it or else, but she could not respond at that point. (*Id.*). Defendant told her again to undo the spell or else, and when she did not, defendant took the knife he had brought and slashed her throat. (*Id.*). Even then she was still breathing, so defendant repeatedly stabbed her in the back. (*Id.*).

In his report Dr. Hilton also concluded that defendant was competent to stand trial and that he knew right from wrong at the time he murdered Ms. Tiesler. (Doc. 454-262). Therefore, the trial team was aware that a defense of not guilty by reason of insanity was not going to be available. (Doc. 454-263).

The trial team received and reviewed Dr. Hilton's report. (Doc. 454-258-59, 264). The trial team recognized that the detailed and graphic description of the rape and murder of Joann Tiesler given to Dr. Hilton would support the statutory aggravating factors that the murder was unusually cruel and heinous and that the murder was carried out with substantial premeditation and planning. (Doc. 454-259-261).

19

In addition, the trial team intended to argue to the jury that the facts and circumstances established that the crime started as a burglary and that defendant snapped when Joann Tiesler caught him in the act of burglarizing her residence, and that he formed the intent to steal her vehicle only after he raped and murdered her. (Doc. 454-261-62). The trial team believed that this botched burglary defense would provide a defense to the federal offense of carjacking, and if successful, would avoid the imposition of the death penalty. (Doc. 454-262). The botched burglary defense would also be submitted in rebuttal to the statutory aggravating factor that the murder was committed with substantial planning and premeditation. (Doc. 454-261). Upon reading Dr. Hilton's report, the trial team readily recognized that defendant's description of the offense was not consistent with the botched burglary defense. (Doc. 454-261-62). The trial team also concluded that Dr. Hilton's diagnosis that defendant possessed antisocial and borderline personality disorders would not be helpful. (Doc. 454-263).

Dr. Hilton testified at the evidentiary hearing that as part of his evaluation, he reviewed the MCMI report of psychological testing that was done on defendant in 1999. (Doc. 454-218). The purpose of the report was to predict how well defendant would adjust to prison. (Doc. 454-218-19). The report concluded that defendant was abrasive

and intimidating, that he was likely to be defiant and untrustworthy, that he would play staff members against one another, that he would be a general troublemaker, that defendant possessed a potential for violence, that defendant possessed a deficient conscience, that defendant may evidence a recklessly violent disposition, that defendant exhibited malicious and hostile tendencies that may lead him to humiliate and sexually dominate other prisoners. (Doc. 355-220-21). Dr. Hilton concluded that based upon his personal examination of defendant, the assessment of defendant's personality as set forth in the report was accurate. (Doc. 454-222).

Dr. Hilton also conceded that because defendant suffered from antisocial personality disorder, defendant would tend to be irritable and aggressive, that he would repeatedly get into physical fights or commit acts of physical assault, that he would demonstrate a lack of respect for others and their rights, and that defendant would engage in cruel and sadistic behavior. (Doc. 454-224, 244-45).

During Dr. Hilton's examination of defendant, defendant told him that he had thought about killing other prisoners with whom he was incarcerated at the time. (*Id.*). Based upon his examination, Dr. Hilton concluded that defendant represented a danger to commit additional assaults and murders in the future against persons in the community,

if he was in the community, and against other inmates and staff within the prison system. (Doc. 454-226-27).

### b. Trial proceedings regarding mental health evidence.

During pre-trial proceedings, the defense disclosed that it intended to call a teaching expert to educate the jury about the ramifications that childhood sexual abuse can have on grown men. (Doc. 330-2). Defendant's notice did not include an opinion by his expert, Dr. David Lisak, about whether defendant had actually been the victim of childhood sexual abuse, as defendant alleged. (Doc. 454-268-69). The trial team did not intend for Dr. Lisak to evaluate defendant nor did the team intend to ask Dr. Lisak his opinion about whether defendant had been sexually abused as a child because the team believed that by doing so the district court would order that defendant submit to an evaluation by a government expert. (Doc. 454-269-70). The trial team believed that a government expert would reach the same conclusions that Dr. Hilton did and the expert would question defendant about the offense, and the trial team did not want this evidence presented to the jury. (*Id.*).

Nevertheless, the district court affirmed an earlier order from the magistrate judge requiring defendant to submit to a government examination. (Doc. 330; Doc. 453-30). Defendant subsequently

invoked his Fifth and Sixth Amendment rights and refused to submit to the court-ordered government evaluation. (Doc. 454-270).

The district court reserved ruling on whether defendant could call Dr. Lisak. (Doc. 453-8). The court permitted the government to retain an expert to prepare a report regarding defendant's mental condition based solely on certain records she had been provided. (Doc. 454-272). The Court required the government expert's report to be filed under seal and remain under seal until the close of the guilt/innocence phase of the trial. (*Id.*). At that time, the report would be released to the defense team to assist them in deciding whether to call Dr. Lisak as a witness. (*Id.*).

After the jury began its deliberations on the guilt of defendant, the trial team received a copy of the report prepared by the government expert, Dr. Julie Medlin. (Doc. 454-273). Upon reading Dr. Medlin's report the trial team noted that Dr. Medlin was prepared to point out a number of instances in which defendant gave conflicting reports about being the victim of childhood sexual abuse and that she would testify that defendant was fabricating his report of childhood sexual abuse. (Doc. 454-275). The team also noted that Dr. Medlin was prepared to cite a study that people in prison make up a history of sexual abuse to engender sympathy or obtain some benefit. (*Id.*). The trial team concluded that calling Dr. Lisak would create a battle of

23

experts before the jury over defendant's alleged childhood sexual abuse and a lay jury could conclude that Dr. Medlin was credible in concluding that defendant had not been sexually abused when he was a child. (Doc. 454-278). The trial team also knew that if they did not call Dr. Lisak, they could still present fact witnesses regarding defendant's self-report of being the victim of childhood sexual abuse. (*Id.*). Therefore, the trial team decided collectively that they would not call Dr. Lisak. (Doc. 454-273-74).

### c. Dr. Medlin's report.

Dr. Medlin's report disclosed that she had conducted an extensive and thorough review of defendant's medical and psychological records, and that she was prepared to testify to a number of matters that would be damaging to defendant's mitigation case. (Gov. Ex. 63). First, Dr. Medlin was prepared to note that on a BOP Intake Screening form and a medical history form both dated February 14, 2000, defendant denied that he had been sexually assaulted. (Gov. Ex. 63, p. 7). Dr. Medlin's report also notes that defendant first reported childhood sexual abuse on February 21, 1992, while defendant was serving a prison term for child molestation. (Gov. Ex. 63-5). Dr. Medlin's report notes that research indicates that a significant number of sexual offenders falsely report sexual abuse as children. (*Id.*). Dr. Medlin was also prepared to demonstrate that defendant had been

24

inconsistent in reporting depression and other mental health issues while he was in prison and that there was reason to believe that defendant had made false reports of depressive symptoms in an effort to manipulate prison staff. (Gov. Ex. 63-10-22).

### C. Standard of Review

In reviewing a district court's denial of a Section 2255 motion, this Court reviews findings of fact for clear error and questions of law *de novo*. *Lynn v. United States*, 365 F.3d 1225, 1232 (11th Cir. 2004).

## SUMMARY OF THE ARGUMENT

Defendant's trial team consisted of four experienced and highly capable criminal defense lawyers. The trial team made an informed and reasoned strategic decision to rely upon a botched burglary defense to explain defendant's commission of this capital crime and to present a mitigation case during the penalty phase which would not conflict with the botched burglary defense. The trial team's mitigation case consisted of more than two days of testimony from family, prisoners who knew him in prison, rebuttal evidence that defendant posed a risk of escape, prison mental health professionals, and an expert who conducted a biopsychosocial assessment and who testified that there were nearly twenty factors in defendant's chaotic and violent upbringing that contributed to his criminal conduct as an adult. In addition, defendant's trial team made an informed and reasoned strategic decision not to present expert testimony regarding defendant's alleged mental illness because that evidence would have conflicted with the botched burglary defense and that would have supported the aggravating factors that the murder was carried out with substantial planning and premeditation, that the murder was committed in a heinous, cruel, and depraved manner, and that defendant represented a future danger.

26

Moreover, defendant has not demonstrated that the outcome of the penalty phase of the trial would have been different had his trial team presented the mental health evidence proposed by habeas counsel in this appeal. Because of the gruesome nature of this rape/murder case and because of defendant's prior criminal history, no amount of lawyering could have affected the outcome of the penalty phase. Also, along with the mitigating evidence proposed by defendant, the jury would have heard that defendant has an antisocial personality, that defendant committed the offense with substantial planning and premeditation, that the offense was committed in a heinous and cruel manner, and that defendant posed a risk of future dangerousness to anyone with whom he would come in contact.

The trial team was not ineffective for failing to object to the charge that the jury would have to find beyond a reasonable doubt that defendant presented a risk of escape before finding that defendant posed a risk of danger to the community at large. The charge correctly stated the law. Any argument that the jury could have found the aggravator factor based on mere speculation was foreclosed by the requirement that the jury find defendant posed a risk of escape beyond a reasonable doubt.

The trial team was not ineffective for failing to request a charge that the jury must find beyond a reasonable doubt that the aggravating

27

factors outweigh the mitigating factors. This balancing process does not operate to increase the maximum penalty, nor is it a finding of fact made by the jury. Therefore, had the trial team requested such an instruction, it would not have been error to fail to give it.

## ARGUMENT AND CITATIONS OF AUTHORITY

**1. The district court did not err in finding that trial counsel was not constitutionally ineffective when they chose a reasonable trial strategy, and did not change the outcome of the case.**

Defendant contends that his trial counsel provided ineffective assistance of counsel by failing to present an effective mental health mitigation case during the sentencing phase in that counsel failed to meet with Dr. Hilton regarding his evaluation of defendant, did not call Dr. Lisak as a teaching expert on the effects of childhood sexual abuse on adult behavior, and failed to connect the dots during closing argument regarding defendant's childhood sexual abuse and his violent acts as an adult.

To prevail on his claim of ineffective assistance of counsel, defendant bears the burden of establishing by a preponderance of the evidence that: (1) trial counsel's performance was deficient; and (2) prejudice from the inadequate performance. *Strickland v. Washington*, 466 U.S. 668, 687, 104 S. Ct. 2052, 2064 (1984). The inquiry is two-pronged: defendant must show both ineffective assistance (the performance prong) and resulting prejudice (the prejudice prong). *Id.* This standard applies equally to the guilt and sentencing phases of the trial. *King v. Strickland*, 748 F.2d 1462, 1463 (11th Cir. 1984).

29

Defendant has not–and cannot—meet his burden of proof on either prong. Consequently, defendant's claim fails.

## A. Defendant has failed to satisfy his burden of proof that his trial team's performance was deficient.

First, to satisfy the performance prong, the defendant must prove that his counsel's representation was unreasonable under prevailing professional norms. *Strickland,* 466 U.S. at 690, 104 S. Ct. 2066. The defendant must overcome a strong presumption of competence on the part of his trial counsel, and this Court must give significant deference to the attorney's decisions. *Id.*; *Hagins v. U.S.,* 267 F.3d 1202, 1204-05 (11th Cir. 2001).

In assessing the performance of trial counsel, "the issue is not what is possible or 'what is prudent or appropriate, but only what is constitutionally compelled.' (footnote omitted)." *U.S. v. Chandler,* 218 F.3d 1305, 1313 11th Cir. 2000), *citing Burger v. Kemp,* 483 U.S. 776, 107 S. Ct. 3114 (1987). In cases such as the instant case where the court is reviewing the performance of trial counsel that are experienced, the presumption in favor of reasonableness is even stronger. *Chandler,* 218 F.3d 1316.

This Court prohibits a habeas court from "second-guess[ing] counsel's strategy," and recognizes that "reliance on [one] line of defense to [the] exclusion of others is [a] matter of strategy." *Chandler,*

218 F.3d at 1314 (n.14). If the chosen course was reasonable, then counsel was not ineffective. *Id.* The goal is not to evaluate counsel's choice between two possible paths, but to determine if the path counsel chose was reasonable. *Chandler*, 218 F.3d at 1316 (n.16).

In *Reed v. Secretary, Florida Department of Corrections*, 593 F.3d 1217, 1244 (11th Cir. 2010), this Court affirmed the denial of habeas relief in a state death penalty proceeding in which trial counsel made a strategic decision not to present evidence during the sentencing phase that the defendant was mentally ill. This Court noted the "strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." 593 F.3d at 1240, *quoting Strickland*, 466 U.S. at 690-91, 104 S. Ct. at 2060. This Court also held that reasonably competent trial counsel will not be deemed to have been ineffective for failing to do a more extensive investigation to uncover mitigating evidence where extensive mitigating evidence was discovered. *Reed*, 593 F.3d at 1242.

### 1. The trial team's strategic decision to rely upon a botched burglary defense was reasonable.

The trial team consisted of four experienced attorneys--Stephanie Kearns, the director of the Federal Defender Program; Paul Kish and Brian Mendelsohn, both experienced and senior attorneys with the Federal Defender Program; and Daniel Sumner from Gainesville, Georgia. The trial team performed as a team in making strategic decisions about how to proceed in defending this death penalty prosecution. Given the trial team's collective experience and the fact that the four attorneys made decisions jointly, this Court must give defendant's trial team's strategic decisions the strongest presumption of reasonableness. *Chandler*, 218 F.3d at 1316; *Reed* 593 F.3d at 1244.

Defendant was the only witness to the carjacking and the rape and murder of Joann Tiesler. Defendant did not make a post-arrest, custodial statement regarding his commission of the crime. Therefore, while the evidence establishing that defendant committed the crime was overwhelming, the evidence about the details of the rape and murder, as well as the taking of Joann Tiesler's car, was entirely circumstantial.

The capital offense was carjacking. In order to convict defendant of this offense, the government was required to prove beyond a reasonable doubt that defendant (1) with intent to cause death or serious bodily harm (2) took a motor vehicle (3) that had been

transported, shipped or received in interstate or foreign commerce (4) from the person or presence of another (5) by force and violence (6) resulting in death. *U.S. v. Diaz,* 248 F.3d 1065, 1096 (11th Cir. 2001). Thus, in order for the jury to consider a death sentence, the jury would have to find beyond a reasonable doubt that the circumstantial evidence proved that defendant, with the intent to cause death or serious bodily harm, took Ms. Tiesler's vehicle and caused her death in the process.

This gave the defense team the opportunity to develop the botched burglary defense to the carjacking charge. In their guilt phase opening statement and closing argument trial counsel contended that defendant was burglarizing Ms. Tiesler's cabin when she unexpectedly returned home, and that he killed her in "an irrational criminal act in the middle of a burglary." (Doc. 428-617; Doc. 432-1604, 1607-10). Trial counsel argued that the evidence established that defendant left the cabin after killing Ms. Tiesler, returned to his home, and only then decided to flee but had no means of transportation because his step-father had taken both sets of keys to the family's Jeep. (Doc. 432-1608-10). Defendant then returned to Ms. Tiesler's cabin, took her vehicle and fled for Canada. (Doc. 432-1612).

If trial team's botched burglary defense created a reasonable doubt in the jury's mind that defendant committed Joann Tiesler's murder

33

in furtherance of the carjacking, then the jury would have acquitted defendant of carjacking because the vehicle would not have been obtained by force, and violence. Obviously, had that been the outcome of the guilt phase, there would not have been a penalty phase and a death sentence would have been avoided.

Employing the botched burglary defense strategy was imminently reasonable because circumstances surrounding Ms. Tiesler's murder arguably were inconsistent with the murder being committed in furtherance of the carjacking. First, Ms. Tiesler was sexually assaulted before she was murdered and before her vehicle was stolen. The sexual assault would suggest that defendant did not intend to steal Ms. Tiesler's vehicle when he first encountered her and that the theft of the vehicle was merely an afterthought as defendant devised a plan to avoid apprehension for committing the crime. Second, the entire encounter between defendant and the victim happened inside her cabin rather than at her vehicle where a carjacking typically occurs. Therefore, the trial team in this wholly circumstantial case was able to give the jury a reasonable hypothesis that was consistent with defendant being not guilty of the capital offense. It was certainly reasonable for the trial team to devise a strategy that would allow them to pursue that defense.

34

Indeed, in defendant's post-hearing brief below, habeas counsel conceded that it was "more than reasonable" for the trial team to pursue the botched burglary defense during the guilt phase. (Doc. 541-18). The district court also found that it was reasonable for the trial team to pursue the botched burglary defense. (Doc. 551-135 (n.35)).

### 2. The decision to utilize Dr. Lisak as a teaching expert on the effects of childhood sexual abuse on adult behavior during the sentencing phase was reasonable.

The trial team's strategic decision to pursue the botched burglary defense influenced its strategic decisions about how to present defendant's mental health issues to the jury. Early on, the team decided to have defendant evaluated by Dr. Michael Hilton as a test run to determine what evidence would result from a mental health evaluation. However, the team never intended to call Dr. Hilton as a witness at trial, rather, the trial team intended to use Dr. Hilton's findings to determine how best to proceed with expert testimony regarding defendant's mental state. Dr. Hilton saw defendant on March 27, 2003, and submitted his report to the trial team shortly thereafter. During the interview defendant gave Dr. Hilton an account of the facts that was inconsistent with the botched burglary defense which the defense team planned to pursue at trial. In his report Dr. Hilton also concluded that defendant was competent to stand trial

and that he knew right from wrong at the time he murdered Ms. Tiesler. Thus, Dr. Hilton's report provided no mental health defense to the carjacking charge.

After reading the report, the trial team knew, as would any reasonably competent attorney, that the team could not pursue the botched burglary defense during the guilt phase, then call a witness during the penalty phase who would recount defendant's version giving the details of how he raped and murdered Joann Tiesler. To do so would cause the trial team to lose all credibility with the jury precisely at the time when the team's credibility with the jury would have been most important to their efforts to avoid having defendant sentenced to death. The team also knew that they would not be able to present an insanity defense to the carjacking charge during the penalty phase. Therefore, the trial team understood that it could not simultaneously pursue the botched burglary defense and a mental health mitigation case that would be presented by an expert who had personally interviewed defendant about the details of the offense.

Thus, the trial team made a strategic decision that it would not call Dr. Hilton or any other mental health expert who had personally done an evaluation of defendant, because the jury undoubtedly would hear the version of the rape and murder that defendant recounted to Dr. Hilton. And the trial team made a strategic decision that it would

36

not allow a government expert to evaluate defendant for the same reason.

Once the trial team received and evaluated Dr. Hilton's report, the team decided to pursue a middle approach. Specifically, the team decided to call Dr. Lisak as a teaching expert on the effect of childhood sexual abuse on the behavior of adult men, but they would not have Dr. Lisak interview defendant about his mental state. By doing so, the team recognized that Dr. Lisak would not hear defendant's version of the crime. By employing this strategy, the team believed it could credibly pursue the botched burglary defense during the guilt phase, then present testimony during the penalty phase that defendant reported that as a child he was sexually abused by a babysitter and follow that testimony by having Dr. Lisak explain in general terms the effect of childhood sexual abuse on adult behavior. Thus, the team believed that it could pursue both stratagems available to it.

The trial team believed that by employing this strategy it could also accomplish the objective of avoiding a government expert evaluation. As was true with Dr. Lisak, the team wanted to avoid disclosing to the jury defendant's version of the crime. Again, the pursuit of this strategy allowed the trial team to accomplish both stratagems, pursuing the botched burglary defense during the guilt phase and

37

calling Dr. Lisak during the penalty phase without risk that he or a government expert would disclose defendant's version of the details of the crime.

Defendant now contends that the trial team performed deficiently by failing to speak with Dr. Hilton about his conclusions. The team's failure to do so, however, was not deficient performance because Dr. Hilton's report set out in substantial detail the fact that defendant was mentally ill and that defendant's mental illness contributed to defendant's rape, torture and murder of Joann Tiesler. The trial team readily understood from reading Dr. Hilton's report that in Dr. Hilton's opinion defendant was mentally ill; defendant had an antisocial personality; and defendant's mental illness contributed to his commission of the rape and murder. Accordingly, the trial team already knew what Dr. Hilton would say about defendant's mental illness and the relationship of his mental illness to the crime. There was nothing to be gained by talking to Dr. Hilton directly.

Having heard Dr. Hilton testify at the evidentiary hearing, and having reviewed Dr. Hilton's report, the district court concluded that counsel's failure to contact Dr. Hilton was not deficient performance, because they were aware of what was in Dr. Hilton's report and Dr. Hilton's report "was so detailed that a reasonable attorney did not need to speak with him to understand his diagnosis." (Doc. 551-134).

The record fully supports that district court's conclusion, therefore, the court's findings were not error.

Defendant also contends that the trial team performed deficiently by failing to have Dr. Lisak personally examine defendant and for pursuing a strategy designed to avoid having a government psychiatrist examine defendant. Defendant contends that the trial team's performance was deficient because the trial team never determined what Dr. Lisak or a government expert would conclude about defendant's mental state, in other words, the trial team made strategic decisions about how to proceed without knowledge of what it was avoiding.

However, the trial team already knew what a mental health professional would say if the professional evaluated defendant, precisely because the team already had Dr. Hilton's report. The whole point for having Dr. Hilton evaluate defendant in the first place was to test what a psychiatrist would conclude about defendant's mental state. The trial team had no reason to believe, nor does habeas counsel proffer a reason for the trial team to have believed, that Dr. Lisak or a government expert would reach a significantly different conclusion or hear a different version of the commission of the offense from defendant than Dr. Hilton did.

39

Moreover, the trial team did not need to speak directly with Dr. Hilton or have Dr. Lisak or a government expert evaluate defendant to understand the implications that a personal evaluation of defendant's mental state by a mental health expert would have on the team's strategic decisions about how to proceed with defending defendant in both stages of the upcoming trial. Upon reading Dr. Hilton's report, the trial team immediately recognized that the description of the offense given to Dr. Hilton by the defendant was incompatible with the botched burglary defense the trial team intended to pursue.

Thus, the decision to employ Dr. Lisak as a teaching expert allowed the trial team to pursue the botched burglary defense during the guilt phase and to present during the sentencing phase the most sympathetic mental health mitigation evidence available to it--i.e., that defendant was sexually abused as a child and this abuse influenced his behavior as an adult. This decision was imminently reasonable.

The district court found this strategy to be reasonable. (Doc. 551-137-39). The court recognized that by not allowing defendant to be evaluated by another defense expert and/or by a government expert, and concomitantly not presenting this evidence to the jury, the trial team could avoid the problems that defendant's version of the facts was inconsistent with the botched burglary defense; that defendant's

40

version of the facts supported the statutory aggravating factors that the murder was committed with substantial planning and premeditation and that the murder was committed in a heinous, cruel, and depraved manner; and that defendant was diagnosed as having an antisocial personality. (*Id.*). The district court's conclusions are fully supported by the record and should be affirmed by this Court.

### 3. The mid-trial decision not to call Dr. Lisak was also reasonable.

Defendant next contends that the trial team unreasonably failed to call Dr. Lisak during the sentencing phase. After hearing both Dr. Lisak and Dr. Medlin testify at the Section 2255 evidentiary hearing, and after reviewing Dr. Medlin's report, the district court found this mid-trial decision to be a strategic decision that was reasonable. (Doc. 551-140). The district court was undoubtedly correct.

At the beginning of the trial, neither Dr. Lisak nor Dr. Medlin had personally examined defendant. However, the trial team had provided the government with notice that Dr. Lisak would testify to the effects of childhood trauma on adult behavior. Defendant's notice did not include an opinion by Dr. Lisak about whether defendant had actually been the victim of childhood sexual abuse because the trial team believed that if Dr. Lisak provided such an opinion the door would be opened for a government evaluation.

At the Court's direction, Dr. Medlin had prepared a report and submitted it under seal to the court. After the jury began deliberating the guilt phase verdict, the trial team received a copy of the Dr. Medlin's report. After reviewing Dr. Medlin's report, the trial team decided not to call Dr. Lisak, because the team recognized that Dr. Medlin was prepared to testify to all the inconsistencies in defendant's self-report of childhood sexual abuse. The trial team concluded that if defendant called Dr. Lisak, then the government would call Dr. Medlin, and the penalty phase would devolve into a battle of experts over the issue of childhood sexual abuse. The team concluded that it would be more effective to call witnesses to whom defendant had stated that he was sexually abused, then argue the childhood sexual abuse as a mitigating factor.

The trial team's strategic decision to rely on fact testimony about defendant's report of childhood sexual abuse was reasonable. First, as explained above, this Court must evaluate the reasonableness of counsel's performance from counsel's perspective at the time of the alleged error in light of all the circumstances. *Kimmelman v. Morrison,* 477 U.S. 365, 381, 106 S. Ct. 2574, 2587 (1986). Because Dr. Lisak was going to testify as a teaching expert on the effect of childhood sexual abuse, and because Dr. Lisak had not evaluated defendant, Dr. Lisak was not prepared to render an opinion on whether the sexual

42

abuse actually occurred. (Doc. 537-563-71). On the other hand, the trial team discovered after reading Dr. Medlin's report that Dr. Medlin had conducted an extensive and thorough review of defendant's medical and psychological records, and that she was prepared to testify to a number of matters that would be damaging to defendant's mitigation case. The trial team was aware that Dr. Medlin was prepared to call into question the veracity of defendant's self-report of childhood sexual abuse based upon defendant's inconsistent self-report about the sexual abuse, she was prepared to cite studies that concluded that sexual offenders often falsely report a history of sexual abuse as a child, and she was prepared to cite studies that showed that the experience of childhood sexual abuse was likely not a cause of adult sexual offending. Dr. Medlin was also prepared to present records which revealed a history of defendant's efforts to manipulate prison staff with respect to his alleged mental health issues in order to achieve gain for himself. Therefore, the trial team made a strategic decision not to cast doubt on their client's credibility regarding his claim of childhood sexual abuse. In addition, the trial team avoided Dr. Medlin's testimony that suggested that defendant had been deceptive with respect to mental health issues in an effort to manipulate prison staff for his own gain. The trial team concluded that it would be more effective to rely on the factual testimony of the

43

witnesses to whom defendant had reported the childhood sexual abuse, then argue the fact that he had been sexually abused as a child as a mitigating factor.

The district court found the trial team's decision was a reasonable strategic decision. (Doc. 551-140-41). The court noted that it heard the testimony of both Dr. Lisak and Dr. Medlin at the evidentiary hearing and the court concluded that the trial team's concern that Dr. Medlin might have convinced a lay jury that defendant was not sexually abused was a real concern. (*Id.*). Therefore, the court concluded that the trial team was not ineffective for deciding not to call Dr. Lisak and putting up fact witness testimony regarding defendant's report of childhood sexual abuse.

Based upon the record, the district court did not err in reaching this conclusion.

### 4. Defense counsel's closing argument more than satisfies constitutional scrutiny.

Lastly, defendant contends that he was denied the effective assistance of counsel because trial counsel in closing argument did not adequately address the correlation between defendant's childhood sexual abuse and the rape and murder of Joann Tiesler.

Deficient performance in closing argument "is demonstrated by an attorney's failure to use the closing argument to focus the jury's

44

attention on his client's character or any mitigating factors of the offender's circumstances, and by his failure to ask the jury to spare his client's life." *Lawhorn v. Allen*, 519 F.3d 1272 (11th Cir. 2008). Closing arguments during the penalty phase have been found to be deficient where the argument failed to focus the sentencing jury's attention on "the character and record of the individualized offender and the circumstances of the particular offense...." *Penry v. Lynaugh*, 492 U.S. 302, 316, 109 S. Ct. 2934, 2945 (1989), *citing Woodson v. North Carolina*, 428 U.S. 280, 304, 96 S. Ct. 2978, 2991 (1976).

The trial team divided the closing argument during the penalty phase. Mr. Mendelsohn told the jury that the decision to impose the death penalty was uniquely in each juror's hands because the decision to sentence defendant to death must be unanimous, and that if only one juror believed that a life sentence was appropriate, then the sentence would be life imprisonment. (Doc. 237-2687). He also told the jury that their decision was final because the judge could not overturn it. (*Id.*). Mr. Mendelsohn then attacked the aggravating circumstances. (Doc. 237-2688-96). He concluded his argument by telling the jury that defendant would spend the rest of his life in prison and that defendant would think about the victim impact testimony of the victim's family and friends every day for the rest of

45

his life. (Doc. 237-2296-98). Finally, Mr. Mendelsohn asked the jury to grant mercy. (Doc. 237-2298).

Ms. Kearns then addressed the jury about the mitigating factors. She first defined the mitigating factors and explained that the jurors must look at defendant as a human being. (Doc. 237-2702-04). Ms. Kearns argued that the evidence of defendant's conduct immediately after the murder established that defendant was immediately remorseful for killing Joann Tiesler, and that life imprisonment for a defendant who feels remorse for his crime would be just punishment. (Doc. 237-2705-08). Ms. Kearns also argued that defendant's writings and contacts with psychologists while he was in prison before the murder demonstrated that he felt remorse for his other actions that hurt people. (Doc. 237-2708-11). Ms. Kearns argued that life imprisonment was an appropriate punishment because a death sentence would make victims of defendant's family who still supported him. (Doc. 237-2711-14). Finally, Ms. Kearns argued that defendant's childhood and family history and the lack of evidence of violence while he was incarcerated demonstrated that defendant has basic moral fiber because he was a good kid and did well in school, and that defendant was the victim of childhood sexual abuse. (Doc. 237-2715-16).

46

As to the childhood sexual abuse, Mr. Kearns specifically argued that defendant talked about the childhood sexual abuse when he was in therapy in prison in order to "learn how to deal with his anger and get beyond his anger so that his life will be better emotionally." (Doc. 237-2716). Ms. Kearns argued further that the incident with the babysitter was a significant event in defendant's life because as he said in his writings, "it robbed him of his self-esteem. That's the impact it had on him." (*Id.*).

Ms. Kearns concluded her argument by suggesting that based on the way Joann Tiesler lived her life, she would consider defendant worthy of mercy. (Doc. 237-2717).

Defendant contends that trial counsel should have given a closing argument that better focused the jury's attention on the relationship between defendant's childhood sexual abuse and the crime. However, as noted previously, in reviewing the performance of trial counsel in a death penalty case, the task of the court is not to look in hindsight at what counsel could have done, but to evaluate what counsel did do. It is from this perspective that the court determines whether the closing argument was within the sphere of what a reasonably competent trial attorney would do.

Trial counsel told the jury that defendant was a victim of childhood sexual abuse, that it caused him to be angry and robbed

47

him of his self-esteem and that he sought counseling for being a victim. Counsel did meet her constitutionally mandated duty to draw the jury's attention to this individualized factor in defendant's background that would mitigate the imposition of the death penalty.

Trial counsel also told the jury that the decision to execute defendant was an individual one that would not be overturned by the judge, asked the jury to show mercy on defendant, argued that defendant was remorseful for his crime, argued that life imprisonment for a remorseful defendant was sufficient punishment, discussed defendant's lack of violence in prison, discussed other mitigating factors such as defendant's upbringing, his parent's divorce and the impact that those issues had on his behavior, and concluded by arguing to the jury that the victim would have mercy for defendant.

The district court found that under *Lawhorn* counsel is required to point out to the jury the mitigating factors and defense counsel clearly brought to the jury's attention the fact that defendant had been sexually abused and discussed the effect the abuse had had on him as an adult. (Doc. 551-141). In finding that counsel's argument passed constitutional muster, the court noted that half the jury found that the fact that defendant was sexually abused as a child was a mitigating factor. (Doc. 551-142).

48

The closing argument that defense counsel gave was well within the sphere of what a reasonably competent attorney would give. The district court did not err in failing to grant defendant relief because of the alleged deficient closing argument.

Simply, put, defendant has failed to carry his burden of proof on the performance prong as to whether the trial team rendered ineffective assistance of counsel in the investigation, presentation, and argument regarding possible mental health evidence.

## B. Defendant also has failed to carry his burden of proving prejudice.

Nor can defendant satisfy the prejudice prong, specifically, defendant cannot show a reasonable probability that the outcome of the sentencing hearing would have been different had the trial team personally interviewed Dr. Hilton, had Dr. Lisak and a government expert evaluate defendant, and/or made a closing argument that connected the dots between defendant's alleged childhood sexual abuse and his violence as an adult.

The district court concluded that defendant was not prejudiced by the alleged deficient performance of his trial team. (Doc. 551-173). Having heard the testimony regarding the brutal nature of this crime, the district court concluded that this is a case that even the best lawyering cannot convince the sentencer to overlook the facts and

impose a life sentence. (Doc. 551-176). The district court correctly noted the testimony of a mental health expert was "the ultimate double edged sword." (Doc. 551-174-75). The court noted that had Dr. Hilton or Dr. Lisak testified after evaluating defendant, they would have presented definitive proof of the aggravating factors that the murder was committed after substantial planning and premeditation, that the murder was unusually cruel and heinous, that defendant presented a future danger to society, if he escaped, and to other prisoners. (*Id.*). The court also noted that the botched burglary defense could not have been employed during the guilt phase. (Doc. 551-175). The court noted that the antisocial personality diagnosis was not favorable to defendant. (*Id.*). Finally, the jury did hear evidence that defendant was sexually assaulted as a child and that he had worked with mental health professionals regarding his mental health issues. (Doc. 551-177).

The district court was correct in its assessment. This Court recognizes that there are "some [death penalty] cases [that] almost certainly cannot be won by defendants" because "sometimes the best lawyering, not just reasonable lawyering, cannot convince the sentencer to overlook the facts of a brutal murder-or, even a less brutal murder[-] for which there is strong evidence of guilt in fact." *Lawhorn*

50

*v. Allen*, 519 F.3d at 1296, *quoting Clisby v. State of Alabama*, 26 F.3d 1054, 1057 (11th Cir. 1994).

The instant case is just such a case. Defendant attacked Joanne Tiesler in her home. Defendant struck her in the back of the head with a shotgun. Defendant bound her and brutally raped and sodomized her. Defendant strangled her to the point that she nearly passed out. Defendant cut Joann Tiesler's throat with such savagery that he nearly decapitated her. Finally, defendant stabbed her in the back multiple times. The last minutes of Joann Tiesler's life were filled with terror, pain, horror, and apprehension all at the hands of defendant.

Defendant committed this gruesome rape/murder only months after being released from serving 10 years in prison for offenses that included a sexual offense.

The trial team could not change or overcome these facts. Nor can habeas counsel. This is simply one of those cases in which the facts of the crime are so aggravating that no amount of mitigating evidence or even the most effective lawyering can overcome them. Because of the facts of the crime, habeas counsel simply cannot demonstrate that the outcome of the sentencing phase of the trial would have been different. Therefore, defendant cannot satisfy the *Strickland* prejudice prong.

In considering the prejudice prong in a habeas proceeding in a death penalty case where habeas counsel alleges that trial counsel was ineffective for failing to present additional mitigating evidence, this Court must weigh the mitigation evidence presented at trial along with the mitigation evidence brought to light by habeas counsel against the evidence in aggravation. *Reed v. Secretary, Florida Department of Corrections*, 593 F.3d at 1247. "This includes aggravating evidence to which the proposed mitigating evidence would have opened the door." *Id.* (*citing Wong v. Belmontes*, 558 U.S. ___, 130 S. Ct. 383, 388-89 (2009)).

In addition to the horrific nature of the offense, habeas counsel must also overcome the fact that along with the alleged mitigating evidence that defendant contends was not presented would have come significant aggravating evidence, most significantly the diagnosis of defendant's antisocial personality disorder and the conclusion that defendant represents a future danger to those with whom he comes in contact.

Notably, defendant does not allege that the failure to call Dr. Hilton as a witness during the sentencing phase was deficient performance. However, had Dr. Hilton testified or had Dr. Lisak or a government expert done an evaluation of defendant's mental state and testified, any one of them would have testified that defendant had

52

been diagnosed with an antisocial personality, and therefore, that defendant would tend to be irritable and aggressive; that he would repeatedly get into physical fights or commit acts of physical assault; that he would demonstrate a lack of respect for others and their rights; and that defendant would engage in cruel and sadistic behavior.

Dr. Hilton, Dr. Lisak, and/or a government expert would agree, again as Dr. Hilton did, that the MCMI report of psychological testing done in 1999 was accurate. That report concluded that defendant was abrasive and intimidating; that he was likely to be defiant and untrustworthy; that he would play staff members against one another; that he would be a general troublemaker; that defendant possessed a potential for violence; that defendant possessed a deficient conscience; that defendant may evidence a recklessly violent disposition; and that defendant exhibited malicious and hostile tendencies that may lead him to humiliate and sexually dominate other prisoners. This testimony would have been damaging to trial team's contention that the Bureau of Prisons could safely house defendant without creating an undue risk to staff and other inmates if the jury imposed a life sentence rather than the death penalty. Finally, Dr. Lisak or another mental health expert would have to concede that

most men who are abused as children do not commit an act of violence as adults.

This Court has held in a number of cases that testimony regarding a diagnosis that the defendant has an antisocial personality "is not mitigating, but damaging." *See Reed*, 593 F.3d at 1246, *quoting Cummings v. Sec'y Dep't of Corr.*, 588 F.3d 1331, 1368 (11th Cir. 2009)(collecting cases). Moreover, this Court has also repeatedly held that a defendant could not satisfy the prejudice prong where proposed mitigation evidence would have led to the introduction of damaging evidence in aggravation of sentence. *See Reed* 593 F.3d at 1245, *citing Windom v. Sec'y Dep't of Corr.*, 578 F.3d 1227, 1251 (11th Cir. 2009); *Gaskin v. Sec'y Dep't of Corr.*, 494 F.3d 997, 1004 (11th Cir. 2007); *Robinson v. Moore*, 300 F.3d 1320, 1350-51 (11th Cir. 2002).

Had Dr. Hilton, Dr. Lisak and/or a government expert witness testified, it would likely have come to light that defendant had thoughts about killing other prisoners with whom he was incarcerated, as he told Dr. Hilton, and it is likely that it would have been brought to light that the mental health expert considered defendant to represent a danger to commit assaults and murders in the future against persons in the community, if he was in the community, and against other inmates and staff within the prison system.

Had Dr. Hilton, Dr. Lisak and/or a government expert witness testified, defendant's version of his commission of the rape and murder of Joann Tiesler would been presented to the jury, and the mental health expert would have conceded, as Dr. Hilton did, that defendant's version of the commission of the crime would support the statutory aggravating factors that the murder was committed after substantial planning and premeditation and that the murder was committed in an unusually cruel and heinous manner.

As in *Reed* and *Lawhorn*, the aggravating nature of the crime itself places an insurmountable burden on habeas counsel to demonstrate that there was additional mitigating evidence of such compelling nature available to trial counsel, but not presented to the jury, that there is a reasonable probability that the outcome of the sentencing proceeding would have been different had the mitigating evidence been presented. Coupled with the aggravating nature of the crime itself, this Court must also consider that defendant had already been convicted of sexual assault, that defendant committed the offense only four months after serving ten years in prison, that mental health experts concluded that defendant represented a future danger to assault and murder others, that defendant was manipulative, that defendant was disrespectful of the rights of others, and that mental health experts would concede that the crime was unusually cruel and

55

heinous and that it was committed with premeditation and planning. Weighed against that was the evidence that Dr. Lisak concluded that defendant was telling the truth about his childhood sexual abuse, and that in a mental health expert's opinion defendant was mentally ill, but at the same time still understood right from wrong at the time of the commission of the offense, and that defendant's mental illness contributed to the brutal rape and murder of Joann Tiesler.

Finally, the jury did hear evidence from Jan Vogelsong, who conducted the biopsychosocial assessment of defendant, Dr. Marti Carlson and Dr. Gary Ganahl who saw defendant while he was in prison, and Anita Novey who had defendant in group therapy sessions. They testified about defendant's suicide attempts and the mental health problems he was experiencing, and they testified that defendant reported that he was sexually abused as a child. Therefore, the jury did hear evidence of defendant's sexual abuse and mental health issues, yet the jury still returned a death sentence.

In the end, this Court must conclude, as did the district court, that the aggravating factors outweigh the mitigating factors to such a degree that there is no reasonable probability that even if the additional aggravating and mitigating evidence was presented to the jury, the outcome would have been different.

Because defendant has failed to carry his burden on either the performance prong or the prejudice prong this Court should affirm the district court's finding that trial counsel was not ineffective for failing to present additional mitigating evidence regarding defendant's mental health.

**2.  The district court did not err in finding that counsel was not constitutionally ineffective in failing to object to the jury instruction on future dangerousness to the public.**

Defendant contends that his trial team was ineffective for failing to object to the court's instruction that the jury could consider the non-statutory aggravating factor of future dangerousness to the public if the jury found beyond a reasonable doubt that defendant posed an escape "risk," as opposed to a finding that there was a "likelihood" that defendant would escape. Defendant contends that the use of the word "risk" allowed the jury to find only a fanciful risk of escape to warrant the finding that the aggravating factor applied.

Defendant contends that although this error was decided adversely to him on direct appeal, this Court only considered the issue under the plain error standard because the trial team failed to object to the charge. *See U.S. v. LeCroy*, 441 F.3d at 930-931. Finally, defendant argues that he was prejudiced by the trial counsel's failure to object to the instruction because the error in the instruction was exacerbated by an allegedly improper closing argument by government counsel that

57

the government could not safely house defendant except on death row.

The district court denied defendant relief on this issue. (Doc. 551-161). The court noted that in rejecting defendant's argument on direct appeal, this Court found that because the court's instruction required the jury to find beyond a reasonable doubt that defendant posed a risk of escape, there was no concern that the jury could find the aggravator based on a fanciful risk of escape. (Doc. 551-158). The district court agreed with this Court's conclusion and decided that had the alleged error been reviewed by this Court on direct appeal under the abuse of discretion standard, this Court still would have affirmed defendant's death sentence. *(Id.).*

The district court did not err in denying defendant relief on this issue. Because the court's instruction on future dangerousness was both legally correct and supported by ample evidence, defendant cannot demonstrate that the trial team's performance was deficient for failing to object to the instruction.

The government concedes that trial counsel did not raise the objection to the future dangerous charge that is now raised on collateral attack. (Doc. 436-2638-56; Doc. 437-2760).

District courts have "broad discretion in formulating a jury charge so long as the charge as a whole accurately reflects the law and the

58

facts." *United States v. Turner*, 871 F.2d 1574, 1578 (11th Cir. 1989). Accordingly, a conviction, or sentence in a death penalty case, will not normally be reversed on the basis of a jury charge unless "the issues of law were presented inaccurately, or the charge improperly guided the jury in a substantial way as to violate due process." *U.S. v. Prather*, 205 F.3d 1265, 1270 (11th Cir. 2000) (*quoting U.S. v. Arias*, 984 F.2d 1139, 1143 (11th Cir. 1993)).

Defendant claims that the charge was flawed because it did not require the jury to determine that there was a <u>likelihood</u> that defendant would escape before allowing the jury to decide whether defendant would be a danger if he was out in the public. While it is true that the court did not require the jury to determine the exact probability that defendant would escape, such a finding was not necessary. *See Jurek v. Texas*, 428 U.S. 262, 269, 96 S. Ct. 2950, 2955 (1976) (upholding Texas statute which merely required the state to prove a probability of future dangerousness, not a specific probability). Moreover, the court instructed jurors <u>twice</u> that before considering the danger posed to the public by defendant, first they had to find beyond a reasonable doubt that defendant posed an escape risk. (Doc. 437-2738, 2739). As this Court found on direct appeal, this eliminated any concern that the jury's consideration of defendant's threat to society would be based on sheer speculation.

59

The district court also rejected defendant's contention that he was prejudiced by the error because of the closing argument of government counsel. (Doc. 551-161). The Court noted that defendant cited no authority for his argument. (*Id.*). And notably, defendant cites no authority on appeal. The district court also found that it was proper for the government to argue that defendant could not safely be housed, otherwise the prosecution could never argue that a capital defendant posed a danger to the public because he was an escape risk. (*Id.*).

The district court was correct. Other than making a bare bones allegation that the argument was improper, defendant does not support his allegation with citation of authority or argument. In order for the prosecution to establish that a defendant poses a danger to the community because he might escape, the prosecutor must be allowed to say that the prison authorities cannot safely house him. That argument was supported by the evidence that defendant posed an escape risk, therefore, it was not improper to make.

For the foregoing reasons, defendant has not satisfied either prong of the *Strickland* test on this issue and the district court properly denied defendant relief.

**3.  The district court did not err in finding that the trial team was not constitutionally ineffective for failing to request an instruction that the jury must find beyond a reasonable doubt that the aggravating factors outweigh the mitigating factors.**

Defendant argues that his trial counsel was ineffective for failing to request an instruction that the jury must find beyond a reasonable doubt that the aggravating factors outweigh the mitigating factors. Defendant contends that the weighing process during the penalty phase is a fact finding process and pursuant to *Apprendi v. New Jersey*, 530 U.S. 466, 120 S. Ct. 2348 (2000), *Arizona v. Ring*, 536 U.S. 584, 122 S. Ct. 2428 (2002), and their progeny, this fact must be proven beyond a reasonable doubt.

The district court denied defendant relief on this issue. (Doc. 551-1661-66). The court noted that prior to the trial in 2004, no court had ruled that the jury must be instructed that it must find beyond a reasonable doubt that the aggravating factors outweigh the mitigating factors. The court also noted that only two courts had addressed the issue *in dicta*, and neither of those opinions had decided that the balancing process was a finding of fact. (Doc. 551-662-64). Accordingly, the court found that a reasonable attorney would not have read *Apprendi* and *Ring* to require such an instruction. (*Id.*). The court also concluded that based upon this Court's decision in *U.S. v. Brown*, 441 F.3d 1330, 1368 (11th Cir. 2006), this Court would not

61

find that the Federal Death Penalty Act's (FDPA) balancing process was subject to *Apprendi* and *Ring*. (Doc. 551-164).

The district court was correct. In *Apprendi*, the Court held that "[i]f a State makes an increase in a defendant's authorized punishment contingent on the finding of a fact, that fact-no matter how the State labels it-must be found by a jury beyond a reasonable doubt." *Ring*, 536 U.S. at 602, 122 S. Ct. 2439 (*citing Apprendi*, 530 U.S. at 482-83). The FDPA satisfies this requirement by requiring the sentencing jury to find beyond a reasonable doubt that one or more statutory aggravating factors have been proven in order to make defendant death eligible. 18 U.S.C. § 3593(e). Under the FDPA, once the jury has fulfilled its responsibility and found the defendant death eligible, the maximum penalty can go no higher.

Defendant's reliance on *Apprendi* and *Ring* is misplaced because the weighing process does not operate as the functional equivalent of an element of a greater offense and increase the punishment to which a capital defendant can be subjected. Rather the weighing process serves the purpose of aiding the jury in selecting the appropriate sentence, after it has already determined that the maximum sentence is death. *U.S. v. Higgs*, 353 F.3d 281, 298-99 (4th Cir. 2003). Contrary to defendant's argument, the weighing process does not operate to increase the potential punishment.

Other courts have rejected defendant's *Ring/Apprendi* argument on the basis that the weighing process is not a finding of fact, but rather a complex moral judgment made by the jury as to the appropriate sentence in a death eligible case. *See U.S. v. Runyon*, 707 F.3d 475, 516 (4th Cir. 2013); *U.S. v. Fields*, 516 F.3d 923, 950 (10th Cir. 2008); *U.S. v. Mitchell*, 502 F.3d 931, 993–94 (9th Cir. 2007); *U.S. v. Sampson*, 486 F.3d 13, 31–32 (1st Cir. 2007); *U.S. v. Fields*, 483 F.3d 313, 345–46 (5th Cir. 2007).

This Court has also rejected defendant's argument in a pre-*Ring*, pre-FDPA decision construing the Florida death penalty statute. In *Ford v. Strickland*, 696 F.2d 804, 818 (11th Cir. 1983), the defendant argued that due process requires that the jury find beyond a reasonable doubt that the aggravating factors outweigh the mitigating factors. This Court rejected that argument and held that "[w]hile the existence of an aggravating or mitigating circumstance is a fact susceptible to proof under a reasonable doubt or preponderance standard, [citations omitted], the relative weight is not. The process of weighing circumstances is a matter for judge and jury, and, unlike facts, is not susceptible to proof by either party." (*Id.*). This Court noted, "petitioner confuses proof of facts with the weighing process undertaken by the sentencing jury and judge. Because the latter process is not a fact susceptible of proof under any standard, we reject

63

this contention." 696 F.2d at 818-19. Nothing in *Ring* and its progeny or the FDPA requires a different finding.

In the face of this substantial circuit authority against him, defendant relies on a single panel opinion from the Sixth Circuit, which was vacated upon the circuit's decision to rehear the case *en banc. See U.S. v. Gabrion,* 648 F.3d 307, 325–28 (6th Cir. 2011), *reh'g en banc granted, opinion vacated,* 648 F.3d 307 (6th Cir. 2011). In its opinion, the panel noted that its decision that *Ring* applies to the sentencing process went against the weight of authority from its sister circuits. 648 F.3d at 326-27. Defendant provides no persuasive reason why this Court should follow the rationale of a since-vacated panel opinion and reject the unanimous decisions of the five other circuits that have addressed this issue.

This Court should find that defendant is not entitled to relief on this issue, because defendant fails to demonstrate that the trial team provided deficient performance for failing to request a jury instruction that was not the law at the time of the trial. Nor can defendant show that he was prejudiced by his attorneys' failure to request the instruction when the instruction was not a correct statement of the law.

64

## CONCLUSION

The United States respectfully requests that this Court affirm the district court's order denying defendant's motion to vacate his death sentence.

Respectfully submitted,

SALLY QUILLIAN YATES
*U.S. Attorney*

WILLIAM L. MCKINNON, JR.
*Assistant U.S. Attorney*

65

## CERTIFICATE OF COMPLIANCE AND SERVICE

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in 14-point Goudy Old Style, a proportionally spaced typeface, using Microsoft Word 2010 word processing software.

This brief complies with the 14,000 word type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because, according to the word processing software, it contains 13,554 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

Today, this brief was uploaded to the Court's website and a copy was sent by first class mail, postage prepaid, to:

> JOHN R MARTIN, ESQ.
> Martin Brothers, P.C.
> 202 The Grant Building
> 44 Broad Street
> Atlanta, GA 30303

May 6, 2013

_____
WILLIAM L. MCKINNON, JR.
*Assistant U.S. Attorney*

66